**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| QUANERGY SYSTEMS, INC.,[1] | Case No. 22-11305 |
| Debtor. | |

**DECLARATION OF LAWRENCE PERKINS IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Lawrence Perkins, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") and President of the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").  On December 11, 2022, by resolution of the Board of Directors of Quanergy Systems, Inc., I was appointed Chief Restructuring Officer and President of the Debtor.[2]  I have been authorized by the Board to submit this declaration in support of the First Day Motions (as defined herein).

2.      I am also the founder and Chief Executive Officer of SierraConstellation Partners LLC ("SCP").  SCP is an interim management, consulting and advisory firm that specializes in corporate restructurings, operations improvement, litigation analytics, valuations, and bankruptcy case management services, with headquarters in Los Angeles and offices in New York, Boston, Houston, Dallas, and Seattle.  SCP has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out-of-court and in chapter 11 proceedings throughout the United States.

---

[1]      The Debtor and the last four digits of its taxpayer identification number are: Quanergy Systems, Inc. (5845).  The Debtor's mailing address for purposes of the Chapter 11 Case is 433 Lakeside Drive, Sunnyvale, CA 94085.

[2]      A separate application for approval of my retention as CRO will be submitted to the Court in due course.

3.      I have over 20 years of management consulting and advisory experience with distressed companies or companies undergoing transition.  I have held senior roles in various industries including healthcare, technology, industrial manufacturing, retail, real estate, and financial services.

4.      In my capacity as CRO of the Debtor, and because of my discussions with the Debtor's employees, advisors, professionals, and Board of Directors, I have become generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records.

5.      On the date hereof (the "Petition Date"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor") filed a voluntary petition (the "Petition") with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), as well as a number of motions requesting various forms of "first day" relief (collectively, the "First Day Motions").

6.      I submit this Declaration in support of the Petition and First Day Motions.  The relief requested in each of the First Day Motions is necessary to maximize the value of the Debtor's estate and allow the Debtor to sustain its current operations in chapter 11.

7.      I am familiar with the contents of each First Day Motion (including the exhibits and other attachments to such pleadings) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Motion: (i) will enable the Debtor to sustain its current level of operations while in chapter 11; (ii) is critical to the Debtor's ability to maximize the value of its business; and (iii) best serves the interests of the Debtor's estate and creditors.

Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above.[3]

8.      I am familiar with the Debtor's day-to-day operations, assets, financial condition, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information supplied to me by members of management, the Debtor's professionals, or its employees; (iii) my review of relevant documents; and/or (iv) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities, and financials.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

9.      The Debtor designs, develops, and markets Light Detection and Ranging ("LiDAR") sensors and 3D perception software solutions that enable intelligent, real-time detection, tracking and classification of objects such as people and vehicles in mission-critical markets such as security, smart cities and industrial automation.  In early 2022, the Debtor became publicly traded on the New York Stock Exchange through a special purpose acquisition company transaction, whereby the Debtor secured a $125 million equity line of credit and closed the Business Combination (defined below) with approximately $30 million of cash on its balance sheet.  Although the Debtor anticipated sufficient liquidity in the near term following the Business Combination, a decline in investor interest in the LiDAR sector, as well as general macroeconomic trends during the same time period, caused a selloff of the Debtor's and other LiDAR industry stocks.  By June 1, 2022, the Debtor's market capitalization declined to approximately $48 million, reflected by a stock price of approximately $0.52 per share.  This decline limited the Debtor's

---

[3]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

access to its equity line of credit or other sources of equity or equity-linked financing offerings, while the Debtor's operating expenses totaled approximately $4 million per month.

10.    In June 2022, the Debtor determined that it was necessary to explore strategic alternatives to preserve its liquidity, maintain its operations, and maximize value for its stakeholders.    On June 29, 2022, the Debtor retained Raymond James & Associates, Inc. ("Raymond James") to explore and evaluate strategic alternatives, including a business combination transaction (i.e., a sale to a third party as a going concern) and a financing transaction (i.e., a capital raise of structured private debt).

