**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| QUANERGY SYSTEMS, INC.,[1] | Case No. 22-11305 (CTG) |
| Debtor. | **Requested Objection Deadline:**<br>**December 19, 2022 at 4:00 p.m. (ET)** |
| | **Requested Hearing Date:**<br>**December 20, 2022 at TBD** |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING MANNER OF NOTICE THEREOF, (D) SCHEDULING A HEARING TO APPROVE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS, AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE DEBTOR'S ENTRY INTO AN ASSET PURCHASE AGREEMENT, (B) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS, AND (D) GRANTING RELATED RELIEF**

By this motion (this "Motion"), the above-captioned debtor and debtor in possession (the "Debtor") requests, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), entry of:

    (i)       an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**:

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Quanergy Systems, Inc. (5845). The debtor's mailing address for purposes of the Chapter 11 Case is 433 Lakeside Drive, Sunnyvale, CA 94085.

(a) approving proposed auction and bidding procedures (the "Bidding Procedures") in connection with the sale (or series of sales) (collectively, the "Sale") of all or substantially all of the Debtor's assets (the "Assets") in the form attached to the Bidding Procedures Order as Exhibit 1, and approving the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 2,

(b) subject to final Court approval of the Stalking Horse Approval Order, authorizing, but not directing, the Debtor to designate the Stalking Horse Bidder (as defined below) in accordance with the Bidding Procedures,

(c) subject to final Court approval at the Sale Hearing (as defined below), authorizing and approving the Debtor to enter into and perform under an asset purchase agreement consistent with the Bidding Procedures (the "Purchase Agreement"),

(d) scheduling an auction (the "Auction") and a sale hearing (the "Sale Hearing") in connection with the Sale,

(e) establishing procedures for the assumption and assignment (the "Assumption and Assignment Procedures") of certain executory contracts and unexpired leases (each, an "Assumed Contract," and collectively, the "Assumed Contracts") and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 3,

(f) scheduling a hearing to authorize and approve assumption and assignment of the Assumed Contracts in connection with the Sale, including payment of cure (if any) (the "Assumption/Assignment Hearing"),

(g) granting related relief; and

(ii) an order (the "Sale Order"):

(a) authorizing and approving the Debtor's entry into the Purchase Agreement with the Successful Bidder(s) (as defined below) or Next-Highest Bidder(s) (as defined below), as applicable,

(b) authorizing the Sale of the Assets to the party or parties that are the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances (the "Encumbrances"), except for certain assumed liabilities,

(c) authorizing and approving the assumption and assignment of the Assumed Contracts in connection with the Sale, including proposed cure amounts (if any), and

(d) granting related relief.

In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Lawrence Perkins in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration")[2] and the *Declaration of Geoffrey Richards in Support of Motion of Debtor for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of all or Substantially all of the Debtor's Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, (D) Scheduling a Hearing to Approve Assumption and Assignment of the Assumed Contracts, and (E) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtor's Entry Into an Asset Purchase Agreement, (B) Authorizing the Sale of all or Substantially all of the Debtor's Assets free and Clear of all Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* (the "Richards Declaration"), each filed contemporaneously herewith, and further respectfully states as follows:

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtor confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## PRELIMINARY STATEMENT

4.      The Debtor commenced the Chapter 11 Case in the wake of a liquidity crisis with the goal of pursuing a value-maximizing sale of all or substantially all of the Assets and an orderly wind-down of its business.  As discussed more fully in the First Day Declaration and the Richards Declaration, prior to the Petition Date, the Debtor experienced a rapidly declining cash position due to the challenging equity markets in the Light Detection and Ranging ("LiDAR") sector that impacted the Company's stock price and access to its equity line of credit from Global Emerging Markets Group ("GEM"), and the significant cash burn required to fund its operations. Moreover, as a result of the Debtor's stock price falling precipitously since the Business Combination, and delisting procedures commenced by the New York Stock Exchange ("NYSE") that followed, the Debtor's access to capital has been significantly limited, which has directly contributed to the Debtor filing this Chapter 11 Case.

5.      Confronted with growing liquidity constraints, the Debtor determined, in consultation with Raymond James & Associates, Inc. ("Raymond James"), its investment banker, and the Debtor's other advisors, that an expedited sale process under chapter 11 of the Bankruptcy Code is the best and only path forward to ensuring that the Debtor has sufficient liquidity to consummate a sale transaction aimed at maximizing value for the Debtor's estate and its stakeholders.  The Debtor believes marketing its assets with the benefits afforded to a buyer under section 363 of the Bankruptcy Code will provide the Debtor with certain advantages to effectuating

a sale transaction or transactions in chapter 11, that were not available to the Debtor during the prepetition marketing process. In addition, certain developments in the LiDAR market, including the pending Ouster/Velodyne merger and the pending asset sale transaction between Ibeo Automotive Systems GmbH and MicroVision, Inc., may signal the start of a wave of consolidation activity in the LiDAR sector.

