# **EXHIBIT 1**

**(Stipulation)**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| QUANERGY SYSTEMS, INC.,[1] ) | Case No. 22-11305 (CTG) |
| ) | |
| Debtor. ) | |

### STIPULATION BETWEEN DEBTOR AND BUYER REGARDING THE HANDLING AND APPLICATION OF POST-CLOSING RECEIVABLES UNDER ASSET PURCHASE AGREEMENT

The above-captioned Debtor (the "Debtor") and ROLISI, LLC ("Buyer," and together with the Debtors, the "Parties"), by and through their respective undersigned counsel, hereby enter into this stipulation (the "Stipulation") on the handling and application of post-Closing receivables related to that certain Purchase Order No. 051-188802-143 dated January 30, 2023 and issued by Anixter (the "Purchase Order") to Debtor, and which was fulfilled on or about February 6, 2023, with reference to the following facts:

### RECITALS

A.  On December 13, 2022 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.  Upon the motion, dated December 13, 2022 [Docket No. 12], the Debtor applied for, among other things, (i) an order (the "Bidding Procedures Order") (a) approving the bidding

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Quanergy Systems, Inc. (5845). The Debtor's mailing address for purposes of this Chapter 11 Case is 433 Lakeside Drive, Sunnyvale, CA 94085.

30254165.1

procedures (the "Bidding Procedures") in connection with the sale or disposition (the "Sale") of certain of the Debtor's assets (including the Transferred Assets), (b) authorizing the Debtors to enter into an asset purchase agreement, (c) scheduling an auction (the "Auction") and approving the form and manner of notice thereof, (d) scheduling a sale hearing (the "Sale Hearing") to approve the Sale and approving the form and manner of notice thereof; and (ii) an order (the "Sale Order") (a) approving the Sale and other transactions contemplated by the Asset Purchase Agreement by and between the Buyer and the Debtor dated as of February 3, 2023 (the "Purchase Agreement") free and clear of all Claims, Interests and Encumbrances in accordance with the terms of the Purchase Agreement, and as such terms are defined in the Sale Order.

C. The Court entered the Bidding Procedures Order on December 21, 2022 [Docket No. 59].

D. On February 2, 2023, following the Sale Hearing, the Court entered the Sale Order [Docket No. 193] approving the Sale as set forth in the Purchase Agreement to the Buyer.

E. On or about February 3, 2023, in accordance with the Sale Order, the Debtor and Buyer executed the Purchase Agreement and fully consummated and closed the Sale, which closing was finalized when wire transfers were initiated and received and escrowed signatures were released as of approximately 3:00 p.m. ET on Friday, February 3, 2023 (the "Closing").

F. On or about January 30, 2023, Debtor received Purchase Order No. 051-188802-143 (the "Purchase Order") from Anixter for the purchase of products (sensors) in the amount of $400,869.00 and a 1-year sensor license in the amount of $61,614.00 for a total order of $462,483.00 (such amount, the "Purchase Order Receivable"). The Purchase Order required shipment on January 30, 2023 via UPS Ground. A true and correct copy of the Purchase Order is attached as **Exhibit "1"**.

30254165.1

G. Despite it being the intention of the Debtor to ship the products specified on the Purchase Order pre-Closing, and this being brought to the attention of the Buyer, due to unavoidable and unforeseeable technical issues, the Debtor was unable to ship the products specified on the Purchase Order as of the Closing. Debtor's technical staff resolved the technical issues on Monday, February 6, 2023, and the products specified on the Purchase Order shipped later that day, which was post-Closing. However, as of the Closing, Buyer contends that ownership of the products specified on the Purchase Order passed to Buyer per the terms of the Purchase Agreement.

H. On March 13, 2023, the Debtor received payment in full of the Purchase Order Receivable from Anixter.

I. Debtor and Buyer, and their respective professionals, have determined that the events and circumstances associated with a pre-Closing Purchase Order that was fulfilled post-Closing raised legitimate questions with respect to the ownership of the Purchase Order Receivable under the Purchase Agreement, and have agreed to the handling and allocation of the Purchase Order Receivable as set forth below.

J. In light of the foregoing, and subject to Court approval, the Parties wish to memorialize their agreement.

NOW, THEREFORE, it is hereby stipulated and agreed by and between the Parties that:

**AGREEMENT**

1. The foregoing recitals are incorporated herein by reference and are made a part of the Stipulation.

2. The Debtor and Buyer have agreed that all amounts paid by Anixter pursuant to the Purchase Order shall be split equally between the Debtor and the Buyer.

30254165.1

3. No later than two (2) business days following entry of an order approving this Stipulation, the Debtor shall pay to Buyer $231,241.00. Contemporaneously with payment to Buyer, the Debtor shall provide to Buyer documentation reflecting the amount received from Anixter.

4. Except as provided in this Stipulation, Buyer retains all other payments or rights to payments from Anixter arising as of the Closing through the date of this Stipulation. To the extent Debtor receives any such payments, Debtor shall promptly remit such funds to Buyer pursuant to the terms of the Purchase Agreement.

5. This Stipulation has been entered into to avoid the costs and delays of litigation. Neither Party makes any admission concerning the strengths or weaknesses of its legal position by entry into this Stipulation.

6. This Stipulation constitutes the entire agreement and supersedes any and all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and, except as otherwise expressly provided herein, this Stipulation is not intended to confer upon any other person any rights or remedies hereunder.

7. The undersigned persons represent and warrant that they have full authority to execute this Stipulation on behalf of the respective Parties and that the respective Parties have full knowledge of and have consented to this Stipulation.

8. Each party shall bear its own attorneys' fees and costs with respect to the execution and delivery of this Stipulation.

9. This Stipulation may be executed in counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

10. This Stipulation shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws.

11. This Stipulation may not be amended without the express written consent of all Parties hereto.

12. This Stipulation shall be binding upon the Parties hereto and upon all of their affiliates, assigns and successors, including without limitation any bankruptcy trustee that might be appointed in the future.

13. It is acknowledged that each Party has participated in and jointly consented to the drafting of this Stipulation and that any claimed ambiguity shall not be construed for or against either Party on account of such drafting.