11.    As described in more detail below, the Debtor's prepetition marketing process with respect to both a sale to a strategic partner or a comprehensive financing transaction was unsuccessful leading up to the Petition Date.    The Debtor, however, believes that a timely marketing and sale process in Chapter 11 that includes broader outreach to potential purchasers, including those interested in purchasing individual assets, in addition to a going concern sale, would be value-maximizing for all parties in interest, including unsecured creditors.    The Debtor's ability to maximize value depends, in large part, on its ability to proceed expeditiously through this Chapter 11 case efficiently and with minimal cash burn.    Accordingly, concurrently herewith, the Debtor is filing a motion to approve bidding procedures that would allow the Debtor to undertake a value-maximizing postpetition sale and marketing process that will build on the prepetition marketing process overseen by Raymond James.

12.    This Declaration is divided into three parts.    Part I sets forth a summary of the Debtor's business, corporate structure, and prepetition indebtedness.    Part II discusses the circumstances surrounding the commencement of this Chapter 11 case and the Debtor's

anticipated path forward.  Part III sets forth the relevant acts in support of the First Day motions filed concurrently herewith.

I.     **The Debtor's Business**

A.     **Background**

13.     The Debtor's business was founded in 2012.  As described above, the Debtor designs, develops, and markets LiDAR sensors and 3D perception software solutions that enable robust and intelligent detection, tracking and classification of objects such as people or vehicles. LiDAR is a time-of-flight sensing technology that pulses low-power, eye-safe lasers and measures the time it takes for the laser to complete a round trip between the sensor and a target.  The resulting aggregate data are used to generate a 3D point cloud image, which provides both spatial location and depth information to identify, classify, and track moving objects.

14.     The Debtor provides high performance LiDAR sensors and 3D perception software designed to improve safety, efficiency, and performance while reducing costs in a wide variety of markets and applications.  The Debtor's patented M Series of LiDAR sensors feature high resolution, 360-degree field of view that generate rich 3D point clouds in real-time at long range. These LiDAR sensors are a reliable solution for challenging real-world applications in mission-critical markets such as security, smart cities and industrial automation.

15.     LiDAR is different from radar and camera-based sensing systems because LiDAR provides a full real-time 3D image of the world around it in any lighting condition and captures no personally identifying information.  LiDAR creates an image of the object at the same time as it determines the object's distance, thus providing a 3D view of the object *and* the precise calculation of the direction in which it is moving—something neither cameras nor radar can provide.  In addition, neither radar nor cameras can see accurately in the dark or through weather conditions

such as rain or snow, which substantially limit their "sight" capabilities.  LiDAR can also provide surface measurements and a precise resolution of objects within a certain range.  Because of its inherent performance capabilities and advantages, LiDAR has become a vital sensing technology in a wide array of markets.

16.    The Debtor's applications and products are currently targeted towards four key market groups:

a.  **Security market:** In the Security market, the Debtor offers its M Series LiDAR sensors combined with its QORTEX 3D perception software for perimeter security and intrusion detection applications in critical infrastructure facilities.

b.  **Smart Cities / Spaces market:** In the Smart Cities / Spaces market, the Debtor's sensors and software are used in to improve the movement and safety of people and vehicles in dense urban settings, commercial offices, retail stores, airports and other high density environments.

c.  **Industrial market:** In the Industrial market, the Debtor's sensors enable the automation of industrial locations, such as shipping ports, and also allow mobile robots to operate more quickly, safely and efficiently in warehouse and other industrial environments.

d.  **Transportation market:** The Transportation market consists of passenger vehicles as well as heavy vehicles and off highway applications such as agricultural and mining equipment.  The Debtor has been investing in the development of a solid state LiDAR sensor, which has no moving parts and is based on mature silicon process technologies, designed to offer the durability, performance and low cost

desired by transportation customers.  The Debtor's solid state sensor is not yet commercially available.