6.    Accordingly, the Debtor files this Motion to approve the Bidding Procedures while simultaneously working to identify a Stalking Horse Bidder for the sale of all or substantially all of the Debtor's U.S. assets in an effort to create a bid floor. This effort is aimed at culminating in a productive Auction, where interested parties will be given the opportunity to bid on all or substantially all of the Debtor's Assets or a subset of the Assets. The Bidding Procedures proposed by this Motion will ensure that the Debtor's marketing and sale process is conducted openly and in a manner that will encourage bidders to submit bids to best maximize the value of the Assets while simultaneously reserving the Debtor's right to designate the Stalking Horse Bidder. The Debtor expects that the postpetition sale and marketing process will build upon the prepetition marketing process overseen by Raymond James.

7.    For these reasons, and the reasons more fully articulated below, the Debtor seeks entry of the Bidding Procedures Order, approval to conduct the marketing and sale process in accordance with the Bidding Procedures, and, following the completion of the sale process, entry of the Sale Order.

## RELEVANT BACKGROUND

### A.    Overview

8.    The Debtor designs, develops, and markets LiDAR sensors and 3D perception software solutions that enable robust and intelligent detection, tracking and

classification of objects such as people or vehicles. LiDAR is a time-of-flight sensing technology that pulses low-power, eye-safe lasers and measures the time it takes for the laser to complete a round trip between the sensor and a target.  The resulting aggregate data are used to generate a 3D point cloud image, which provides both spatial location and depth information to identify, classify, and track moving objects.  The Debtor provides high performance LiDAR sensors and 3D perception software designed to improve safety, efficiency, and performance while reducing costs in a wide variety of markets and applications.  The Debtor's patented M Series of LiDAR sensors feature high resolution, 360-degree field of view that generate rich 3D point clouds in real-time at long range.  These LiDAR sensors are a reliable solution for challenging real-world applications in mission-critical markets such as security, smart cities, and industrial automation.

9.        On the date hereof (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no official committees have been appointed in the Chapter 11 Case and no request has been made for the appointment of a trustee or examiner.

10.        A detailed description of the Debtor, including its business operations, its corporate and capital structure, the events leading to the commencement of the Chapter 11 Case, and the facts and circumstances supporting this Motion, is set forth in the First Day Declaration.

**B.        The Debtor's Prepetition Sale and Marketing Efforts**

11.        In June 2022, the Debtor determined that it was necessary to explore strategic alternatives to preserve its liquidity and maintain ongoing operations.  Accordingly, the

Debtor retained Raymond James to explore and evaluate strategic alternatives, including a going-concern sale of the Debtor's business.

12.     Beginning in late August 2022, the Debtor, with the assistance of Raymond James, began outreach to potential counterparties for a going-concern sale.  Raymond James' outreach focused on parties that would be a strategic fit for the Debtor, including other LiDAR providers and also other prospects that could potentially leverage the Debtor's sensors and software in other markets.  The Debtor's prepetition marketing process included outreach to 36 prospective buyers for a going-concern transaction, twenty-seven (27) of which Raymond James held preliminary diligence calls with to review the opportunity and answer questions.  Eight (8) parties entered into non-disclosure agreements with the Debtor.  No party submitted an actionable proposal.

13.     Furthermore, on November 7, 2022, Ouster, Inc. ("Ouster") and Velodyne LiDAR USA Inc. ("Velodyne") announced plans to merge in an all-stock transaction.  The announcement of the proposed merger made it unlikely that either Ouster or Velodyne could become acquirers of the Debtor in the near-term, because the companies had chosen a merger partner with products and technologies that are competitive to those of the Debtor and the companies would be preoccupied working to complete the merger, so would be less likely to engage in acquisition discussions with the Debtor.

### C.     The Debtor's Proposed Expedited Sale Process

14.     Through the Chapter 11 Case, the Debtor intends to continue to build upon its prepetition marketing efforts by marketing the Assets more broadly, including by contacting potential purchasers that may be interested in only certain business segments or assets.  The Debtor believes that marketing the Assets postpetition pursuant to a section 363 sale under the Bankruptcy

Code provides the best path forward to consummating a value-maximizing sale transaction, particularly in light of the ability to broadly market and sell the Assets free and clear of burn rate and liabilities.  In addition to the benefits afforded in a 363 process, the Debtor is also better positioned to market the Assets.  In the days and weeks leading up to the Chapter 11 Case, the Debtor reduced significant overhead expenses and resolved substantial litigation with Velodyne, which caused reluctance for certain prospective purchasers in pursuing a transaction prepetition. In addition, certain developments in the LiDAR market, including the pending Ouster/Velodyne merger and the pending asset sale transaction between Ibeo Automotive Systems GmbH and MicroVision, Inc., may signal the start of consolidation activity in the LiDAR sector.