14. The Bankruptcy Court shall retain jurisdiction over any and all disputes or other matters arising under or otherwise relating to this Stipulation.

 /s/ Howard A. Cohen
Howard A. Cohen (DE 4082)
**FOX ROTHSCHILD LLP**
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE  19801
Telephone: (302) 427-5507
Facsimile: (302) 656-8920
Email: hcohen@foxrothschild.com

*Counsel for Buyer*

 /s/Shane M. Reil
Sean M. Beach (DE 4070)
Shane M. Reil (DE 6195)
Heather P. Smillie (DE 6923)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 N. King Street
Wilmington, DE 19801
Telephone: (302) 571-6600

30254165.1

Email: sbeach@ycst.com
      sreil@ycst.com
      hsmillie@ycst.com

    -and –

Cullen Drescher Speckhart
Michael A. Klein
Lauren A. Reichardt
**COOLEY LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Email:   cspeckhart@cooley.com
          mklein@cooley.com
          lreichardt@cooley.com

*Counsel for the Debtor and Debtor in Possession*

30254165.1

# EXHIBIT 1

| PURCHASE ORDER ENTERED AT 051 | **PURCHASE ORDER**  P.O.Box 3074 Glenview IL 60026-3074 (BILL TO ADDRESS ONLY, DO NOT SHIP HERE) | SHOW THIS NUMBER ON ALL PAPERS AND PACKAGES PERTAINING HERE TO |
|---|---|---|
| TIME PRINTED 12:06:38 | | PURCHASE ORDER NO. 051-188802-143 |
| | | PURCHASE ORDER DATE 01/30/23 |
| | | VENDOR NO. 220350-000 |
| DATE PRINTED 01/30/23 | | PAGE 1 OF 1 |

| MAIL ACKNOWLEDGEMENT TO ATTN PURCHASING DEPT | DATE REQUIRED |
|---|---|
| WESCO/ANIXTER PURCHASING<br>2301 PATRIOT BLVD<br>GLENVIEW, IL 60026<br>PHONE:224-521-8000<br>FAX #:224-521-8200 | CONFIRMING ORDER ☐<br>NON-CONFIRMING ORDER ☒<br>CONFIRM WITH<br>ACKNOWLEDGE BY DATE |

| VENDOR | SHIP TO |
|---|---|
| QUANERGY SYSTEMS INC<br>433 LAKESIDE DRIVE<br>SUNNYVALE    CA 94085 | JOHNSON CONTROLS<br>PHILLIPS, ELLEN F<br>            REF NBR: 1636526<br>19625C 62ND AVE SOUTH #C112<br>KENT, WA 98032 |

| F.O.B. POINT | ROUTING | FREIGHT TERMS | PAYMENT TERMS | PC NUMBER | REQ. NUMBER |
|---|---|---|---|---|---|
| ORIGIN | BEST WAY | PREPAID & ALLOWED | | | |

| LINE | QUANTITY | DESCRIPTION | DATE REQUIRED | UM | UNIT COST | EXTENSION |
|---|---|---|---|---|---|---|
| 001 | 63 | PART.NBR: DS-143B3415-01<br> VND.NBR: MQ-8-POE-PLUS<br>MQ-8 POE+ PLUS SENSOR, 2 YEARS WARRANTY<br>--<br>SAL.ORD:143B3415-01<br><br>DAY 2 DAY $8,746.39<br>.<br>UPS GROUND #90A19Y | 02/06/23 | EA | 6363.00 | 400,869.00 |
| 002 | 63 | PART.NBR: DS-143B3415-02<br> VND.NBR: QRTXDTC-PREM-LIC-1YR<br>1 YEAR QORTEX DTC ESSENTIALS SENSOR LICENSE WITH 1 YEAR OF MAINTENANCE AND<br>SAL.ORD:143B3415-02<br><br>SUPPORT<br>DAY 2 DAY $1,344.33<br>.<br>UPS GROUND #90A19Y | 02/06/23 | EA | 978.00 | 61,614.00 |
| | | ** P.O. MEMO **<br>SHIP GROUND<br>SHIP COLLECT THIRD PARTY<br>SHIP VIA UPS<br>ACCOUNT #90A19Y<br>SHIP ON 01/30/2023<br>VERIFY SHIP DATE & PRICING TO<br>IJAIZAHMEDA.HALBHAVI@WESCODIST.COM | | | | |
| | | | | | | USD |

| PURCHASING AGENT N/S IJAIZ AHMED 051 | TOTAL PRICE | 462,483.00 |
|---|---|---|

ANIXTER CATALOG NUMBER AND PO NUMBER ARE REQUIRED ON ALL SHIPPING DOCUMENTS, PACKAGES, AND INVOICES. UNLESS OTHERWISE SPECIFIED IN THE PO, USE PREFERRED CARRIER ROUTING GUIDE (<http://WWW.ANIXTER.COM/ROUTINGGUIDE>). BY ACCEPTING THIS ORDER, YOU AGREE THAT THE ANIXTER GENERAL TERMS OF PURCHASE PUBLISHED AT WWW.ANIXTER.COM/SUPPLIERTERMS ARE EXPRESSLY INCORPORATED INTO AND SHALL GOVERN THIS PURCHASE ORDER.