17.     The Debtor generates revenue primarily by entering into supply arrangements with channel partners, including systems integrators, value added resellers and distributors, who in turn sell the Debtor's products to end customers, often times bundled with third-party products.  These supply agreements do not necessarily obligate the channel partner to purchase products from the Debtor.  Instead, revenues are generated as these channel partners submit purchase orders based on their engagements with end customers.

### B.    The Debtor's Employees

18.     The Debtor operates out of a headquarters located in Sunnyvale, California.  As of the Petition Date, the Debtor employs approximately eighty-seven (87) full-time (salaried and hourly) employees, none of whom are subject to a collective bargaining agreement.

19.     Prior to the Petition Date, the Debtor issued a notice under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 – 2109, and other similar state and local laws (the "WARN Acts").  However, the Debtor does not expect to terminate Employees prior to the termination of the notice period under the WARN Acts, given its anticipated need for the employees' assistance through the Chapter 11 Case and sale process.

### C.    Special Purpose Acquisition Company Transaction

20.     On June 21, 2021, CITIC Capital Acquisition Corp. ("CCAC"), CITIC Capital Merger Sub Inc., a wholly owned subsidiary of CCAC ("Merger Sub"), and Quanergy Systems, Inc., (when referred to in its pre-Business Combination (as defined below) capacity, "Legacy Quanergy") entered into an Agreement and Plan of Merger (as amended, the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, on the Closing Date (as defined

below) Merger Sub merged with and into Legacy Quanergy, with Legacy Quanergy continuing as the surviving corporation and a wholly-owned subsidiary of the Debtor (the "Business Combination"). On January 28, 2022, Legacy Quanergy changed its name to Quanergy Perception Technologies, Inc.

21.    On February 7, 2022, CCAC effectuated a change of its jurisdiction of incorporation by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation formed under the laws of the State of Delaware (the "Domestication"). Pursuant to the Domestication, each of CCAC's then issued and outstanding Class A Ordinary Shares and Class B Ordinary Shares automatically converted, on a one-for-one basis, into shares of common stock of CCAC. All of CCAC's outstanding warrants became warrants to acquire shares of the Debtor's common stock. In connection with the Domestication, CCAC changed its name from CITIC Capital Acquisition Corp. to Quanergy Systems, Inc.

22.    On February 8, 2022, the closing date of the Business Combination (the "Closing Date"), certain investors purchased from the Debtor an aggregate of 3,695,000 shares of common stock at a price of $10.00 per share, for an aggregate purchase price of approximately $36.5 million, in a private placement pursuant to separate subscription agreements consummated substantially concurrently with the closing of the Business Combination (the "PIPE Financing"). Upon the closing of the Business Combination and the PIPE Financing, the Debtor received net cash proceeds of $43.8 million, $35.0 million of which was used to pay down outstanding convertible notes with accrued interest, and closed on a $125 million equity line of credit facility with Global Emerging Markets Group ("GEM"), a Luxembourg-based private alternative investment group.

D.    **Organizational Structure**

23.    Quanergy Systems, Inc. is the direct parent of non-Debtor Quanergy Perceptions Technology Inc., which is the direct or indirect parent of multiple foreign subsidiaries, which are non-Debtors in this Chapter 11 Case.  The Debtor's foreign subsidiaries are as follows:

- Quanergy Systems FZ-LLC: Quanergy Systems FZ-LLC is incorporated in Dubai, United Arab Emirates and serves as a sales office for customers in the Middle East.

- Quanergy Systems Canada Inc.: Quanergy Systems Canada Inc. is incorporated in Canada and serves as a research and development center focused on software development.

- Quanergy Systems Hong Kong Limited: Quanergy Systems Hong Kong Limited is incorporated in Hong Kong and serves as a holding company for Quanergy (Shanghai) Electronic Science & Technology Ltd.

- Quanergy (Shanghai) Electronic Science & Technology Ltd.: Quanergy (Shanghai) Electronic Science & Technology Ltd. is incorporated in the Peoples Republic of China and serves as a sales office for customers in China.