15.     Given the Debtor's liquidity constraints, maximizing the value of the Debtor's estate for the benefit of all the Debtor's stakeholders will depend in large part on the Debtor expeditiously proceeding through the Chapter 11 Case in a manner that is both efficient and minimizes administrative expenses.  The Debtor does not currently have a debtor-in-possession financing option to extend the sale process.   Therefore, the Debtor is operating on a tight budget that will only permit the Debtor to fund a sale process for a limited period of time; however, it believes that the proposed sale process is sufficient to generate the best value for the Assets.  Without an expedited sale process, the Debtor will run out of money to fund operations and consequently the sale process, which will significantly impact the Debtor's ability to maximize value for the benefit of its stakeholders.

## THE PROPOSED BIDDING PROCEDURES[3]

16.     The Debtor is requesting approval of the Bidding Procedures, which describe, among other things, (i) the assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtor, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, (vi) the selection and approval of the Successful Bidder and the selection of the Next-Highest Bidder (as defined below), and (vii) the designation and approval of the Stalking Horse Bidder, Stalking Horse APA, and Bid Protections, if one is designated.  The Bidding Procedures reflect the Debtor's objective of conducting the sale process in a controlled, but fair and open, manner while ensuring that the highest or best bid is generated for the Assets.  The following is a summary of the Debtor's proposed Bidding Procedures[4] as required by Local Rule 6004-1.

17.     <u>Confidentiality Agreement.</u>  Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process, each person or entity must enter into (unless previously entered into) with the Debtor, on or before the Bid Deadline, a confidentiality agreement in form and substance satisfactory to the Debtor (the "<u>Confidentiality Agreement</u>").  Each such person that enters into a Confidentiality Agreement with the Debtor on or before the Bid Deadline is hereinafter referred to as a "<u>Potential Bidder</u>."  After a Potential Bidder enters into a Confidentiality Agreement with the Debtor and demonstrates the financial wherewithal to potentially consummate a sale transaction, the Debtor shall deliver or make available

---

[3] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

[4] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in <u>Exhibit 1</u> to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures shall control in all respects.

(unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Assets.

18.     <u>Designation of the Stalking Horse Bidder</u>.  The Debtor may, at any time prior to the Auction, in consultation with the Consultation Parties, designate a stalking horse bidder (the "<u>Stalking Horse Bidder</u>"), whose Qualified Bid shall serve as the stalking horse bid (the "<u>Stalking Horse Bid</u>"), and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (the "<u>Stalking Horse APA</u>") will be binding on the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction.  If the Stalking Horse Bid is not selected as the Successful Bid, the Stalking Horse Bidder may still serve as the Next-Highest Bidder (as defined below).  Notwithstanding any of the foregoing, the Debtor is not obligated to select a Stalking Horse Bidder and may proceed to the Auction without one.

19.     <u>Timing of the Designation of the Stalking Horse Bidder</u>.  In the event that the Debtor designates a Stalking Horse Bidder and enters into the Stalking Horse APA on or prior to January 13, 2023, at 4:00 p.m. (prevailing Eastern Time) (the "<u>Stalking Horse Supplement Deadline</u>"), the Debtor shall file a supplement to the Motion (the "<u>Stalking Horse Supplement</u>") seeking approval of the same, with no less than three (3) business days' notice of the objection deadline (the "<u>Stalking Horse Objection Deadline</u>") to the U.S. Trustee, the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Case (the "<u>Stalking Horse Notice Parties</u>") with no further notice being required, provided that the Stalking Horse Supplement (a) sets forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor), (b) sets forth the amount of

the Stalking Horse Bid and what portion (if any) is cash; (c) states whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Stalking Horse Bid, (d) specify any proposed bid protections (the "Bid Protections"), (e) attach the Stalking Horse APA, including all exhibits, schedules or attachments thereto; and (f) set forth the deadline to object to the Stalking Horse Bidder designation and Bid Protections.  The Stalking Horse Supplement shall also include any evidence the Debtor would like the Court to consider in connection with any request to approve any breakup fee and/or expense reimbursement and/or any other Bid Protections as an administrative expense under section 503(b) of the Bankruptcy Code. If the Debtor designates a Stalking Horse Bidder by the Stalking Horse Supplement Deadline, the Debtor will file the proposed form of the Sale Order agreed to by the Stalking Horse Bidder on or before the Stalking Horse Supplement Deadline.

20.    In the event the Debtor designates a Stalking Horse Bidder after the occurrence of the Stalking Horse Supplement Deadline, but prior to the Auction, the Debtor may seek Court approval on an expedited basis of the Stalking Horse Bidder and Stalking Horse APA, including the Bid Protections, and reserves its right to file such a motion at any time after the Stalking Horse Supplement Deadline and prior to the Auction.  Prior to the filing of any proposed motion, the Debtor will consult with the Consultation Parties with respect to the designation of the Stalking Horse Bidder and Stalking Horse APA

21.    Objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid (the "Stalking Horse Objection") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Stalking Horse Notice Parties within three (3) business days after the service of the Stalking Horse Supplement.