Form_POEmail_Anixtera_0716

GENERAL TERMS OF PURCHASE

1. **DEFINITIONS**.
1.1. "Buyer" means the Anixter entity specified in the Order.
1.2. "Confidential Information" means Buyer's non-public, proprietary, or confidential information; in oral, visual, written, electronic, or other tangible or intangible form; marked or designated as "confidential" or that would reasonably be considered confidential and/or proprietary under the circumstances surrounding disclosure. Confidential Information includes, but is not limited to: (a) technical, marketing, operating, performance, costs, pricing information, programs, inventions, discoveries, trade secrets, material specifications, business and operating techniques, procedures, processes, strategies, models, methods, and practices, source code, information concerning future products, customer lists, employees, strategic relationships, business opportunities, sample data, and any other information; (b) any terms, conditions, or arrangements discussed regarding the Order; and (c) all notes, analyses, summaries, and other materials prepared by receiving party or any of its representatives that contain, are based on, or otherwise reflect any of the Confidential Information.
1.3. "Customer" means any Buyer customer, including any end user, of the Products, Software, and/or Services.
1.4. "Intellectual Property Rights" means patents, trademarks, copyrights, database rights, design rights, registered designs, know-how, trade secrets, and all other intellectual property rights, in each case whether registered or unregistered and including applications or rights to apply for them and together with all extensions and renewals of them, and in each case all rights and forms of protection having equivalent and similar effect anywhere in the world.
1.5. "Order" means an order issued by Buyer to Seller hereunder for the purchase of Products, Software, and/or Services.
1.6. "Products" means those products specified in the Order.
1.7. "Seller" means the person, firm, or company named in the Order.
1.8. "Services" means those services described in the Order.
1.9. "Software" means any computer program, operating system, interface, software-as-a-service, application or other software as specified in the Order.
1.10. "Special Terms" means any additional mutually agreed upon terms set forth in the Order. In the event of a conflict, the Special Terms shall prevail over these general terms of purchase.
1.11. "Terms" means these general terms of purchase and Special Terms.
2. **TERMS**. These Terms, together with the Order, constitute an offer by Buyer to purchase Products, Software, and/or Services from Seller pursuant to the terms and conditions described herein. This offer is not an acceptance or a confirmation of any previous offer or proposal from Seller, and this offer shall be deemed to be a rejection and counteroffer with respect to any previous offer or proposal from Seller. An offer is deemed accepted "as is" by Seller upon the first of the following to occur: (i) Seller's verbal or written acceptance of the Order; (ii) any performance by Seller pursuant to the Order; or (iii) the passage of two (2) business days after Seller's receipt of the Order without written notice to Buyer that Seller explicitly does not accept the Order. Any additional or different provisions contained in or referred to in Seller's quotation, order acceptance or acknowledgement, correspondence or any other communication are deemed rejected by Buyer and will not modify the Order or these Terms and will not be binding on the parties unless such terms have been explicitly approved in a signed writing by both parties. All Orders shall incorporate by reference all terms of the Uniform Commercial Code providing any protection for Buyer, including all Buyer's remedies under the Uniform Commercial Code. These Terms supersede all prior written or oral statements between Buyer and Seller and constitutes the entire and only agreement between them relating to the Products, Software, and Services. Products, Software, or Services supplied or performed prior to an Order being placed or accepted by Seller are subject to these Terms. Notwithstanding the foregoing, in the event that Buyer and Seller are parties to a mutually executed and negotiated agreement that governs the purchase of Products, Software or Services (the "Existing Agreement"), the terms and conditions of such Existing Agreement shall be deemed to supersede these Terms for the specific purpose set forth therein.
3. **CHANGE.** Buyer shall have the right to modify, change, or cancel all or any part of an Order (including design specifications), packing, destination, delivery schedule or quantity) for any or no reason before delivery of the Products, Software, and/or Services, without any cost or liability to Buyer. If such changes cause an increase or decrease in Seller's cost of performance hereunder or in the time required for performance, an equitable adjustment shall be negotiated promptly and the Order shall be modified in a writing signed by both parties accordingly. Any claim by Seller to an adjustment in the purchase price or delivery date(s) due to such change must be asserted by Seller to Buyer in writing within two (2) business days from Buyer's issuance of such revised Order; otherwise Seller waives its right to such an adjustment. After receipt of Seller's claim for an adjustment, Buyer may cancel all or part of the Order, without liability to Seller or Buyer. The restocking fee and freight coverage constitute Seller's sole remedy for cancellation of shipped Products or Software. Notwithstanding the foregoing, if Seller is aware that the Order is for Products or Software intended for a project identified by Seller to Buyer, and the Customer identified by Seller fails to take delivery of or returns the Products or Software to Buyer, Buyer has the right to return all refused Products or Software to Seller without a restocking charge or any liability for shipping charges incurred in returning the Products or Software to Seller.

4. **PRICE.**
4.1. Seller shall provide the Products, Software, and Services to Buyer at the prices stated in the Order, or if no price is stated in the Order lowest price currently quoted or charged at the date of the Order by Seller for the same or commercially similar products, but not higher than the price last quoted by Seller to Buyer ("Price"). Unless otherwise agreed in writing, the Price shall be a fixed Price:
4.1.1. exclusive of amounts in respect of any applicable value added tax (VAT) or goods and services tax (GST) (which shall be payable by Buyer at the prevailing rate, subject to receipt of a valid VAT or GST invoice detailing such amounts); and
4.1.2. inclusive of all charges for disposable packing, costs associated with returnable packing and/or containers, carriage, delivery, insurance, as well as all other charges. No increase in the Price is effective, whether due to increased material, labor, or transportation costs or otherwise, without the prior written consent of Buyer; and
4.1.3. inclusive of a bulk purchase or volume of purchase discount customarily granted by Seller.
4.2. Notwithstanding anything to the contrary in these Terms, and without prejudice to any other right or remedy it has or may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller. Buyer may also deduct damages for breach of warranty or of any other provision of these Terms from amounts due to Seller on any invoice, whether or not such invoice relates to the transaction occasioning the breach.
4.3. Where off-loading is required, the Price shall include Seller providing any special equipment to ensure delivery as instructed in the Order.

5. **PAYMENT.**
5.1 Unless otherwise specified in the Order, and except for any amounts disputed by Buyer, Buyer shall pay all invoiced amounts due to Seller 2% 30, net 90 days of: (i) Buyer's receipt of the Products and/or Software and/or completion of the Services consistent with the Order; and (ii) Seller's complete and correct invoice. Buyer shall have the right to withhold payment of disputed amounts pending receipt of substantiating evidence, in such form and detail as Buyer may reasonably direct (including original proof of Product, Software, and/or Services delivery on direct shipments to Customer, and manufacturing and/or testing certifications for any shipments). Neither payment of invoices nor receipt of Products, Software, and/or Services will be deemed acceptance of the Product, Software, and/or Services. Notwithstanding anything to the contrary, Seller shall continue performing its obligations under these Terms during any such dispute.
5.2 For all withholding taxes paid by Buyer on behalf of Seller and where permitted by applicable law, Buyer will deduct from the invoice to be paid to Seller and shall provide to Seller within thirty (30) days after the date of payment, a valid certificate of tax payment documenting the amount of withholding tax paid therein. Furthermore, Buyer shall provide Seller specific information regarding which invoice the deduction applies to, as well as, the actual percentage that is being deducted from the invoice.