- Quanergy Systems Japan GK: Quanergy Systems Japan GK is incorporated in Japan and serves as a sales office for customers in Japan.

- Quanergy Systems UK Limited: Quanergy Systems UK Limited is a limited liability company organized under the laws of the United Kingdom and serves as a sales office for customers based in the United Kingdom.

- Quanergy Systems, GmbH: Quanergy Systems, GmbH is organized under the laws of Germany and serves as a sales office for customers in Germany.

24.    A chart showing the Debtor's organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

E.    **Prepetition Capital Structure**

**i. Secured Indebtedness**

25.    As stated above, in connection with the Business Combination, approximately $35.0 million of secured outstanding convertible notes, which included accrued interest, was

repaid, and since the Business Combination, the Debtor has incurred no additional funded secured debt.  Therefore, as of the Petition Date, the Debtor has no funded secured debt.

### ii. Unsecured Indebtedness and Trade Debt

26.     In the ordinary course of business, the Debtor incurs unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers, and service providers, among others. In addition, the Debtor incurred obligations related to unsecured promissory notes to professionals in connection the Business Combination that remain unpaid.  As of the Petition Date, the Debtor's estimated outstanding unsecured indebtedness, including trade payables, is approximately $25 million.

### iii. Equity Holders

27.     The Debtor is a publicly-traded company with its common stock and warrants previously listed on the New York Stock Exchange.  Trading of the Debtor's common stock and warrants have suspended pending a delisting determination made by the staff of the New York Stock Exchange ("NYSE") Regulation, which the Debtor is in the process of appealing.  The Debtor's common stock and public warrants are currently traded on the over-the-counter, or OTC, market under the ticker symbols QNGY and QNGYW, respectively.  As of November 10, 2022, there were 16,164,406 shares of the Debtor's common stock outstanding.

28.     Historically, the Debtor financed its operations primarily through private placements of convertible preferred stock and issuance of convertible notes.  From the date of the Debtor's incorporation through September 30, 2022, the Debtor has raised, in the aggregate, net proceeds of approximately $298 million, including approximately $154 million from the issuance of convertible preferred stock, approximately $90 million from the issuance of convertible notes, approximately $44 million of net proceeds from the Business Combination, and approximately

$11.6 million from draw downs of a share subscription facility with Global Emerging Markets Group ("GEM"), a Luxembourg-based private alternative investment group.  In the year ended December 31, 2021 and nine months ended September 30, 2022, the Debtor incurred a net loss of $63.5 million and $148.0 million, respectively, and used $30.1 million and $45.0 million, respectively, in cash to fund operations.  The Debtor's accumulated deficit was $455.6 million as of September 30, 2022.

## II.   Circumstances Giving Rise to This Chapter 11 Case

### A.   The Debtor's Declining Liquidity and Inability to Access Financing

29.   Several factors contributed to the Debtor's need to commence the Chapter 11 Cases, including operational, financial, and macroeconomic challenges that have, over time, tightened the Debtor's liquidity, complicated the Debtor's operations, and limited the Debtor's access to capital.

30.   Following the Business Combination, despite operating performance in-line with expectations, the Debtor's capital structure proved insufficient to fund ongoing operational needs due to the challenging equity markets in the LiDAR sector, which impacted the Company's stock price and access to its equity line of credit from GEM.  For example, in the Debtor's peer group, which includes eight (8) other publicly traded LiDAR providers, share price is down 69% over the last 12 months.  As described in more detail below in Section II.B., as a result of the Debtor's stock price falling precipitously since the Business Combination, and delisting procedures commenced by the NYSE that followed, the Debtor's access to capital was significantly impaired, which directly contributed to the Debtor filing this Chapter 11 Case.

31.   Leading up to the Petition Date, the Debtor also faced certain operational challenges, including supply chain issues related to the COVID-19 pandemic.  While the supply chain challenges have started to improve in the recent past, certain component parts and alternative

parts have remained difficult or more costly for the Debtor to procure, which has impacted revenue and gross margins through 2022.