22.     If a timely Stalking Horse Objection is filed, the Debtor will schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable seeking approval of such Stalking Horse Bid on or before January 16, 2023 (but in no event fewer than three (3) business days after the service of the Stalking Horse Supplement).  If no timely Stalking Horse Objection is filed and served with respect to the Stalking Horse Bid, upon the expiration of the Stalking Horse Objection Deadline, the Debtor will submit to the Court an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse APA (the "Stalking Horse Approval Order"), which may be entered by the Court without a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement

23.     Upon entry of an order approving the Stalking Horse Bidder, the Debtor's obligation to pay the Bid Protections shall constitute, pursuant to sections 503(b) of the Bankruptcy Code, an administrative expense claim against the Debtor's bankruptcy estate, and shall survive termination of the Stalking Horse APA.  In such case, the Bid Protections shall be payable by the Debtor to the Stalking Horse Bidder on the terms and conditions set forth in the Stalking Horse APA.  For the avoidance of doubt, this Motion is not seeking authorization to grant the Bid Protections superpriority expense treatment pursuant to sections 364(c)(1) or 507(b) of the Bankruptcy Code but the Debtor reserves its right to do so by filing a separate motion with the Court.

24.     Determination by the Debtor.  Following consultation with the Consultation Parties, the Debtor shall (a) coordinate with Potential Bidders regarding the conduct of its respective due diligence, (b) evaluate Bids from Potential Bidders on any or all of the Assets, (c) negotiate any bid made to acquire any or all of the Assets, and (d) make such other determinations as are provided in the Bidding Procedures.

25.     <u>Due Diligence.</u>  The Debtor established the Data Room (as defined in the Bidding Procedures) into which substantial information about the Debtor and its business has been deposited.  Except to the extent a Confidentiality Agreement or other agreement provides otherwise, all Potential Bidders and the Consultation Parties will be granted full access to the Data Room.  The Debtor, with the assistance of Raymond James, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the Consultation Parties.  In the event that any such due diligence material is prepared by the Debtor in written form and has not previously been provided to any other Potential Bidder, the Debtor will simultaneously provide access to such materials to (a) all Potential Bidders, and (b) all Consultation Parties.

26.     <u>Bid Deadline.</u>  On or before January 20, 2023, at 10:00 a.m. (prevailing Eastern Time) (the "<u>Bid Deadline</u>"), a Potential Bidder that desires to make a Bid is required to deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to Raymond James, Attn: Geoffrey Richards, Geoff Tobin,  and Alec Haesler, at   geoffrey.richards@raymondjames.com;   geoffrey.tobin@raymondjames.com; alec.haesler@raymondjames.com.  As soon as reasonably practicable following the Bid Deadline, the Debtor will provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

27.     <u>Bid Requirements.</u>[5]  All Bids must comply with the following Bid Requirements:

(a)     be accompanied by a letter or email:

(i)     fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtor or its

---

[5] The Debtor will also consider proposals to acquire any and all of the Assets through a plan of reorganization.  Should any such proposal be received prior to the Bid Deadline that the Debtor, in consultation with the Consultation Parties, concludes is in the best interest of the estate and its stakeholders, then the Debtor reserves the right to postpone the Auction and proceed toward the confirmation of a plan.

advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale) in the event that the Debtor has any questions or wishes to discuss the Bid submitted by the Potential Bidder;

(ii)    setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

(iii)   stating with specificity the Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(iv)    providing, other than as may be exclusively applicable to the Stalking Horse Bidder, if designated, that the Bid is not subject to any bidding, break-up fee, termination fee, transaction fee, expense reimbursement or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code related to bidding for the Assets; provided that, in the event a Stalking Horse Bidder is designated, all bids must provide consideration to the Debtor of at least the sum of (i) the Stalking Horse Bid, (ii) the Break-Up Fee, (iii) the Expense Reimbursement, and a reasonable minimum overbid amount equal to or greater than $250,000 or such other amount determined by the Debtor in consultation with the Consultation Parties ("Incremental Overbid") over the Starting Bid (as defined below) or the Leading Bid (as defined in the Bidding Procedures);

(v)     agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until two (2) business days after the closing of the Sale;

(vi)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than February 3, 2023;

(vii)   providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(viii)  containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

(ix)    providing that the Potential Bidder agrees to serve as a backup bidder (the "Next-Highest Bidder") if the Stalking Horse Bidder is not designated and the Potential Bidder's Qualified Bid (as defined below) is the highest or

best bid after the Successful Bid (as defined below) (the "Next-Highest Bid") with respect to the relevant Assets through the Closing Date; and

(b)    be accompanied by (i) an executed purchase agreement in form and substance reasonably satisfactory to the Debtor (a "Qualified Bid Purchase Agreement"), and (ii) if a Stalking Horse APA has been entered into, or if a form agreement is provided, a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse APA or the form purchase agreement, as applicable, and the applicable schedules and exhibits;

(c)    be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iv) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtor may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale and the Consultation Parties in the event that the Debtor determines such bid to be a Qualified Bid (as defined below); and

(d)    be accompanied by (i) a deposit in the form of a certified check or wire transfer, payable to the order of the Debtor, in the amount of ten percent (10%) of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtor (a "Good Faith Deposit"), and (ii) written evidence, documented to the Debtor's satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (provided, however, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtor may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtor).  The Debtor reserves the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in its sole discretion after consulting with the Consultation Parties.