6. **DRAWINGS. INSPECTION. RETURNS. RECALL.**
6.1. Seller is responsible for the accuracy and completeness of all instructions, data, specifications, documentation, drawings and information provided with the Products, Software, and Services.
6.2. All Products, Software, and Services ordered will be subject to inspection and acceptance by Buyer and Customer on or after the delivery date notwithstanding that title may have passed to Buyer or Customer, that Buyer or Customer may have made a prior payment, or that Buyer or Customer may have performed some type of source

inspection. Buyer, at its sole option, may inspect all or a sample of the Products, Software, and Services, and may reject all or any portion of the Products, Software, and Services if it determines they are nonconforming or defective. If Buyer rejects any portion of the Products, Software, or Services, Buyer has the right, effective upon written notice to Seller, to reject the Products, Software, or Services and require replacement of the rejected items or services. If Buyer requires replacement of the Products, Software or Services, Seller shall, at its expense, promptly replace the nonconforming Products, Software, or Services and pay for all related expenses, including transportation charges for the return of the defective goods and the delivery of replacement items. Any inspection or other action by Buyer under this Section shall not reduce or otherwise affect Seller's obligations under these Terms, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions. Delivery of defective or nonconforming Products, Software and/or Services shall not be deemed to satisfy the delivery schedule required herein nor shall acceptance of any of the foregoing be deemed to alter the obligation of Seller or the rights of Buyer under these Terms. Buyer will also be entitled to inspect and test the Products during manufacture, prior to shipment or storage, and to assess progress towards meeting the delivery date. In addition, Seller shall, if requested by Buyer, give Buyer reasonable notice of all tests and Buyer shall be entitled to be represented at such tests.

6.3. Upon request by Buyer or Customer, Seller will timely provide all test reports, drawings, start up service and other engineering services. Seller shall provide Buyer or its representatives with reasonable access to all relevant quality information and cooperate fully in any quality assessment of the Products or review of Seller's quality assurance processes, including on-site inspection at Seller's facility. Seller shall also maintain complete and accurate records relating to: (i) certified test reports as to each Buyer Order number for a period of five (5) years from date of delivery; and (ii) records of the time spent and materials used by Seller in providing the Services for a period of five (5) years from completion of the Services. Upon Buyer's written request, Seller shall allow Buyer or it's designated representative to inspect and make copies of such reports and records and interview Seller personnel in connection with the provision of the Products, Software, and/or Services.

6.4. Standard Products shall be manufactured in accordance with Seller's specifications. Seller will notify Buyer in writing 90 days in advance of implementing any change to a standard Product's specifications or 180 days in advance for Product obsolescence. Furthermore, such change shall only be implemented after the notification period in the notice has lapsed. In the event of Product obsolescence, Buyer shall have the right to return such Product at Seller's expense and receive a purchase price credit. Non-standard Products are manufactured in accordance with the specifications provided in the Order or as otherwise provided by Buyer in writing. Seller acknowledges and agrees that it cannot implement any changes to non-standard Product's specifications without Buyer's prior written approval.

6.5. Buyer may return product for any reason for full credit or refund with no restocking fee. Authorization to return a product for any reason shall be issued in a reasonable period of time not to exceed 2 business days. This includes incorrect merchandise or over-shipment.

6.6. Upon written request, Seller shall timely provide Buyer: (i) monthly reports detailing orders and fulfilment status; (ii) at the time of quote or within 48 hours of Buyer's request, a report of available finished goods inventory of Product; (iii) periodic training and support for the Products, Software, and Services as well as assistance with the sale of the Products, Software, and Services to Customer free of charge; and (iv) a copy of its current business continuity plan (BCP) and disaster recovery plan (DRP) that includes at a minimum: (a) a description of the scenarios the BCP/DRP can support (e.g. loss of facilities, key people, pandemic, systems, vital records, internal/external dependencies); and (b) a description of the process to restore operations to the original site to resume full service capabilities. Seller will also be required to document operational issues and initiatives as well as include status or solutions to resolve.

6.7. Buyer has the right to rotate stock once every calendar quarter by returning any Products in its inventory to Seller. Inventory returned under this Section must be undamaged and in a resalable condition. Seller shall bear all shipping costs relating to the rotation of Products. If an initial order of a given product is required, Buyer will have the right to return all the initial order that remains in Buyer's inventory for 12 months from the date of delivery of such order. In addition, Buyer may, from time to time, scrap or otherwise destroy any or all of the Products upon receipt of written confirmation from Seller. The Parties will agree on a mutually acceptable method for the scrapping or destruction of such Products. Seller shall reimburse Buyer for all reasonable costs incurred for the scrapping or destruction of such Products. Products authorized for scrapping must be destroyed within thirty (30) days from Seller's approval. Seller reserves the right to request that Buyer provide a certificate of destruction, scrap certificate or a letter including part details and value of such Products which is signed by a director certifying that such Products were in fact destroyed.

6.8. If any Product purchased from Seller is the subject of a recall, safety notice or other corrective action plan (collectively, "Recall"), whether initiated by Seller, Buyer, Customer, or a government entity, Seller shall be responsible for any and all costs, expenses and damages associated with the Recall ("Recall Costs"). Recall Costs include repairs, replacements, reimbursements, transportation costs, costs involved with the removal of any Products subject to a Recall, repairs associated with such Recall, return of such Products, delivery, and installation of Products that replace the Recalled Products, and all other associated costs and expenses, including all expenses, damages and losses incurred by Buyer and Customer in connection with such Recall. Seller shall immediately notify Buyer of any investigation or inquiry initiated by a government agency relating to any Recall, and take the appropriate steps to resolve the matter without exposing Buyer and Customer to any liability, damages or risk.

6.9. In the event a Customer directly provides notice to Seller of defective or nonconforming Products, Software, and/or Services or of any other issue or matter, Seller shall immediately notify Buyer of such notice, and engage Buyer on any and all discussions and actions to be taken with such Customer.