32.     The Debtor also operates in a challenging commercial environment.  The LiDAR market generally faces challenges as a new, early-stage technology that requires significant capital to scale.  Most companies in the LiDAR market, including the Debtor, have a high-cost structure and low revenue base as LiDAR technology continues to be developed and improved.  The Debtor, therefore, requires significant cash and ample financing for its operations.

33.     The Debtor also faced challenges prepetition resulting from litigation between the Debtor and Velodyne LiDAR USA Inc. ("Velodyne"), which was a significant factor contributing to the lack of interest from potential purchasers in the Debtor's prepetition marketing and sale process.  The litigation, which was costly to defend and a distraction for management, has recently been resolved, providing more certainty to the market with respect to certain of the Debtor's intellectual property.  The Debtor is hopeful that a postpetition marketing process will yield more interest as a result of this resolution.

34.     In order to address the liquidity constraints caused by the foregoing factors, and in an effort to better-position the Company for continued growth, the Debtor began seeking additional capital and financing in the first quarter of 2022.  By the third quarter of 2022, the Debtor's strategy focused around raising equity capital through a public equity offering to improve its cash position and better position the Debtor to obtain complementary debt financing that would be sufficient to provide runway into 2024 or beyond.  In parallel, the Debtor ran a marketing process for a strategic going concern or asset sale.  Despite the Debtor's efforts, however, the Company was unable to mitigate the challenges it faced leading up to the commencement of the Chapter 11 Case.

B.    **The Debtor's Prepetition Financing Process**

35.    In late July 2022, the Debtor began evaluating its ability to raise equity through a public offering to address its liquidity needs.  The Debtor retained Maxim Group LLC ("Maxim") to run this process, with a goal of raising funds sufficient to allow for the funding of on-going operations while the Debtor continued to look for long term solutions to address its liquidity constraints.  Concurrently, the Debtor began a debt financing process.

36.    Raymond James launched a multi-pronged outreach effort to 118 potential debt financing parties.  Of the 118 potential debt financing parties, 58 were venture debt and other parties that could be interested in taking a longer-term growth outlook on an investment opportunity with the Debtor.  The remaining 60 potential debt financing parties included distressed or opportunistic lenders that may be more generally focused on the recovery value of the collateral to support a financing transaction.  Conversations with lenders explored a variety of structuring alternatives, including whether they may be interested in supporting a strategic transaction, including through a debtor-in-possession financing facility.

37.    Of the 118 parties contacted, Raymond James held diligence calls with 26 parties to review the opportunity and answer questions.  Twenty-four parties entered into non-disclosure agreements with the Debtor.  To support this process, the Debtor organized a comprehensive 163-document data room, including a 25-page Confidential Information Memorandum ("CIM"), for parties under non-disclosure agreement.  None of the parties under NDA ultimately submitted an actionable debt-financing proposal.

38.    By mid-August 2022, however, the Debtor determined, in consultation with its advisors and based on initial feedback from potential lenders, that a debt financing transaction would be more likely after improving the Debtor's balance sheet through the completion of the

public equity financing.  On October 30, 2022, the Debtor entered into an underwriting agreement

with Maxim, pursuant to which Maxim agreed to issue and sell, in a registered public offering by

the Debtor (the "Public Offering"), 9,800,000 shares of the Debtor's common stock, par value

$0.0001 per share, and 19,600,000 warrants with a term of five years to purchase one share of

common stock at an exercise price of $1.70 per share.  On November 2, 2022, the Public Offering

closed, and the Debtor raised approximately $15.4 million in net proceeds.