28.    A Bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtor, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a

Qualified Bid will be considered a "Qualified Bidder."  The Debtor shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) January 22, 2023, at 9:00 p.m. (prevailing Eastern Time).  For the avoidance of doubt, any Stalking Horse Bid will be deemed a Qualified Bid and the Stalking Horse Bidder will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.  The Debtor shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid(s) (as defined below) no later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) January 22, 2023, at 9:00 p.m. (prevailing Eastern Time).

29.    Starting Bid(s).  If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets, the Debtor will conduct the Auction with respect to such Assets and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)").  In the event a Stalking Horse Bidder is selected, the Starting Bid shall include the amount provided for in the Stalking Horse Bid plus the amount of any Bid Protections.  The Starting Bid(s) will be communicated to Qualified Bidders prior to the commencement of the Auction.

30.    The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtor (in consultation with the Consultation Parties) reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory

contracts and unexpired leases of the Debtor, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type and nature of any changes to the Stalking Horse APA, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtor of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtor's estate (including after taking account of the Bid Protections); (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations.  .  The Starting Bid(s) will be provided to Qualified Bidders on or before January 22, 2023, at 9:00 p.m. (prevailing Eastern Time).

31.    _Auction._  The Auction if required, will be conducted on January 24, 2023, starting at 10:00 a.m. (prevailing Eastern Time) at the offices of Raymond James & Associates, Inc. 320 Park Ave. Floor 12, New York, NY 10022.  Professionals and principals for the Debtor, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any other parties the Debtor deems appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith _bona fide_ offer that it intends to consummate if selected as the Successful Bidder.

32.    At the Auction, participants will be permitted to increase their Bids and improve their terms in accordance with the Bidding Procedures; _provided_ that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply).  Bidding for

any part or all of the Assets will start at the applicable Starting Bid(s) and will continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid is submitted by a Qualified Bidder.  Following consultation with the Consultation Parties, the Debtor may at any time adopt rules for the Auction that the Debtor reasonably determines to be appropriate to promote the goals of the Bidding Process and not in conflict with the Bidding Procedures, the Bankruptcy Code, or applicable orders of the Court.

33.     Prior to the conclusion of the Auction, the Debtor will: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction; (b) in the exercise of its good faith business judgment and consistent with the Bidding Procedures, identify the highest or otherwise best offer or collection of offers in respect of the Assets (the "Successful Bid(s)"); (c) inform and consult with the Consultation Parties regarding the foregoing, so long as the Consultation Party is not also a Potential Bidder; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)") and the amount and other material terms of the Successful Bid(s).

34.     After determining the Successful Bid(s) for the Assets, if a Stalking Horse Bid is not designated, the Debtor may determine, in its reasonable business judgment, in consultation with the Consultation Parties, which Qualified Bid(s) are the Next-Highest Bid(s) for the Assets.

35.     <u>Acceptance of Qualified Bids.</u>  The Debtor's selection and submission to the Court of the selected Bid as the Successful Bid will not constitute the Debtor's acceptance of the Bid.  The Debtor will have accepted a Qualified Bid only when such Qualified Bid has been

approved by the Court at the Sale Hearing.  If the Successful Bidder does not close the Sale by the date agreed upon by the Debtor and the Successful Bidder and a Stalking Horse Bid was not designated, then the Debtor shall be authorized, but not required, to close with the Next-Highest Bidder pursuant to further order of the Court.

36.     <u>Modification of Bidding Procedures.</u>  Following consultation with the Consultation Parties, the Debtor may amend the Bidding Procedures or the Bidding Process at any time and from time to time in any manner that it determines in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein.

37.     <u>Return of Good Faith Deposit.</u>  The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtor's bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court.  At the closing of a sale transaction contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided.  The Good Faith Deposits of any Next-Highest Bidder shall be retained until three (3) business days after the applicable Closing Date.  The Good Faith Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than ten (10) business days following the Auction.

<b>NOTICE PROCEDURES FOR THE SALE,<br>
<u>BIDDING PROCEDURES, AUCTION AND SALE HEARING</u></b>

38.     The Debtor also requests approval of the notice of the Auction, Sale Hearing, and Bidding Procedures (the "<u>Sale Notice</u>"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.

39.     As soon as practicable after the entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice by regular mail and/or email upon: (i) the Office of the United

19

States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the United States Securities and Exchange Commission; (iii) the United States Department of Justice; (iv) counsel to any statutory committee; (v) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located; (vi) the parties included on the Debtor's list of thirty (30) largest unsecured creditors; (vii) all parties who are known by the Debtor to assert liens against the Assets, if any; (viii) all non-Debtor parties to the Assumed Contracts; (ix) any party known or reasonably believed to have expressed an interest in acquiring some or all or substantially all of the Debtor's assets; and (x) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, "Sale Notice Parties").