7. **BUYER'S PROPERTY.** All patterns, dyes, molds, tooling, plans, drawings, specifications, samples and other materials or equipment supplied by Buyer to Seller or prepared or obtained by Seller for and at the cost of Buyer shall be the property of Buyer and shall be labeled and identified accordingly. Seller shall maintain all such items in good order and working condition (fair wear and tear expected). Seller shall at its own cost return all such items to Buyer upon demand in good order and working condition. Should Seller fail to return the items, Buyer may (without prejudice to any other rights it may have) withhold payment of monies due to Seller under the Order to the value of the items until return of the items. Seller shall not use such items nor shall it permit any other person to use such items for or in connection with any purpose other than pursuant to this Order unless authorized in writing by Buyer.

8. **DELIVERY.** Seller acknowledges that time is and shall remain of the essence with respect to the timely delivery of the Products, Software, and Services, including all quantities, performance dates, timetables, project milestones and other requirements in the Order. Seller's failure to meet its delivery obligations shall constitute a material breach of these Terms. Seller shall deliver the Products and Software, and/or complete the Services ordered by Buyer on or before the close of business on the delivery date specified on the applicable Order or according to the schedule thereon stated (provided that Software may be delivered electronically). If no delivery date is specified, Seller shall deliver the Products and Software, and or complete the Services within a reasonable timeframe from Seller's receipt of the Order. If Seller cannot comply with the delivery date specified in the Order, Seller shall immediately notify Buyer, but in no event, later than two business days from receipt of such Order. Buyer may then, at its sole discretion either: (i) request a new delivery date; (ii) request partial shipment of the available Products and Software; or (iii) cancel all or any part of the Order without any penalty or liability. Seller will, at no additional cost to Buyer, employ accelerated measures such as expedite fees, premium transportation costs, or overtime required to meet the specified delivery schedule. In the event of partial failure of Seller's sources of supply of Products purchased hereunder, Seller agrees to first meet all of Buyer's requirements prior to any allocation among other Seller customers. If Seller does not comply with any of its delivery obligations under this Section 8, without limiting Buyer's other rights under these Terms or applicable law, then Seller shall be

responsible for any losses, claims, damages (including liquidated damages), and reasonable costs and expenses incurred by Buyer and attributable to Seller's failure to comply with its delivery obligations.

9. **PACKING.** Products shall be properly and securely packed in accordance with the packing instructions specified in the Order or, if none are specified, the industry standard. Unless otherwise agreed by Buyer in writing, Seller will provide all cases and packing material free of charge. Without prejudice to Buyer's right of rejection and/or cancellation, damage to Products not properly or securely packed will be charged to Seller.
10. **SHIPMENT**.
10.1. Unless otherwise stated on the Order, all Product shipments shall be FOB destination. Where specific written preauthorization is granted to ship Products FOB Shipping Point, Seller agrees to prepay all shipping charges, comply with Buyer's Routing Guide, published on www.anixter.com/routingguide, and bill Buyer as a separate item on the invoice for said charges at cost, if routing instructions are not included on the Order. Non-compliance may result in additional freight costs and service fees at Seller's expense. Each invoice for shipping charges shall contain the original or a copy of the shipping bill indicating that the payment for shipping has been paid. Buyer reserves the right to refuse COD Shipments. Seller shall suitably pack or otherwise prepare the Products for shipment so as to secure the lowest transportation rates and to meet the carrier's requirements. No charges will be allowed for such packing or preparation unless otherwise stated on the Order.
10.2. Title to the Products under any individual Order passes to Buyer upon the earliest to occur of: (a) payment of the Price for the Products; or (b) delivery of the Products to Buyer at the "Ship-To" location indicated by Buyer on the Order. Risk of loss passes to Buyer upon receipt and acceptance by Buyer at the "Ship-To" location indicated by Buyer on the Order, and Seller will bear all risk of loss or damage regarding the Products until Buyer's receipt and acceptance of such Products in accordance with the terms hereof.
11. **SOFTWARE LICENSE.** Seller grants to Buyer a worldwide, non-exclusive, fully paid up license during the term of the Order to download, access, promote, market, resell and use the Software as contemplated herein.
12. **SERVICE LEVELS AND CREDIT.** If Seller is providing Services, including Software as a Service, the parties may agree to certain service level commitments as set forth in a service level agreement, the service level agreement published at www.anixter.com/supplierterms shall apply to such Services unless the parties have explicitly agreed to a different service level agreement attached to the SOW or Order.
13. **DATA SECURITY.**
13.1. User Data. "User Data" means any information provided or made available by Buyer or Customers under or in connection with these Terms that identifies or discloses the name, identity, password, or other identifying information or characteristic of an individual. Seller shall not collect, track, maintain, use or reproduce any User Data except to the extent necessary to perform its obligations under these Terms and shall not distribute or make available to any person or entity, including its third party service providers, any User Data for any purpose without Buyer's and/or Customer's prior written consent. Except as otherwise provided herein, Seller shall have no right, title, or interest in or to the User Data.
13.2. Security Measures. Seller shall maintain a formal security program in accordance with industry standards that is designed to: (i) ensure the security and integrity of User Data; (ii) protect against threats or hazards to the security or integrity of User Data; and (iii) prevent unauthorized access to User Data. Seller shall immediately notify Buyer of any failure of such security measures, practices, and procedures to accomplish the foregoing protection or regarding any security breach or incident related to User Data, and shall promptly provide Buyer and Customer, as applicable, with full and detailed written information regarding such failure, incident or breach and fully cooperate with and assist Buyer and Customer, as applicable, in any efforts to address or otherwise respond to such failure, incident or breach. Seller acknowledges that Buyer is headquartered in the United States and operates globally, that data collected by Buyer from Seller in connection with these Terms may be transferred into and/or processed in the United States or other locations by Buyer or an authorized third party/subcontractor, and Seller expressly consents to such transfer and processing. In addition, where applicable, Seller shall cooperate with Buyer in Buyer's efforts to determine the risk to the Bulk Electric System (as that term is defined by the North American Electric Reliability Council (NERC), which definition is available at http://www.nerc.com/files/glossary_of_terms.pdf) ("**BES**") posed by the security breach or incident, including providing additional information regarding the security breach or incident upon request from Seller.