39.     Based on feedback from certain potential lenders that continued to engage with the

Debtor, and representations from Maxim that Maxim believed it could raise a convertible note

following the Public Offering, and had in fact received inbound inquiries from investors regarding

the same, the Debtor believed that the capital raised from the Public Offering would help facilitate

a financing transaction and that the funds made available through such transaction, together with

the capital raised from the Public Offering, would provide the Debtor with sufficient liquidity

through 2023.  However, immediately following the closing of the Public Offering, the Debtor's

stock price dropped precipitously, from $3.30 per share immediately before the Public Offering,

to $0.71 per share by November 8, 2022, and down to $0.24 per share by November 9, 2022,

adversely affecting the Debtor's market capitalization.   On November 8, 2022, the NYSE

announced that NYSE Regulation had decided to commence proceedings to delist the Company's

securities from the NYSE because the Debtor had fallen below the NYSE's continued listing

standard requiring companies to maintain an average market capitalization of $15 million over a

consecutive 30 trading day period.  That same day, after the market close, the NYSE immediately

suspended trading in the Debtor's securities, as authorized under NYSE Rule 804.00.

C.      **The Debtor's Prepetition Restructuring Initiatives and Marketing Process**

40.     As mentioned, in June 2022, the Debtor began exploring strategic alternatives to preserve liquidity and maintain its operations.  Beginning in late August, the Debtor, with the assistance of Raymond James, began outreach to potential counterparties for a going-concern sale. Raymond James' outreach focused on parties that would be a strategic fit for the Debtor, including other LiDAR providers and also other prospects that could potentially leverage the Debtors sensors and software in other markets.  The Debtor's prepetition marketing process included outreach to 36 prospective buyers for a going-concern transaction, twenty-seven (27) of which Raymond James held preliminary diligence calls with to review the opportunity and answer questions.  [Eight (8)] parties entered into non-disclosure agreements with the Debtor.  No party submitted an actionable proposal.

41.     On November 7, 2022, Ouster, Inc. ("Ouster") and Velodyne announced plans to merge in an all-stock transaction.  The announcement of the proposed merger made it unlikely that either Ouster or Velodyne could become acquirers of the Debtor in the near-term, because the companies had chosen a merger partner with products and technologies that are competitive to those of the Debtor and the companies would be preoccupied working to complete the merger, so would be less likely to engage in acquisition discussions with the Debtor.

D.      **The Path Forward**

42.     The Debtor enters chapter 11 in order to pursue a value-maximizing sale process that builds upon the Debtor's prepetition marketing efforts.  The Debtor believes that certain measures taken prepetition have substantially increased the likelihood of a successful postpetition marketing process.  Prior to the Petition Date, the Debtor undertook certain cost-saving measures that have significantly reduced operating expenses.  This allows for a postpetition sale process

focused on the value of the Debtor's assets, without the burden of significant operating expenses resulting from employee headcount and other overhead costs.  Further, on November 23, 2022, the Debtor and Velodyne entered into a settlement agreement and patent cross license agreement that resolved all litigation between the parties.  The Debtor believes that the resolution of this litigation, which caused reluctance for certain prospective purchasers in pursuing a transaction prepetition, provides helpful clarity to potential purchasers of the Debtor's assets that are covered under the settlement agreement.

43.     Further, while the Debtor would still welcome and be positioned to close on going-concern bids for its business, it intends to market its assets more broadly postpetition, including by contacting potential purchasers that may be interested in only certain business segments or assets.  In addition, the Debtor believes marketing its assets with the benefits afforded to a buyer under section 363 of the Bankruptcy Code will provide the Debtor with certain advantages to effectuating a sale transaction or transactions in chapter 11, that were not available to the Debtor during the prepetition marketing process.  In addition, certain developments in the LiDAR market, including the pending Ouster/Velodyne merger and the pending asset sale transaction between Ibeo Automotive Systems GmbH and MicroVision, Inc., may signal the start of a wave of consolidation activity in the LiDAR sector.

44.     The Debtor enters Chapter 11 with approximately $9 million in cash on hand to fund this case and implement a postpetition sale process.  Without any debtor in possession financing, the Debtor's liquidity is constrained and will only permit funding a sale process on an expedited timeline that allows for a sale closing in early February.  The sale timeline contemplated gives consideration to this liquidity constraint, the marketing efforts made prepetition, and the Debtor's belief that conducting a sale and marketing process postpetition, which will allow the

Debtor to sell its assets free and clear of any liabilities, best positions the Debtor to maximize value

for its stakeholders.