40.    The Debtor will also cause the Sale Notice to be published once in the national edition of USA Today, the Wall Street Journal, or another publication with similar national circulation, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtor's proposed claims and noticing agent, Stretto, Inc.  The Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

41.    To facilitate the Sale, the Debtor seeks authority to assume and assign to any Successful Bidder(s), the Assumed Contracts in accordance with the Assumption and Assignment Procedures provided herein and the form and manner of notice thereof substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Assumption and Assignment Notice").

42.     By no later than five (5) business days after the entry of the Bidding Procedures Order, the Debtor will file a schedule of cure obligations (the "Cure Schedule") for the Assumed Contracts.  The Cure Schedule will include a description of each Assumed Contract potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtor believes is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").  A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-Debtor parties listed on the Cure Schedule by first class mail and/or email on the date that the Cure Schedule is filed with the Court.

43.     The Debtor proposes that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, the Cure Costs set forth on such schedule, must be in writing, filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) calendar days from date of the service of the Cure Schedule, and served on the following parties:  (i) proposed counsel to the Debtor, Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn.: Cullen D. Speckhart (cspeckhart@cooley.com), Michael A. Klein (mklein@cooley.com), and Lauren A. Reichardt (lreichardt@cooley.com)); (ii) proposed co-counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP, One Rodney Square, 1000 N. King Street, Wilmington, DE 19801 (Attn.: Sean M. Beach (sbeach@ycst.com) and Shane M. Reil (sreil@ycst.com)); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn.: Richard L. Schepacarter (richard.schepacarter@usdoj.gov)); and (iv) counsel to any statutory committee that has been appointed in the Chapter 11 Case (collectively, the "Notice Parties").  Any such objections shall

set forth a specific default by the Debtor in any Assumed Contracts and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Schedule.

44.     If no objection is timely and properly received with respect to an Assumed Contract, then (i) the Cure Cost set forth in the Cure Schedule will be binding upon the non-Debtor party to such Assumed Contract for all purposes in the Chapter 11 Case and will constitute a final determination of the total Cure Costs required to be paid by the Successful Bidder in connection with the assumption and assignment of the Assumed Contract; and (ii) the counterparty to the Assumed Contract will (a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed Contract, and the Debtor and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (b) be deemed to have consented to the assumption and assignment of such Assumed Contract; and (c) be forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract or that there is any objection or defense to the assumption and assignment of such Assumed Contract.

45.     Where a non-Debtor counterparty to an Assumed Contract timely files an objection asserting a cure amount higher or different than the proposed Cure Costs (the "Disputed Cure Amount"), then (y) to the extent that the parties are able to consensually resolve the Disputed Cure Amount, the Cure Amount shall be as agreed between the parties, or (z) to the extent the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Assumption/Assignment Hearing to be scheduled by the Court.  All other objections to the proposed assumption and assignment of the Assumed Contracts will be heard at the Sale Hearing,

unless adjourned by agreement of the parties.  The Debtor intends to reasonably cooperate with counterparties to Assumed Contracts to attempt to reconcile any differences with respect to a particular cure amount.

### KEY SALE PROCESS DATES

46.    The following is a summary of the proposed key dates for the sale process:

| Date | Deadline/Event |
|---|---|
| December 20, 2022, at 4:00 p.m. (ET) | Bidding Procedures Hearing |
| Three (3) business days after the entry of the Bidding Procedures Order | Deadline for Debtor to file the Assumption and Assignment Notice and Cure Schedule |
| Fourteen (14) calendar days after service of the Assumption and Assignment Notice at 4:00 p.m. (ET) | Deadline to object to the Debtor's proposed assumption and assignment of the Assumed Contracts and related Cure Costs |
| January 13, 2023, at 4:00 p.m. (ET) | Stalking Horse Supplement Deadline |
| January 20, 2023, at 10:00 a.m. (ET) | Bid Deadline |
| January 20, 2023, at 4:00 p.m. (ET) | Deadline to object to the Sale[6] of the Assets |
| No later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) January 22, 2023, at 9:00 p.m. (ET) | Deadline for Debtor to notify Potential Bidders of whether their Bids are Qualified Bids |
| January 24, 2023, starting at 10:00 a.m. (ET) | Auction (if necessary) |
| January 25, 2023, at 4:00 p.m. (ET) | Deadline to file and serve Notice of Successful Bidder(s) |
| January 26, 2023, at 4:00 p.m. (ET) | Deadline to object to (i) conduct of the Auction, (ii) the proposed Sale to the Successful Bidder(s), and (iii) ability of the Successful Bidder to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance |
| January 27, 2023, at 10:00 a.m. (ET) | Sale Hearing |

---

[6] This objection deadline applies to all objections to this Motion and the Sale of the Assets to a Successful Bidder, with the exception of objections related solely to conduct of the Auction, identity of the Successful Bidder(s), and adequate assurance of future performance by the Successful Bidder(s).

| **Date** | **Deadline/Event** |
|:---:|:---|
| On or prior to February 3, 2023 | Closing |
| TBD | Assumption/Assignment Hearing (if necessary) |