14. **REPRESENTATIONS AND WARRANTIES.**
14.1. Product and Software Warranties. Seller warrants to Buyer and the applicable Customer that:
14.1.1  the Products and Software are fit and safe for use consistent with and will conform to the specifications set forth in these Terms, the applicable Order, and in Seller's Product documentation;
14.1.2  the Products and Software are free of defects in materials, workmanship, and design and suitable for the purposes intended;
14.1.3  the Products and Software are not counterfeit;
14.1.4  it has the authority and right to sell and/or license the Products and Software to Buyer, and grants Buyer the authority and right to resell such Products and Software to third parties via those channels Buyer, at its sole discretion, deems necessary;
14.1.5  Buyer or the applicable Customer will receive good and valid title to the Products, free and clear of all liens and encumbrances of any kind;
14.1.6  the Products are free from hydrogen embrittlement and/or hydrogen degradation whether submitted to electro-plating or phosphating or otherwise;
14.1.7  the Software does not include (directly or indirectly) any open source, public-source, or freeware, except as expressly disclosed in writing by Seller to Buyer. Seller is and shall continue to be in full compliance with the terms of all licenses relating to any software which is incorporated into or required for the operation of any of the Products;
14.1.8  the Products and Software will not introduce or cause to be introduced into Buyer's or any Customer's systems any viruses, Trojan horses, worms, spyware, time bombs, corrupted files or other computer programming routines that are intended to damage, detrimentally interfere with, surreptitiously intercept or expropriate any systems, data, personal information or property of another or other such malicious code;
14.1.8 the Products and Software will comply with all other warranties implied by applicable law.
14.2. Services Warranties. Seller warrants to Buyer that:
14.2.1 it has the unconditional and irrevocable right, power, and authority to provide the Services and grant and perform all rights and licenses granted or required by it under these Terms;
14.2.2 the Services to be provided shall conform to the specifications (including any agreed service levels) set forth in these Terms and the Order;
14.2.3 the Services shall be performed with due care, skill and diligence and in a timely and professional manner by qualified and suitable personnel in accordance with best industry standards and practices, and in compliance with any Customer policies applicable to the site;
14.2.4 Deliverables and work product provided in connection with the Services shall be accurate and complete;
14.2.5 neither its grant of the rights or licenses hereunder nor its performance of any Services or other obligations under these Terms: (i) conflicts with or violates any applicable law, including any law relating to data privacy, data security, or personal information; or (ii) require the consent, approval, or authorization of any governmental or regulatory authority or other third party; and
14.2.6 the Services shall be of acceptable quality.
14.3 Warranty Specifics. The warranties shall run to Buyer and Customer, and shall continue in full force and effect for the longer of: (i) two (2) years from delivery of the Products or Software to Customer (or from completion of any warranty repair for nonconforming Products or Software); (ii) one (1) year from completion of the Services; (iii) the standard warranty period provided by Seller for the Products or Software; (iii) the period specified in the Special Terms; or (iv) the mutually agreed upon period. Seller shall obtain and assign to Buyer, its assigns and each applicable Customer the warranties provided by the manufacturers or suppliers of material or equipment incorporated into the Products and Software, and shall perform its responsibilities so that such warranties remain in full force and effect. If Buyer gives Seller notice of noncompliance pursuant to this Section 14, Seller

shall, at its own cost and expense, promptly replace or repair the defective or nonconforming Products, Software or re-perform the Services, or at Buyer's sole discretion, shall fully refund Buyer for such defective Products, Software or Services and pay for all related costs and expenses. Return of all defective or nonconforming Products or Software by Buyer or Customer to Seller and shipping of repaired or replacement Products or Software back to a designated location shall be at Seller's expense including: (i) all transportation related charges; and (ii) any expenses and penalties incurred by Buyer in recalling such Products or Software or articles containing such Products or Software which have been delivered to Customer. Seller shall repair units that are out of the warranty period for actual cost of repairs. Seller shall maintain this repair service for Customer for a period of at least two (2) years after expiration of the warranty period. Should Seller fail to repair or replace any Product, Software or Services in accordance with the terms of this warranty, or if immediate replacement or work is necessary to maintain operations or avoid loss of life, Buyer shall have the right to cause such replacement to be made, utilizing its own forces and/or those third parties as Buyer shall reasonably deem appropriate, at Seller's expense.