### III.    Summary of First Day Motions

45.    To minimize the adverse effects of commencement of this Chapter 11 Case on the

Debtor's business and asset value, the Debtor has requested a variety of relief in the First Day

Motions filed contemporaneously herewith.    Specifically, the Debtor seeks approval of the

following First Day Motions:

- Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Stretto as Claims and Noticing Agent in the Chapter 11 Case; and (II) Granting Related Relief

- Debtor's Motion for Entry of an Order (I) Authorizing the Redaction of Certain Personal Identification Information in the Debtor's Creditor Matrix; (II) Modifying the Requirement to File a List of Its Equity Security Holders and Notice Thereto; and (III) Granting Related Relief

- Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests

- Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment, (III) Establishing Procedures for Resolving Requests for Additional Assurance, and (IV) Granting Related Relief

- Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System; (II) Authorizing Use of Prepetition Bank Accounts and Certain Payment Methods; (III) Waiving the Requirements of 11 U.S.C. Section 345(b) on an Interim Basis; and (IV) Granting Related Relief

- Debtor's Motion for Interim and Final Orders, Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing Procedures for Trading in, or Certain Claims of Worthlessness With Respect to, Equity Securities in Quanergy Systems, Inc.

- Debtor's Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Honor Certain Prepetition Obligations Arising Under Customer Program

- Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and Honor Certain (A) Prepetition Wages, Benefits, and Other Compensation Obligations; (B) Prepetition Employee Business Expenses; and (C)

Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief

46.     In addition to the First Day Motions, contemporaneously herewith the Debtor files (a) *Debtor's Motion for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtor's Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, (D) Scheduling a Hearing to Approve Assumption and Assignment of the Assumed Contracts, and (E) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtor's Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of all or Substantially all of the Debtor's Assets Free and Clear of all Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* (the "Bidding Procedures Motion") and (b) and a motion to shorten notice of the time for the Bidding Procedures Motion to be heard by the Court (the "Motion to Shorten").   For the reasons stated therein and in the declaration of Geoffrey Richards in support of the Bidding Procedures Motion filed contemporaneously therewith, the Debtor requests that this Court grant the Motion to Shorten at the first day hearing and schedule a hearing on the Bidding Procedures Motion as expeditiously as possible to allow for the Debtor to market and sell its assets in Chapter 11 under the time constraints created by the Debtor's limited cash position.

47.     I am familiar with the contents of each of the First Day Motions and the Bidding Procedures Motion, and to the best of my knowledge, information, and believe, the facts set forth therein are true and correct.   I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and to therefore preserve and maximize value of the Debtor's

estate for the benefit of the Debtor's stakeholders.  The relief requested in connection with the First Day Motions is also narrowly tailored so as to only seek such relief as the Debtor believes is necessary to avoid immediate and irreparable harm to the Debtor's estate.

48.     Furthermore, I believe that with respect to the First Day Motions requesting the authority, but not direction, to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to allowing the Debtor to continue the essential operations that are necessary to a value-maximizing sale process.  Granting the interim relief described therein is necessary to avoid immediate and irreparable harm to the Debtor and its employees, customers, vendors, creditors, equity holders, and other stakeholders.  I further believe that such relief is necessary to enable the Debtor to continue its operations to the extent necessary to run a value-maximizing sale process, including by paying its employees in the ordinary course of business.

## CONCLUSION

49.     The Debtor's ultimate goal in this chapter 11 case is to consummate a value-maximizing transaction for the benefit of all of its creditors.  In the near term, however, to minimize any loss of value of its business or assets during this time, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the pendency of this chapter 11 case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospective for achieving the Debtor's objectives will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Date: December 13, 2022                          */s/ Lawrence Perkins*_____