47.     The Debtor respectfully submits that the timeline set forth above is reasonable and necessary under the circumstances of the Chapter 11 Case.  Such timeline provides an approximately five/six-week period between the filing of this Motion and the Bid Deadline and is comparable to other timelines recently approved in this district.  *See, e.g.*, *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022) (approving a sale timeline that provided an approximate three-week period between the filing of the motion and the bid deadline).  This timeline, which will allow the Debtor to build off of the months' long marketing process conducted prepetition by the Debtor's investment banker, Raymond James, will allow Potential Bidders sufficient time to formulate bids for the Assets.  In addition to the Debtor's prepetition marketing efforts, the Debtor will actively market the Assets postpetition, including by contacting Potential Purchasers that may be interested in only certain business segments or assets instead of a going concern sale.  Moreover, relevant information regarding the Debtor's business has been made available in the Data Room (as defined in the Bidding Procedures), allowing Potential Bidders (subject to the execution of a confidentiality agreement) to immediately conduct due diligence on the Assets.

## **THE PROPOSED SALE ORDER**

48.     The Debtor anticipates that the Sale Order will contain certain provisions that require disclosure under Local Rule 6004-1.  At this time, the Debtor makes the following statements:

(a)     <u>Local Rule 6004-1(b)(iv)(A)</u>.  To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the

Debtor will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

(b)     Local Rule 6004-1(b)(iv)(B).  The Debtor does not presently have any agreement between any interested bidder and the Debtor's management or key employees.  If any agreements are reached, the Debtor will make the necessary disclosures.

(c)     Local Rule 6004-1(b)(iv)(C).  To the extent that the Sale Order includes a release in favor of any entity, the Debtor will make the necessary disclosures.

(d)     Local Rule 6004-1(b)(iv)(E).  The contemplated Closing Date for the Sale is February 3, 2023.

(e)     Local Rule 6004-1(b)(iv)(F).  The Debtor is requiring Qualified Bids to include a good faith deposit constituting ten percent (10%) of the total cash consideration of the bid.

(f)     Local Rule 6004-1(b)(iv)(G).  The Debtor does not currently have any interim management or other agreement with any party.  If any agreements are reached, the Debtor will make the necessary disclosures.

(g)     Local Rule 6004-1(b)(iv)(H).  Other than with respect to a potential credit bid under section 363(k) of the Bankruptcy Code, the Debtor is not seeking to release or allocate any sale proceeds without further order of the Court.

(h)     Local Rule 6004-1(b)(iv)(I).  The Debtor is not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

(i)     Local Rule 6004-1(b)(iv)(J).  The Debtor will retain necessary books and records, copies thereof, or include as part of the Purchase Agreement appropriate access to such information, to enable it to administer the Chapter 11 Case following any Sale.

(j)     Local Rule 6004-1(b)(iv)(K).  The Debtor may seek to sell avoidance actions.

(k)     Local Rule 6004-1(b)(iv)(L).  The Debtor is seeking to sell the Assets free and clear of successor liability claims.  The Debtor may have unpaid prepetition unsecured claims after the closing of the Sale.  No party would likely be willing to purchase the Debtor's assets if it were at risk of liability for those claims under principles of successor liability.

(l)     Local Rule 6004-1(b)(iv)(M).  The Debtor is seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

(m)    Local Rule 6004-1(b)(iv)(O).    The Debtor is seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale, as further described below.

## RELIEF REQUESTED

49.    By this Motion, the Debtor seeks entry of (i) the Bidding Procedures Order, (a) scheduling a date for the Auction and Sale Hearing, (b) approving the Bidding Procedures and the form and manner of notice of the Bidding Procedures, (c) subject to the Stalking Horse Approval Order, authorizing, but not directing, the Debtor to designate the Stalking Horse Bidder and enter into the Stalking Horse APA in accordance with the Bidding Procedures, (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtor to enter into and perform under the Purchase Agreement, as applicable, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, (e) establishing the Assumption and Assignment Procedures and manner and notice thereof; (f) scheduling a hearing to authorize and approve the assumption and assignment of the Assumed Contracts, if applicable, and (g) granting related relief; and (ii) the Sale Order, (a) authorizing and approving the Debtor's entry into the Purchase Agreement with the Successful Bidder(s) or Next-Highest Bidder(s), as applicable, (b) approving the Sale, free and clear of all Encumbrances, (c) authorizing and approving the assumption and assignment of the Assumed Contracts, and (d) granting related relief.

## BASIS FOR RELIEF REQUESTED

### A.  Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code

50.    Section 363(b) of the Bankruptcy Code provides that a Debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141,

143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

51.    Courts typically consider the following factors in determining whether a proposed sale meets this standard:

    a.    whether a sound business justification exists for the sale;

    b.    whether adequate and reasonable notice of the sale was given to interested parties;

    c.    whether the sale will produce a fair and reasonable price for the property; and

    d.    whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

52.    When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

53.    The Debtor submits that its decision to pursue a Sale on the terms set forth in this Motion represents a reasonable exercise of the Debtor's business judgment and, accordingly, the Sale should be approved under section 363(b) of the Bankruptcy Code.  The Debtor will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtor's estate receives the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by

any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder(s), and establish that the Debtor and the Successful Bidder(s) proceeded in good faith.