15. **COMPLIANCE WITH LAWS.**
15.1. Seller, as well as all Products, Software, and Services provided to Buyer and Customer, shall, comply with all applicable laws, rules, orders regulations, regulatory requirements and codes of practice in connection with its obligations under the Order and these Terms. Without limiting the generality of the foregoing, Seller shall comply with all applicable laws, rules, orders, regulations, regulatory requirements and codes of practice (as amended from time to time) relating to:
15.1.1. taxation, data privacy, exchange controls, anti-trust, anti-money laundering, trade sanctions, financial sanctions and criminal matters which are applicable to Seller, its group, or to their respective parent companies, or to their respective affiliates;
15.1.2. imports, exports, customs, and environmental protection laws, including the Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and
15.1.3. anti-human trafficking, anti-slavery, anti-bribery and anti-corruption, including to the US Foreign Corrupt Practices Act 1977 the UK Bribery Act 2010 and will not engage in any activity, practice or conduct which would constitute an offence under such laws. In addition, Seller acknowledges that it has read and agrees to comply with Buyer's Supplier Code of Conduct published on www.anixter.com/suppliercode which is incorporated herein by reference, as amended from time to time.
15.2. Seller warrants that each Product shall be manufactured, packaged, tagged and labeled in strict compliance with, and all Product literature shall be complete, accurate and strictly comply with, all applicable laws, rules, orders, regulations, regulatory requirements and codes of practice. Within two (2) days after receipt of the Order, Seller shall provide Buyer with a written list of all hazardous or toxic substances (as those terms are defined by any applicable laws) contained in any Products identified in the Order. At the time of delivery, Seller shall identify in a SDS or other written statement all hazardous or toxic substances (as those terms are defined in any applicable laws) contained in any Product, to the extent required by applicable laws. With the exception of such hazardous or toxic substances so identified, Seller warrants that at the time of delivery by Seller to Buyer each Product shall contain no hazardous or toxic substances. Seller will furnish to Buyer any information required to enable Buyer to comply with applicable laws, rules, orders and regulations related to the Order and these Terms, including any certification or questionnaire regarding non-existence of any particular hazardous or toxic substance in the Products.
15.3. If providing Services, Seller shall obtain and maintain all necessary licenses, certifications, and permits, specialty or otherwise, and pay all fees, taxes, and other charges required thereby.
15.4 Seller shall comply with all applicable Federal Acquisition Regulations (FARs) and Executive Orders, including those published on www.anixter.com/FAR, which are incorporated herein by reference, as amended from time to time.
15.5. Seller shall disclose to Buyer whether any Product or equipment, system, service, part, component, or element included in a Product is produced or provided by Huawei Technologies Company, ZTE Corporation, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, Dahua Technology Company, or any other entity that the U.S. Department of Defense reasonably believes to fall within the definition of covered telecommunications equipment or services under section 889 of the National Defense Authorization Act for Fiscal Year 2019, including any subsidiary or affiliate of such entities (collectively, the "Restricted Entities"). If any item is produced or provided by the Restricted Entities, then Seller shall provide the part number, serial number, or any other relevant information that Buyer requests to ensure compliance with U.S. law. Seller also shall disclose whether Seller is unable to ascertain whether an item sold to Buyer is produced or provided by the Restricted Entities.
15.6. Seller agrees to notify Buyer of any changes to information provided to Buyer and to participate in any surveys or questionnaires sent to Seller from time to time (e.g. sustainability annual survey).
15.7. Buyer reserves the right to immediately terminate this Order, without fault or penalty, in the event Buyer's performance under this Order is prohibited by applicable laws, regulations, rules, sanctions and/or directives. In the event Buyer suspects that Seller is in breach of this Section 15, Seller will permit Buyer or its professional advisors immediate access to Seller's books and records in order for Buyer or its professional advisors to audit and take copies of Seller's books and records to check compliance with this Section.

16. **INDEMNITY.**
16.1. Notwithstanding anything contrary in these Terms, Seller shall protect, defend, hold harmless and indemnify Buyer and its affiliates, parent company, directors, officers, employees, agents, successors, permitted assigns, and Customers (each, an "Indemnitee") from and against any and all claims, actions, liabilities, losses, deficiencies, costs, damages, judgments, interest, awards, penalties, fines and expenses (including reasonable attorneys' and professional fees and costs, the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers) brought against or suffered by such Indemnitee arising out of any claim alleging:
16.1.1. Seller's breach or non-fulfillment of any representation or warranty in these Terms or the Order, including any actual or alleged defect in the Products, Software, or Services;
16.1.2. Recall of Seller's Product;
16.1.3. Seller's acts or omissions in the performance of its obligations under these Terms and the Order, including Seller's negligent or more culpable acts or omissions (including any recklessness or willful misconduct);
16.1.4. any actual or alleged failure by Seller, its agents, or by any Products, Software, or Services, to comply with any applicable laws, statutes, ordinances, or any governmental administrative order, rule or regulations of any kind;
16.1.5. any actual or alleged infringement or misappropriation of a patent, copyright, trade secret or other Intellectual Property Right of any third party by Seller, its agents, or by any Products, Software, or Services (for purposes of clarity, an allegation of infringement or misappropriation of the Products, Software, and/or Services in a claim or action will trigger this provision); and/or
16.1.6. any disputes involving promotional or advertising matters, fixtures, displays, guarantees, representations, warranties, labels, packing, and/or instructions, verbal or otherwise, furnished and/or approved by Seller.
16.2. As to Seller's obligation to indemnify under Section 16.1.5, if such a claim is or is likely to be made, Seller shall, at its own expense, exercise Buyer's option to either: (a) obtain for Buyer the right to continue to use and sell the infringing Product, Software and/or Services; (b) modify the Products, Software, and/or Services so they are non-infringing and in compliance with these Terms; (c) replace the Products, Software and/or Services with a non-infringing substitute of equivalent or superior functionality that comply with these Terms; or (d) accept return (at Seller's expense) of the infringing Products, Software, and/or Services and refund to Buyer any amount paid for such infringing Products, Software, and/or Services. For the avoidance of doubt, the remedies set forth in this Section 16.2 are cumulative and in addition to any other remedies available to Buyer under these Terms, or under law or equity.
16.3. If Seller fails to assume its defense and indemnity obligations hereunder within 10 days from written notice by Buyer, Buyer has the right, but not the obligation, to proceed with its own defense (which shall include the right to settle such underlying claim or action), and Seller will reimburse and indemnify Buyer for any and all losses,

settlement amounts, costs, and expenses (including reasonable attorneys' fees and expenses) incurred by Buyer in connection with such matter. To the extent an action or a claim is made against Buyer alleging infringement by multiple parties and their respective products, software and/or services including Seller and its Products, Software and/or Services, Seller will pay its proportionate share of any losses, settlement amounts, costs and expenses (including reasonable attorneys' fees and expenses) as reasonably determined by Buyer. Buyer may set off Seller's proportionate share of all such losses, settlement amounts, costs, and expenses (including reasonable attorneys' fees and expenses) against any amounts due to Seller.

16.4. Upon written notice to Buyer, Seller shall have the right to enter into a settlement with the party who brought a claim or action against Buyer as contemplated above; provided, (i) as part of such settlement, Seller must obtain Buyer's prior written consent, (ii) a full release in favor of Buyer in such form satisfactory to Buyer, and (iii) Seller shall remain liable for its proportionate share of any costs and expenses (including reasonable attorneys' fees and expenses) incurred by Buyer up to the date of such settlement. With respect to the foregoing indemnity obligations, Seller waives any statutory limitation of liability to which it may otherwise be entitled under workers' compensation or similar statutes.

17. **INSURANCE**. Seller shall, at its expense, procure and maintain the insurance policies in Buyer's Supplier Insurance Guide located on www.anixter.com/supplierinsurance, as amended from time to time.