54.    Additionally, the Debtor believes that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtor to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtor believes that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale, the Auction, and the Sale Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.  Contemporaneously herewith, the Debtor filed the *Motion of the Debtor for Entry of an Order Shortening the Notice and Objection Periods for the Debtor's Bidding Procedures Motion*, and for the reasons stated therein, believe that the proposed notice of this Motion is reasonably calculated to provide adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing.

55.    The Sale, conducted in accordance with the Bidding Procedures, will generate maximum value for the Debtor's estate, and represents the best path forward for maximizing recoveries.  The Debtor submits that ample business justification exists for the consummation of the Sale, and therefore request that the Court approve such Sale.

**B.  The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

56.    The Debtor requests approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear

of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

      (a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

      (b)    such entity consents;

      (c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (d)    such interest is in bona fide dispute; or

      (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

57.    Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtor's assets free and clear of any claims against the Debtor.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

58.    The Debtor submits that the Sale of the Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtor also believes that the service of the Stalking Horse Supplement and Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Stalking Horse Bidder and Stalking Horse APA, if designated, and the Sale and therefore provides additional justification for approval of the Sale free and clear of all Encumbrances.

**C. The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

59.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).

60.    In approving the Sale free and clear of Encumbrances, the Debtor requests that the Court find and hold that all purchasers of the Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that the selection of the Successful Bidder will be the result of a competitive Bidding Process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**D. The Court Should Approve the Bidding Procedures**

61.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtors "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm.*, 330 F.3d at 573 (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at

659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtor's assets").

62.    The Debtor and its professional advisors have designed the Bidding Procedures to promote a competitive and fair Bidding Process and, thus, to maximize value for the Debtor's estate and stakeholders.  Having the option to enter into a Stalking Horse APA with a Stalking Horse Bidder ensures that the Debtor retains flexibility to set the floor from which other potential bidders can submit higher or better offers.  As a baseline bid, the Stalking Horse Bid fosters competitive bidding, increasing the likelihood that the purchase price of the Assets will increase, allowing the Debtor to maximize value for the benefit of all stakeholders.

63.    The Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtor will receive the highest or best possible consideration for the Assets.    Furthermore, the Bidding Procedures provide an appropriate framework for the Debtor and its independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtor's estate and its stakeholders.

64.    The Debtor submits that the Bidding Procedures are necessary and transparent and will derive the highest or best Bids for the Assets.  Therefore, the Debtor requests that the Court approve the Bidding Procedures.

**E.  The Assumption and Assignment of the Assumed Contracts Satisfies Section 365 of the Bankruptcy Code**

65.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that Debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

66.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).   Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

67.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section

365(f) is to assist the trustee in realizing the full value of the debtors' assets).  Section 365(f)(2)(B) requires that the non-debtor contract counterparty be given adequate assurance of future performance by an assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant.  *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

68.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

69.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtor's business judgment.  Additionally, the Debtor submits that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the Assumed Contracts as proposed in this Motion

are adequate to protect the rights of counterparties to the Debtor's contracts and leases. Furthermore, the Debtor will demonstrate adequate assurance of future performance at the Sale Hearing.

## **WAIVER OF RULES 6004(h) AND 6006(d)**

70.     The Debtor requests that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is necessary to permit the Sale to close expeditiously.  The Debtor respectfully requests that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

71.     Notice of this Motion will be provided to the following, or their counsel, if known: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the United States Department of Justice; (iv) counsel to any statutory committee; (v) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located; (vi) the parties included on the Debtor's list of thirty (30) largest unsecured creditors; (vii) all parties who are known by the Debtor to assert liens against the Assets; (viii) all non-Debtor parties to the Assumed Contracts; (ix) any party known or reasonably believed to have expressed an interest in acquiring some or all or substantially all of the Debtor's assets; and (x) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013 1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) grant the relief requested herein and (ii) grant such other and further relief to the Debtor as the Court may deem proper and just.

Dated: Wilmington, Delaware
December 13, 2022

*/s/ Shane M. Reil*
Sean M. Beach (No. 4070)
Shane M. Reil (No. 6195)
Catherine C. Lyons (No. 6854)
Heather P. Smillie (No. 6923)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Email: sbeach@ycst.com
           sreil@ycst.com
           clyons@ycst.com
           hsmillie@ycst.com

and

Cullen D. Speckhart (*pro hac vice* pending)
Michael A. Klein (*pro hac vice* pending)
Lauren A. Reichardt (*pro hac vice* pending)
**COOLEY LLP**
55 Hudson Yards
New York, NY 10001-2157
Telephone: (212) 479-6000
Email: cspeckhart@cooley.com
           mklein@cooley.com
           lreichardt@cooley.com

*Proposed Counsel for the Debtor and Debtor in Possession*