18. **CONFIDENTIALITY.** Buyer may disclose or make available to Seller certain Confidential Information. Seller shall strictly protect and safeguard the confidentiality of the Buyer's Confidential Information with at least the same degree of care as the Seller normally uses in the protection of its own confidential information, but in no case any less degree than a reasonable degree of care. Seller shall not use Buyer's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under these Terms. Confidential Information does not include any information that (i) is or becomes generally available to the public, other than as a result of Seller's breach of this Section; (ii) is obtained by Seller on a non-confidential basis from a third-party that, to Seller's knowledge, was not legally or contractually restricted from disclosing such information; (iii) was in Seller's possession prior to disclosing party's disclosure hereunder; or (iv) was or is independently developed by Seller without using any Confidential Information. If Seller becomes legally obligated to disclose any Confidential Information by court order or other lawful government action, Seller will disclose the Confidential Information only to the extent so ordered and only after providing prompt written notification to Buyer of the pending disclosure so Buyer may attempt to obtain a protective order. Seller shall restrict internal disclosure of confidential information to its employees with a need-to-know such information and advise such employees of the obligations assumed hereunder.  For the purposes of clarification, prices, discounts and rebates provided to Buyer for the Products, Software or Services shall be considered Buyer's Confidential Information. Order information identifying a Customer is furnished to Seller by Buyer on the understanding that Seller has the right to only use that information for the purposes of fulfilling such Order. If Buyer makes Seller aware of an opportunity with a Customer, verbally or in writing, Seller shall provide the Products and/or Services for such opportunity only through Buyer, and is prohibited from pursuing or servicing such opportunity through another distributor, a third party, or directly in competition with Buyer, without Buyer's prior written approval.

19. **LAW. VENUE.** These Terms and any transactions contemplated herein shall be governed according to the substantive laws of the Commonwealth of Pennsylvania, without regard to principles of conflicts of law, and shall not be governed by the U.N. Convention on the International Sale of Goods. Any issue, dispute or controversy ("Dispute") between the parties, including with respect to contract formation or the interpretation of these Terms, that cannot be commercially resolved by the parties shall, at Buyer's election, be submitted to nonbinding mediation as a condition precedent to litigation. If Buyer elects mediation, the parties shall mutually agree upon the mediator and shall share equally in the mediator's fees. If Buyer does not elect mediation or the parties cannot resolve their Dispute through the mediation process, the parties hereby consent to (i) the exclusive jurisdiction and venue of the state or federal courts located in Allegheny County, Pennsylvania and shall not contest or challenge the personal jurisdiction or venue of such courts, and (ii) extra-territorial service of process. To the fullest extent permitted by applicable law, the parties hereto expressly waive any right to trial by jury in any action, suit or proceeding arising in or in connection with these Terms and the transactions contemplated herein. Notwithstanding the foregoing, if Buyer is sued in any other jurisdiction or forum (including but not limited an arbitration proceeding) for matters related to any Products, Software or Services sold to Buyer, Buyer shall have the right to join Seller as a party to any such proceeding, and Seller hereby consents to such joinder.

20. **NOTICE.** All notices under these Terms must be in writing (e.g., e-mail or physical mail) and addressed to the other party at its address set forth in the Order.

21. **PUBLICITY.** Neither party shall (orally or in writing) publicly disclose, issue any press release, or make any other public statement, or otherwise communicate with the media, concerning the existence of these Terms or the subject matter hereof, without the prior written approval of the other party.

22. **SURVIVAL.** Subject to the limitations and other provisions of these Terms any provision that, in order to give proper effect to its intent, should survive such expiration or termination, shall survive the expiration or earlier termination of these Terms.

23. **FORCE MAJEURE**. If Buyer is prevented from performing or is unable to perform any of its obligations under these Terms due to acts of God, epidemic, pandemic, acts of Seller or Customer, acts of civil or military authorities, riots, or civil disobedience, wars, or fires, Buyer's performance shall be excused and the time for performance shall be extended accordingly, provided that Buyer takes all reasonably necessary steps to resume full performance. Notwithstanding the foregoing, Buyer may terminate this Order if such performance is delayed for more than 15 days, without fault or penalty.

24. **CUMULATIVE REMEDIES**. All rights and remedies provided in these Terms are cumulative and not exclusive, and the exercise by either party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the parties or otherwise.

25. **SUBCONTRACTING.** Seller may subcontract all or part of its obligations hereunder solely upon written authorized by Buyer. Seller shall require all subcontractors to comply with the Order (including these Terms) and shall remain responsible and liable for all acts and omissions of subcontractors.

26. **GENERAL**. No amendments, modifications, waivers, rescission, or termination of these Terms can be made through the parties' course of dealings and no such change can be made except in a single writing signed by the parties hereto. The exhibits, schedules, attachments, and appendices referred to herein are an integral part of these Terms to the same extent as if they were set forth verbatim herein. Failure by Buyer to exercise any right or remedy under these Terms will not be deemed a waiver of such right or remedy unless in writing signed by Buyer, nor shall any waiver be implied from the acceptance of any payment. No waiver by Buyer of any right shall extend to or affect any other right, nor shall a waiver by Buyer of any breach extend to any subsequent similar or dissimilar breach. These Terms shall be for the benefit of the parties and not for the benefit of any other person, except as specified in any applicable Order. Seller may not assign these Terms or any Order, by operation of law or otherwise, without the express written approval of Buyer. Any attempt to assign or transfer all or any part of these Terms without first obtaining that written consent will be void and of no force or effect. Notwithstanding the foregoing, these Terms shall be binding upon, and inure to the benefit of, the permitted successors and assigns of each Party. Any provision of these Terms that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be limited or eliminated to the minimum extent required by that jurisdiction, and the remaining provisions of these Terms will remain in full force and effect. References to hyperlinked terms in these Terms are references to terms or content linked to the hyperlink (or the replacement hyperlink as Buyer may identify from time to time) as amended from time to time. Seller acknowledges that the terms or content in the hyperlink are incorporated into these Terms by reference and that it is Seller's responsibility to review the terms or content in the hyperlinks referenced in these Terms. The parties are independent contractors

and will have no right to assume or create any obligation or responsibility on behalf of the other party.

EFFECTIVE February 15, 2022

Anixter Proprietary and Confidential