## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| QUANERGY SYSTEMS, INC.,[1] | Case No. 22-11305 (CTG) |
| Debtor. | **Re: Docket No. 394, 462** |

## DEBTOR'S MEMORANDUM OF LAW
## IN SUPPORT OF ENTRY OF AN ORDER CONFIRMING THE
## FIRST AMENDED CHAPTER 11 PLAN OF QUANERGY SYSTEMS, INC.

Sean M. Beach (No. 4070)
Shane M. Reil (No. 6195)
Heather P. Smillie (No. 6923)
**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Email: sbeach@ycst.com
        sreil@ycst.com
        hsmillie@ycst.com

*Co-Counsel to the Debtor and Debtor in*
*Possession*

Cullen Drescher Speckhart (admitted *pro hac vice*)
Michael A. Klein (admitted *pro hac vice*)
Lauren A. Reichardt (admitted *pro hac vice*)
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275
Email:  cspeckhart@cooley.com
        mklein@cooley.com
        lreichardt@cooley.com

*Co-Counsel to the Debtor and Debtor in*
*Possession*

Dated: November 6, 2023

---

[1]  The Debtor and the last four digits of its taxpayer identification number are: Quanergy Systems, Inc. (5845). The Debtor's mailing address for purposes of the Chapter 11 Case is Quanergy Systems, Inc., c/o SierraConstellation Partners, LLC, 355 S. Grand Avenue, Suite 1450, Los Angeles, CA 90071.

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.  JURISDICTION AND VENUE ................................................................................ 2

III. BACKGROUND ...................................................................................................... 2

    A.   Procedural History ........................................................................................... 2

    B.   Solicitation and Voting Results ....................................................................... 4

    C.   Confirmation Objections.................................................................................. 6

IV.  ARGUMENT ............................................................................................................ 7

    A.   Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code.......................................................................................... 7

        1.   The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code .......................................................................... 8

        2.   The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code .......................................................................... 9

            a.   Section 1123(a)(1): The Plan Designates Classes of Claims and Interests ............................................................................ 9

            b.   Section 1123(a)(2): The Plan Specifies Classes that are Unimpaired by the Plan ............................................................ 10

            c.   Section 1123(a)(3): The Plan Specifies Treatment of Classes that are Impaired by the Plan ......................................... 10

            d.   Section 1123(a)(4): The Plan Provides Equal Treatment for Claims and Interests Within Each Class ..................................... 10

            e.   Section 1123(a)(5): The Plan Provides Adequate Means for Implementation ......................................................................... 11

            f.   Section 1123(a)(6): Provision Prohibiting the Issuance of Nonvoting Equity Securities....................................................... 12

            g.   Section 1123(a)(7): Provisions Regarding Directors and Officers ..................................................................................... 12

        3.   The Plan Complies with Section 1123(b) of the Bankruptcy Code......... 13

            a.   Section 1123(b)(1): Impairment of Claims and Interests ............ 13

            b.   Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases................................................ 13

            c.   Section 1123(b)(3): Retention of Claims or Interests by the Debtor ....................................................................................... 14

# TABLE OF CONTENTS
## (continued)

                                                                            **Page**

    d.    The Debtor Release Under the Plan Is Appropriate Under Section 1123(b)(3) and (6) ........................................................... 14

        (i)    *The Releases by the Debtor are Appropriate Under Section 1123(b)(3)* .......................................... 15

        (ii)    *The Consensual Third-Party Releases Under the Plan Is Appropriate Under Section 1123(b)(6)* ............... 22

            (a)    *The Third-Party Releases are Consensual Because the Releasing Parties Had a Right to Opt-out or Object to the Third-Party Releases* ................................................. 22

            (b)    *Even if Characterized as Non-Consensual, the Third-Party Releases Should be Approved Because They Satisfy the Fairness and Necessity Guidelines* .................................... 25

        (iii)    *The Exculpation Under the Plan is Appropriate Under Section 1123(b)(6)* ................................ 26

        (iv)    *The Injunction Under the Plan is Appropriate and Should be Approved* ........................................ 27

B.    Section 1129(a)(2): Debtor has Complied with the Applicable Provisions of the Bankruptcy Code ........................................................................ 27

    1.    The Debtor Has Complied with Section 1125 of the Bankruptcy Code ............................................................................................. 28

    2.    The Debtor's Solicitation Complies with Section 1126 of the Bankruptcy Code ................................................................... 29

C.    Section 1129(a)(3): The Plan has Been Proposed in Good Faith and Not by Any Means Forbidden by Law .......................................................... 30

D.    Section 1129(a)(4): The Plan Provides for Court Approval of Certain Administrative Payments .................................................................. 31

E.    Section 1129(a)(5): The Plan Discloses Post-Effective Date Management ........ 32

F.    Section 1129(a)(6): The Plan Does Not Require Governmental Approval of Rate Changes ............................................................................... 33

G.    Section 1129(a)(7): The Plan is in the Best Interests of Creditors .................... 33

H.    Section 1129(a)(8): Acceptance by Impaired Classes ......................................... 35

I.    Section 1129(a)(9): The Plan Complies with Statutorily Mandated Treatment of Administrative Claims and Priority Tax Claims ........................... 35

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| J. | Section 1129(a)(10): The Plan has been Accepted by At Least One Impaired Class of Claims | 36 |
| K. | Section 1129(a)(11): The Plan is Feasible | 36 |
| L. | Section 1129(a)(12): The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 | 37 |
| M. | Sections 1129(a)(13)-(16) Are Inapplicable | 38 |
| N. | Section 1129(b): The Plan Satisfies the "Cramdown" Requirements | 38 |
| | 1. Section 1129(b)(1): The Plan Does Not Unfairly Discriminate | 39 |
| | 2. Section 1129(b)(2): The Plan is Fair and Equitable | 40 |
| O. | Section 1129(c): Only One Plan | 40 |
| P. | Section 1129(d): The Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act | 40 |
| Q. | Section 1129(e): The Debtor's Chapter 11 Case Is Not a Small Business Case | 41 |
| R. | Substantive Consolidation of the Debtor and Quanergy Perception Retroactively as of the Petition Date and Consummation of the Merger Transaction is Appropriate | 41 |
| | 1. Substantive Consolidation of the Debtor and Quanergy Perception is Warranted Under the Third Circuit's Owens Corning Test | 42 |
| | 2. Substantive Consolidation of the Debtor and Quanergy Perception Effective as of the Petition Date is Warranted | 48 |
| | 3. Entry Into the Merger Transaction Following the Retroactive Substantive Consolidation of the Debtor and Quanergy Perception is Warranted | 50 |
| V. | CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER | 52 |
| VI. | CONCLUSION | 53 |

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Abbotts Dairies of Pennsylvania, Inc.*,
  788 F.2d 143 (3d Cir. 1986) ......................................................................................51

*In re Alpha Latam Mgmt., LLC*,
  21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) ..............................................23, 25, 52

*In re Am. Capital Equip. LLC*,
  688 F.3d 145 (3d. Cir. 2012) .....................................................................................31

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) .............................................................................7, 8, 36

*In re Augie/Restivo Baking Co., Ltd.*,
  860 F.2d 515 (2d Cir. 1988) .....................................................................................43

*In re Auto-Train Corp., Inc.*,
  810 F.2d 270 (D.C. Cir. 1987) ............................................................................48, 49

*Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 North LaSalle St. P'ship*,
  526 U.S. 415 (1999) ...............................................................................................33

*In re Bonham*,
  229 F.3d 750 (9th Cir. 2000) .............................................................................43, 48

*In re Caribbean Petroleum Corp.*,
  512 B.R. 774 (Bankr. D. Del. 2014) .........................................................................16

*In re Century Elects., Mfg., Inc.*,
  310 BR 485 (Bankr. D. Mass. 2004) .........................................................................48

*In re Chaparral Energy, Inc.*,
  Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) ...........................................52

*In re Chapel Gate Apartments, Ltd.*,
  64 B.R. 569 (Bankr. N.D. Tex. 1986) ........................................................................31

*In re Chisholm Oil and Gas Operating, LLC*,
  Case No. 20-11593 (BLS) (Bankr. D. Del. Sept. 23, 2020) ..........................................52

*In re Cont'l Airlines*,
  203 F.3d 203 (3d Cir. 2000) ...............................................................................25, 26

*In re Creditors Serv. Corp.*,
  195 B.R. 680 (Bankr. S.D. Ohio 1996) ......................................................................43

# TABLE OF AUTHORITIES
## CONTINUED

**Page(s)**

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010
  WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other
  grounds*, 627 F.3d 496 (2d Cir. 2010) ...................................................................24

*In re Delaware & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991) .............................................................................51

*In re Drug Fair Grp., Inc.*,
  No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984 (Bankr. D. Del. June 7, 2010)....................27

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................16

*In re Falls Event Ctr. LLC*,
  600 BR 857 (Bankr. D. Utah 2019) .....................................................................48

*In re Future Energy Corp.*,
  83 B.R. 470 (Bankr. S.D. Ohio 1988).................................................................31

*In re GC Companies, Inc.*,
  298 B.R. 226 (D. Del. 2003)..............................................................................49

*Grogan v. Garner*,
  498 U.S. 279 (1991)...........................................................................................7

*In re Gucci*,
  174 B.R. 401 (Bankr. S.D.N.Y. 1994).................................................................43

*Heroes World Dist., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp.,
  Inc.)*,
  273 B.R. 58 (D. Del. 2002).................................................................................15

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...................................................... *passim*

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)..............................................................................8

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993).................................................................................8

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)...............................................................................36

# TABLE OF AUTHORITIES
## CONTINUED

**Page(s)**

*In re Kroh Bros. Dev. Co.*,
117 BR 499 (WD Mo. 1989) ................................................................48

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003)................................................................28

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983)..............................................................51

*In re Mallinckrodt PLC*,
2022 Bankr. LEXIS 273 ......................................................................39

*In re Martin*,
91 F.3d 389 (3d Cir. 1996)..................................................................51

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)..........................................16, 26

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019)...............................................................26

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
25 F.3d 1132 (2d Cir. 1994)................................................................28

*In re Montgomery Ward Holding Corp.*,
242 B.R. 147 (D. Del. 1999)...............................................................51

*Matter of Munford, Inc.*,
115 B.R. 390 (Bankr. N.D. Ga. 1990) ................................................43

*In re New Ctr. Hosp.*,
187 B.R. 560 (E.D. Mich. 1995).........................................................43

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ...................................................36

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................7

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)...................................................... *passim*

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) ............................................................36

# TABLE OF AUTHORITIES
## CONTINUED

Page(s)

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ............................................................................26, 30

*In re Pyxus Int'l, Inc.*,
Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) ...................................52

*In re Regent Commc'ns, Inc.*,
No. 10-10632 (KG), 2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) ...................27

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) .......................................................................7

*In re Skillsoft Corp.*,
Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) ...................................52

*In re Smith*,
357 B.R. 60 (Bankr. M.D.N.C. 2006), *appeal dismissed*, No. 1:07CV30, 2007
WL 1087575 (M.D.N.C. Apr. 4, 2007) ....................................................................34

*Soviero v. Franklin Nat'l Bank*,
328 F.2d 446 (2d Cir. 1964) ..................................................................................43

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ................................................................................30

*In re Sunset Aviation, Inc.*,
468 B.R. 641 (Bankr. D. Del. 2011) ................................................................41, 42

*In re The Leslie Fay Cos.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...................................................................36

*In re TK Holdings, Inc.*,
No. 17-11375 (BLS), 2018 Bankr. LEXIS 756 (Bankr. D. Del. Feb. 21, 2018) ....................27

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), 464 B.R. 208 (Bankr. D. Del. 2011)..................7, 19, 20

*U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*,
426 B.R. 114 (Bankr. D. Del. 2010) ................................................................15, 16, 20, 24

*In re United Stairs Corp.*,
176 B.R. 359 (Bankr. D.N.J. 1995) .......................................................................43

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
518 U.S. 213 (1996) ..............................................................................................33

# TABLE OF AUTHORITIES
## CONTINUED

Page(s)

*Unocal Corp. v. Mesa Petroleum Co.*,
493 A.2d 946 (Del. 1985) ...................................................................51

*In re W.R. Grace & Co.*,
446 B.R. .............................................................................................20

*In re Washington Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) .....................................................16

*In re Woodmere Investors Ltd. P'ship*,
178 B.R. 346 (Bankr. S.D.N.Y. 1995) ...................................................36

*In re Zenith Elec. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) .................................16, 19, 20, 26

## Statutes

11 U.S.C.
§ 101(51D)(B) ....................................................................................41
§ 105(a) and 363(b) ...........................................................................50
§ 363(b) .................................................................................1, 50, 51
§ 365 ..................................................................................................13
§ 365(f) ..............................................................................................52
§ 503(b) ..............................................................................................35
§ 507 ..................................................................................................37
§ 507(a)(1) .........................................................................................37
§ 1107(a) ..............................................................................................3
§ 1108 ...................................................................................................3
§ 1114 ................................................................................................38
§ 1122 .................................................................................7, 8, 9, 10
§ 1122(a) ..............................................................................................8
§ 1123 ..............................................................................................7, 8
§ 1123(a) ........................................................................................9, 12
§ 1123(a)(1) .......................................................................................10
§ 1123(a)(2) .......................................................................................10
§ 1123(a)(3) .......................................................................................10
§ 1123(a)(4) .................................................................................10, 11
§ 1123(a)(5) .................................................................................11, 12
§ 1123(b) .......................................................................................13, 15
§ 1123(b)(l) .......................................................................................13
§ 1123(b)(2) .................................................................................13, 14
§ 1123(b)(3) .................................................................................14, 15
§ 1123(b)(3)(A) ..................................................................................15
§ 1123(b)(6) .............................................................................14, 22, 26
§ 1123(a)(7) .................................................................................12, 13

**TABLE OF AUTHORITIES**
**CONTINUED**

**Page(s)**

§ 1125.................................................................................................................. *passim*
§§ 1125..........................................................................................................................28
§§ 1125(a).....................................................................................................................29
§ 1125(b)..................................................................................................................28, 29
§ 1125(c)........................................................................................................................29
§ 1126.........................................................................................................................5, 29
§ 1126(f).........................................................................................................................29
§ 1126(g).........................................................................................................................29
§ 1129(a).........................................................................................................................38
§ 1129(a)(1)...................................................................................................................7, 8
§ 1129(a)(2)................................................................................................................28, 30
§ 1129(a)(3)............................................................................................................. *passim*
§ 1129(a)(5).....................................................................................................................32
§ 1129(a)(7).................................................................................................1, 33, 34, 35
§ 1129(a)(8).......................................................................................................35, 38, 39
§ 1129(a)(9).....................................................................................................................35
§ 1129(a)(11)............................................................................................................36, 37
§ 1129(a)(12)............................................................................................................37, 38
§ 1129(b)....................................................................................................35, 38, 39, 40
§ 1129(b)(1)............................................................................................................38, 39
§ 1129(b)(2)(C).............................................................................................................40
§ 1129(b)(2)(C)(i)-(ii)...................................................................................................40
§ 1129(c)........................................................................................................................40
§ 1129(e)........................................................................................................................41

28 U.S.C.
§ 157...............................................................................................................................2
§ 157(b)...........................................................................................................................2
§ 1334.............................................................................................................................2
§ 1408.............................................................................................................................2
§ 1409.............................................................................................................................2
§ 1930...........................................................................................................................37

Bankruptcy Code
chapter 7.........................................................................................33, 34, 35, 38
chapter 11............................................................................................................. *passim*

Delaware General Corporate Law
§ 253.................................................................................................11, 50, 51

Securities Act
§ 5..................................................................................................................................40

## TABLE OF AUTHORITIES
## CONTINUED

Page(s)

**Other Authorities**

Ballot Report................................................................................................6, 21, 29, 35

Bankruptcy Rules
    2016(a) .........................................................................................................................32
    3020(b)(2) ..............................................................................................................31, 32
    3020(e) ..................................................................................................................52, 53
    6004(h) .......................................................................................................................52
    6006(d) .......................................................................................................................52

The above-captioned debtor and debtor in possession (the "Debtor") submits this memorandum of law (this "Memorandum") in support of confirmation of the *First Amended Chapter 11 Plan of Quanergy Systems, Inc.* [Docket No. 394] (as modified, amended, or supplemented from time to time, the "Plan")[2] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The facts and circumstances supporting confirmation of the Plan are set forth in, among other things, (i) the *Declaration of Lawrence Perkins in Support of Confirmation of the First Amended Chapter 11 Plan of Quanergy Systems, Inc.* (the "Perkins Declaration"), (ii) the *Declaration of Jerome Davis in Support of Confirmation of the First Amended Chapter 11 Plan of Quanergy Systems, Inc.* (the "Davis Declaration"), and (iii) the *Declaration of Angela Tsai on Behalf of Stretto, Inc. Regarding Solicitation and Tabulation of Votes on the First Amended Chapter 11 Plan of Quanergy Systems, Inc.* (the "Voting Declaration" and, together with the Perkins Declaration and the Davis Declaration, the "Declarations"), filed contemporaneously herewith. In support of confirmation of the Plan, the Debtor respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.      The Debtor commenced the chapter 11 case (the "Chapter 11 Case") with the goal of expeditiously pursuing a value-maximizing sale of all or substantially all of its assets pursuant to section 363 of the Bankruptcy Code, followed by an orderly wind down of its Estate. Despite challenging circumstances, the Debtor's efforts culminated in a sale of substantially all of the Debtor's assets, which closed on February 3, 2023. Since closing the sale, the Debtor has actively

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or, if not defined therein, the Solicitation Procedures Order (defined below). As used herein, the term "Disclosure Statement" means the disclosure statement that is embodied in the Plan, and the term "Plan" means the first amended plan that is embodied in the Plan.

engaged and negotiated with the Committee (as defined below) and other parties in interest to agree upon a structure for liquidating and distributing the sale proceeds and any remaining assets of value to creditors as expeditiously as possible, including negotiating consensual settlements with certain creditors and reaching consensus with the Committee with respect to the Debtor's Plan.  The results of those good faith and arm's-length negotiations are embodied in the Plan currently before the Court.  ***The Debtor now stands poised to achieve confirmation of the Plan and effectuate the orderly wind down of its Estate on a fully consensual basis***.

2.      Confirmation of the Plan represents the best path to concluding the Chapter 11 Case and maximizing creditor recoveries.  The Debtor has received no formal objections to the Plan and the Committee supports the Plan.  Most notably, the voting results demonstrate that the two Classes entitled to vote on the Plan—Class 3 (General Unsecured Claims) and Class 4 (GUC Settlement Claims)—have both voted in favor of the Plan.

3.      The Debtor submits this Memorandum and the Declarations to establish that the Plan is in the best interests of the Debtor's Estate and creditors that the Plan meets the requirements for confirmation under section 1129 of the Bankruptcy Code.  For the reasons detailed herein, the Debtor respectfully submits that the Court should confirm the Plan.

## II.      JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.      BACKGROUND

### A.      Procedural History

5.      On December 13, 2022 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On December 20, 2022, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the official committee of unsecured creditors in the Chapter 11 Case (the "Committee").  *See* Docket Nos. 57 & 60.  No requests have been made for the appointment of a trustee or examiner.

7.      Additional factual background relating to the Debtor's business, capital structure, and the commencement of the Chapter 11 Case is set forth in further detail in the *Declaration of Lawrence Perkins in Support of Chapter 11 Petition and First Day Motions* [Docket No. 2] (the "First Day Declaration").

8.      On October 2, 2023, the Court entered *Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballot and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 392] (the "Solicitation Procedures Order").  The Solicitation Procedures Order approved, among other things, the Disclosure Statement and the procedures to solicit and tabulate votes to accept or reject the Plan and the related notices, forms, and ballots (the "Solicitation Packages").

9.      Following the entry of the Solicitation Procedures Order, Stretto, Inc., the Debtor's claims and noticing agent and administrative advisor (the "Voting Agent"), distributed the solicitation packages containing, among other things, the Plan and ballots to all members of the

Voting Classes (as defined below) in accordance with the Solicitation Procedures Order.[3]

10.     On October 2, 2023, the Debtor filed the *Notice of Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballot and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation hearing and Establishing Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 396] indicating the scheduling of the Confirmation Hearing[4] for November 8, 2023 at 10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing Notice").  On October 10, 2023, the Debtor published the Confirmation Hearing Notice in the *New York Times.*[5]

11.     On October 26, 2023, the Debtor filed the *Notice of Filing of Plan Supplement* (the "Plan Supplement") [Docket No. 451], which included the form of Plan Administrator Agreement and the Schedule of Additional Retained Causes of Action and which identified the Plan Administrator and members of the Plan Oversight Committee.

**B.     Solicitation and Voting Results**

12.     Pursuant to the Solicitation Procedures Order, (a) the Voting Record Date was October 2, 2023 (prevailing Eastern Time), (b) the Solicitation Date was within five (5) business days of entry of the Solicitation Procedures Order, (c) the Voting Deadline was November 2, 2023 at 5:00 p.m. (prevailing Eastern Time), and (d) the Confirmation Objection Deadline was November 2, 2023 at 4:00 p.m. (prevailing Eastern Time).

---

[3] *See* Docket No. 428.

[4] "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

[5] *See* Docket No. 427.

13. On October 5, 2023, in accordance with the Solicitation Procedures Order, the Voting Agent distributed the Solicitation Packages, including the Ballots, to all Holders of Claims in Classes 3 and 4—which are the only Classes entitled to vote under the Plan—as evidenced by the *Affidavit of Service* [Docket No. 428], dated October 11, 2023 (the "Solicitation Affidavit").[6]

14. In addition, in accordance with the Solicitation Procedures Order, on October 5, 2023, the Voting Agent distributed (a) the Confirmation Hearing Notice to all Holders of Claims or Interests and all other parties on the Debtor's creditor matrix and (b) the Non-Voting Status Notice[7] to holders of Claims or Interests in the Unimpaired Classes[8] and Impaired Classes,[9] as evidenced by the Solicitation Affidavit.[10]

15. In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote to accept or reject the Plan.[11] Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case they were conclusively presumed to accept the Plan) or Impaired and not entitled to receive a distribution under the Plan (in which case they were conclusively deemed to reject the Plan).

---

[6] On October 18, 2023, the Court entered the *Order Sustaining Debtor's First Omnibus Objection to Claims (Non-Substantive)* [Docket No. 432], which disallowed certain amended claims and claims filed on account of equity interests for voting purposes on the Plan.

[7] "Non-Voting Status Notice" shall mean the Notice of Non-voting Status to Holders of Class 1, 2, 5 & 6 Claims and Interests, as applicable, substantially in the form attached to the Solicitation Procedures Order as Exhibit 5.

[8] "Unimpaired Non-Voting Classes" shall mean, collectively, Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims).

[9] "Impaired Non-Voting Classes" shall mean, collectively, Class 5 (Subordinated Claims) and Class 6 (Interests).

[10] *See* Solicitation Affidavit, Voting Declaration ¶ 10.

[11] *See* 11 U.S.C. § 1126.

16.    The voting results are compiled and reported in the Voting Declaration, which attaches a report regarding the tabulation of Ballots received to accept or reject the Plan (the "Ballot Report") and which is incorporated herein by reference.  The voting results, as reflected in the Ballot Report, are as follows:

| Class 3 – General Unsecured Claims | | Result |
|---|---|---|
| **Ballot Received** | **17** votes accepting the Plan<br>**1** vote rejecting the Plan | **Accept** |
| **Acceptance** | **94.44%** in number of votes accepting the Plan<br>**99.91%** in dollar amount accepting the Plan<br>**($7,057,508.12)** | |
| **Rejection** | **5.56%** in number of votes rejecting the Plan<br>**0.09%** in dollar amount rejecting Plan<br>**($6,475.46)** | |
| Class 4 – GUC Settlement Claims | | Result |
| **Ballots Received** | **2** votes accepting the Plan<br>**0** votes rejecting the Plan | **Accept** |
| **Acceptance** | **100%** in number of votes accepting the Plan<br>**100%** in dollar amount accepting the Plan<br>**($9,832,430.00)** | |
| **Rejection** | **0%** in number of votes rejecting the Plan<br>**0%** in dollar amount rejecting the Plan<br>**($0)** | |

17.    As noted, Class 3 (General Unsecured Claims) and Class 4 (GUC Settlement Claims) are the only Classes entitled to vote on the Plan.  As set forth above and in the Ballot Report, Classes 3 and 4 overwhelmingly voted to accept the Plan.

C.    **Confirmation Objections**

18.    The deadline to file objections to confirmation of the Plan (*i.e.*, the Confirmation Objection Deadline) was November 2, 2023 at 4:00 p.m. (prevailing Eastern Time).  Prior to the Confirmation Objection Deadline, the Debtor received informal comments from the U.S. Trustee, Velodyne LiDAR, Inc., and Sabby Volatility Warrant Master Fund Ltd. and certain other plaintiffs in a lawsuit commenced in the United States District Court for the Southern District of New York against certain current and former officers and directors of the Debtor, which have been

incorporated by inclusion of certain language in the revised Plan and proposed Confirmation Order.

# IV.    ARGUMENT

19.    To confirm the Plan, the Court must find that the Debtor has satisfied the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[12]   The Debtor submits that based on the record of the Chapter 11 Case, the Declarations, and the Debtor's arguments set forth herein, the applicable burden is satisfied and the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.   The Plan exceeds the preponderance of the evidence standard set forth in the Bankruptcy Code and accordingly, the Debtor respectfully requests that the Court confirm the Plan.   This Memorandum addresses each requirement for plan confirmation below.

## A.    Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code

20.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.   A principal objective of section 1129(a)(1) is to ensure compliance with the Bankruptcy Code's requirements regarding classification of claims and interests and the contents of a plan, as set forth in sections 1122 and 1123 of the Bankruptcy Code.[13]

---

[12] *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Tribune Co.*, 464 B.R. 126, 151-52 (Bankr. D. Del. 2011).   Preponderance of the evidence has been described as just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true.   *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("The preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants.") (citations omitted).

[13] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.").

1.      ***The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code***

21.      Section 1122(a) of the Bankruptcy Code provides that, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[14]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[15]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, it is not necessary that all substantially similar claims or interests be designated to the same class, but only that all claims or interests designated to a particular class be substantially similar to each other.[16]

22.      The Plan provides for separate classification of Claims and Interests based on differences in the legal nature and/or priority of such Claims and Interests.  The Plan designates the following classes of Claims and Interests as follows:

| Class | Treatment / Voting Status |
|---|---|
| Class 1 – Secured Claims | Unimpaired / Deemed to Accept |
| Class 2 – Priority Non-Tax Claims | Unimpaired / Deemed to Accept |
| Class 3 – General Unsecured Claims | Impaired / Entitled to Vote |
| Class 4 – GUC Settlement Claims | Impaired / Entitled to Vote |
| Class 5 – Subordinated Claims | Impaired / Deemed to Reject |
| Class 6 – Interests | Impaired / Deemed to Reject |

23.      The Plan's classification of Claims and Interests satisfies section 1122 of the Bankruptcy Code because each Class is comprised of substantially similar Claims or Interests,

---

[14] 11 U.S.C. § 1122(a).

[15] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper.); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes).

[16] *In re Armstrong World Indus., Inc.*, 348 B.R. at 159.

respectively, and each instance of separate classification of similar Claims and Interests is justified by valid factual or legal reasons.[17]

24.     In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims and Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims or Interests.  For example, the Plan distinguishes between GUC Settlement Claims (Class 4) and General Unsecured Claims (Class 3) because the GUC Settlement Claims are Claims held by unsecured creditors that entered into Court-approved settlements with the Debtor whereby such Claims are to receive subordinated treatment to General Unsecured Claims under the Plan.[18]  Accordingly, the Plan's classification of Claims and Interests is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.

### 2.     The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code

25.     Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements that a chapter 11 plan must satisfy.[19]  As demonstrated herein, the Plan satisfies each of these requirements.

### a.     Section 1123(a)(1): The Plan Designates Classes of Claims and Interests

26.     Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests subject to section 1122 of the Bankruptcy Code.  As discussed above, the Plan designates five (5) Classes of Claims and one (1) Class of Interests in compliance with section

---

[17]  Perkins Decl. ¶16.

[18]  *See* Docket No. 363.

[19]  *See* 11 U.S.C. § 1123(a).

1122 of the Bankruptcy Code.   Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

> b.   *Section 1123(a)(2): The Plan Specifies Classes that are Unimpaired by the Plan*

27.   Section 1123(a)(2) requires a plan to specify which classes of claims or equity interests are unimpaired by the plan.   Article III of the Plan specifies that Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims) are unimpaired.   Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

> c.   *Section 1123(a)(3): The Plan Specifies Treatment of Classes that are Impaired by the Plan*

28.   Section 1123(a)(3) requires a plan to specify how classes of claims or equity interests that are impaired by the plan will be treated.   Article III of the Plan sets forth the treatment of Impaired Claims.   Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

> d.   *Section 1123(a)(4): The Plan Provides Equal Treatment for Claims and Interests Within Each Class*

29.   Section 1123(a)(4) requires that a plan provide the same treatment for each claim or equity interest within a particular class unless any claim or equity interest holder agrees to receive treatment less favorable than the treatment of other class members.   Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtor, in each respective Class, is the same as the treatment of each other Claim or Interest in such Class.   Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

e.    *Section 1123(a)(5): The Plan Provides Adequate Means for Implementation*

30.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."[20]   The Plan provides adequate and proper means for its implementation, including, without limitation: (i) substantive consolidation of the Debtor and non-Debtor Quanergy Perception[21] effective as of the Petition Date for all purposes, including the consolidation of assets and liabilities, solicitation of acceptance of the Plan, and distributions to creditors;[22] (ii) consummation of the Merger Transaction[23] with non-Debtor Quanergy Perception following the substantive consolidation of the Debtor and non-Debtor Quanergy Perception, effective as of the Petition Date; (iii) authorization for the Debtor to take all corporate actions necessary to effectuate the Plan, including the termination of the Debtor's officers, directors, and managers and the dissolution of the Post-Effective Date Debtor; (iv) appointment of the Plan Administrator and ability for the Post-Effective Date Debtor and Plan Administrator, as applicable, to take such actions as may be necessary or appropriate to effectuate the Plan; (v) preservation of Causes of Action that vest in the Post-Effective Date Debtor, (vii) creation of the Plan Oversight

---

[20] 11 U.S.C. § 1123(a)(5).

[21] Under the Plan, "Quanergy Perception" means non-Debtor Quanergy Perception Technologies, Inc., a wholly-owned subsidiary of the Debtor, which shall be merged with and into the Debtor pursuant to the Plan, as set forth herein.

[22] As discussed in the Plan and herein, the Plan serves as a motion, pursuant to section 105(a) of the Bankruptcy Code, authorizing the substantive consolidation of the Debtor with non-Debtor Quanergy Perception, effective as of the Petition Date.

[23] Under the Plan, "Merger Transaction" means the merger with non-Debtor Quanergy Perception following the substantive consolidation of the Debtor and Quanergy Perception effective as of the Petition Date, pursuant to the Plan, in which non-Debtor Quanergy Perception will be merged with and into the Debtor, with the Debtor as the surviving entity, pursuant to a parent-subsidiary short-form merger transaction under section 253 of the Delaware General Corporate Law.  The Debtor's Board adopted resolutions authorizing such a transaction, which shall be effective upon the filing of the Certificate of Ownership and Merger in the office of the Secretary of State of the State of Delaware.

30942483.2

Committee for such purposes and with such rights as are set forth in the Plan;[24] and (viii) the funding of the Professional Fee Reserve[25] and other necessary reserves that may be required to effectuate the Plan and distributions to Holders of Claims, including any disputed claims reserve. As such, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.[26]

       f.    *Section 1123(a)(6): Provision Prohibiting the Issuance of Nonvoting Equity Securities*

31.    The sixth requirement of section 1123(a)—that a plan prohibit the issuance of nonvoting equity securities—is not applicable as the Debtor is not issuing any equity securities under the Plan.

       g.    *Section 1123(a)(7): Provisions Regarding Directors and Officers*

32.    Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[27]  The Debtor has disclosed in the Plan Administrator Agreement (which was filed with the Plan Supplement) that Nancy A. Washington, Esq., LLC is proposed to serve as Plan Administrator following the Effective Date and will oversee the wind-down of the Debtor's Estate.  The Plan Administrator was selected by the Committee, in consultation with the Debtor, in a manner consistent with the interests of creditors and with public policy.  In addition to the Plan Administrator, the Plan provides for the appointment of a Plan

---

[24] Under the Plan, "Plan Oversight Committee" means the committee established pursuant to Section 5.5.1 of the Plan to oversee the Plan Administrator and the administration of the Post-Effective Date Debtor by the Plan Administrator.

[25] Under the Plan, "Professional Fee Reserve" means the reserve established and funded by the Debtor on or prior to the Effective Date pursuant to Section 11.2 of the Plan.

[26] Perkins Decl. ¶ 17.

[27] 11 U.S.C. § 1123(a)(7).

Oversight Committee.  The proposed Plan Oversight Committee consists of Edward Brown, Bhagirath Choudhary, and Tawnie Bassett-Parkins.  Effective as of the Effective Date, all directors and officers of the Debtor shall be discharged.[28]  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### 3.    The Plan Complies with Section 1123(b) of the Bankruptcy Code

33.    Section 1123(b) sets forth certain provisions that may be incorporated into a plan, although they are not required.[29]  As set forth below, the Plan includes certain of these discretionary provisions, such as releases.  The contents of the Plan are consistent with these provisions.

### a.    Section 1123(b)(1): Impairment of Claims and Interests

34.    Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."[30]  Claims and Interests in Classes 3, 4, 5 and 6 are impaired.  Claims in Classes 1 and 2 are not impaired by the Plan.[31]  Accordingly, the Plan is consistent with section 1123(b)(l) of the Bankruptcy Code.

### b.    Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases

35.    Section 1123(b)(2) allows a plan to provide for the assumption and assignment or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.  Article VI of the Plan provides that all executory contracts and unexpired leases of the Debtor that have not been assumed, assumed and assigned, or rejected before the Effective Date, or are not subject to a motion to assume or reject that is Filed before the Effective Date, shall be

---

[28] *See* Plan, Article V.

[29] *See* 11 U.S.C. § 1123(b).

[30] 11 U.S.C. § 1123(b)(1).

[31] *See* Plan, Art. III.

deemed rejected pursuant to the Confirmation Order, as of the Effective Date, other than the Insurance Contracts.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

> c.      *Section 1123(b)(3): Retention of Claims or Interests by the Debtor*

36.      Section 1123(b)(3)(B) provides that a plan may "provide for the retention and enforcement by the debtor" of claims or interests belonging to the debtor.[32]  Article V, ¶5.6.7 of the Plan preserves and vests any and all Causes of Action that are not expressly released or waived under the Plan in the Post-Effective Date Debtor on the Effective Date.  The Debtor and the Plan Administrator expressly retain all such Causes of Action, which are described in Exhibit A of the Plan Supplement.[33]  Accordingly, the Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.

> d.      *The Debtor Release Under the Plan Is Appropriate Under Section 1123(b)(3) and (6)*

37.      In accordance with section 1123(b)(6) of the Bankruptcy Code, Article XI of the Plan provides for (a) the Debtor's release of certain parties, (b) releases of the Debtor and certain other parties in interest, and (c) exculpation and injunction provisions prohibiting parties from pursuing Claims and Causes of Action released under the Plan.  These provisions are proper because, among other things, they are the product of arm's-length negotiations, are supported by substantial consideration provided by the beneficiaries thereof, have been critical to obtaining the support of the various constituencies for the Plan, and, as part of the Plan, have received overwhelming support from the creditors that voted for the Plan.  In particular, the Committee is

---

[32] 11 U.S.C. § 1123(b)(3)(B).

[33] *See* Plan, Art. V; Plan Supplement, Ex. A.

supportive of the Plan, including the releases embodied therein.   None of these provisions are inconsistent with the Bankruptcy Code, and therefore, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.   The principal terms of these provisions of the Plan are discussed below.

(i)   <u>The Releases by the Debtor are Appropriate Under Section 1123(b)(3)</u>

38.   The Plan provides for a release by the Debtor of the Released Parties,[34] as more fully set forth in section 11.11 of the Plan (the "<u>Debtor Release</u>").   Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[35]   The Bankruptcy Code thus clearly contemplates that the Debtor is permitted to settle or release any claim or cause of action that it might otherwise have against a third party.   When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A), the appropriate standard is whether "the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[36]   As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference.[37]

---

[34] Under the Plan, the term "<u>Released Parties</u>" means "Each solely in their capacities as such, (a) the Debtor and the Estate; (b) the Debtor's current officers, directors, and managers; (c) the GUC Settlement Creditor(s); and (d) to the extent not included in the foregoing, each of the preceding entities' respective Related Parties.; *provided, however*, that the Debtor's and Quanergy Perception's former directors and officers, to the extent such Persons were not serving as a director or officer of the Debtor or Quanergy Perception as of the Petition Date, are not Released Parties."  *See* Plan, Art. I. ¶1.81.

[35] 11 U.S.C. § 1123(b)(3)(A).

[36] *U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

[37] *See, e.g.*, *In re Spansion*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors."); *Heroes World Dist., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule…a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching. Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court

39.     Additionally, some courts in this district have identified the following list of non-exhaustive factors in determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors (the "*Zenith* Factors"):[38]

1) an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources;

2) a substantial contribution to the plan by the non-debtor;

3) the necessity of the release to the reorganization;

4) the overwhelming acceptance of the plan and release by creditors and interest holders; and

5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[39]

As a list of non-conjunctive factors, these factors provide a way of "weighing the equities of the particular case after a fact-specific review."[40]  Importantly, not each factor is relevant in every case and consensual releases may be approved where only one or two factors are present.[41]

---

will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted).

[38] The *Zenith* factors were first articulated as the standard for approving a third party release (*i.e.*, a provision releasing a non-debtor's claim against another non-debtor.)  *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).  Later, in *Zenith*, this Court applied the *Master Mortgage* factors to a debtor release. *See In re Zenith Elec. Corp.*, 241 B.R. 92, 110–11 (Bankr. D. Del. 1999) (citing *Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)). As such, the Debtor has applied the *Zenith* Factors to the Debtor Releases and, for the reasons set forth herein, submits that the Debtor Releases in this case satisfy the *Zenith* Factors and should be approved.

[39] *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)) and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (same); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[40] *Indianapolis Downs*, 486 B.R. at 303.

[41] *See, e.g., In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014) (finding "no question" that release of debtor's claims was proper because non-debtor "provided Debtor with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases"); *In re Spansion*, 426 B.R. at 143 (approving release where releasees were actively involved in negotiating the plan and four of five creditor classes voted overwhelmingly in favor).

40.     The Debtor Release was the product of good faith, arm's-length negotiations throughout the course of the plan process by the Debtor and the Committee.  As discussed in the Perkins Declaration, the E&T Committee[42] empowered Lawrence Perkins, President and Chief Restructuring Officer of the Debtor (the "CRO"), to conduct an investigation (the "CRO Investigation") to investigate any Causes of Action that the Debtor may have with respect to any transactions of the Debtor or decisions of the Debtor's Board prior to the Petition Date (the "Prior Transactions"), and to determine and make recommendations to the E&T Committee and the Board with respect to prosecuting, waiving, releasing, settling, or negotiating any claims or Causes of Action of the Debtor that arise out of or relate to the Prior Transactions (the "Specified Matters").[43]  In connection therewith, the Debtor retained Seward & Kissel LLP ("S&K") as special counsel in connection with the CRO Investigation.[44]  Throughout the CRO Investigation, the CRO regularly met with S&K to review work in progress, to obtain updates on the status of the Investigation, and to review and discuss preliminary analyses and conclusions.[45]

41.     At the conclusion of the CRO Investigation, S&K did not identify or become aware of any evidence that would lead the CRO or S&K to conclude that there are actionable claims or

---

[42] As more fully described in the Perkins Declaration, prior to the Petition Date, certain members of the Debtor's Board of Directors (the "Board") expressed interest in providing financing to the Debtor and/or purchasing some or substantially all of the Debtor's assets.  Immediately upon learning of such expressions of interest, the Debtor's Board established the Executive and Transactions Committee of the Board of Directors (the "E&T Committee") and appointed certain members of the Board who did not express interest in the Debtor or the assets to serve on the E&T Committee. The Board vested the E&T Committee with the full power of the Board, including all decision-making authority related to the Debtor's pursuit of strategic alternatives, the prepetition sale process, potential chapter 11 filing, and, following the Petition Date, the Chapter 11 Case and the Debtor's postpetition sale process.  *See also* Perkins Decl. ¶8.

[43] *See id.*

[44] *See* Docket No. 173.

[45] *See Id.*

Causes of Action arising out of or related to the Specified Matters.[46]  Accordingly, the CRO

advised the E&T Committee that the CRO Investigation did not produce evidence of any

actionable claims or Causes of Action that the Debtor may have with respect to the Specified

Matters.[47]  As such, the E&T Committee approved the proposed releases, exculpations and

indemnifications by the Debtor with respect to its current or former directors, officers, insiders or

affiliates with respect to the Specified Matters under the Plan, and subject to the limitations set

forth in the Plan.[48]

42.    In addition to the CRO Investigation, the Committee also conducted its own

investigation of potential claims and causes of action held by the Debtor's Estate and engaged in

informal discovery with the Debtor.[49]  Ultimately, the Committee did not conclude whether certain

claims or Causes of Action against the Debtor's officers and directors may exist.  As a result, the

Debtor and the Committee negotiated extensively with respect to the Debtor Release and

preservation of claims or Causes of Action, and ultimately reached an agreement that any recovery

on retained claims or Causes of Action that may be asserted against current officers and directors

shall be limited to the applicable Insurance Contract coverage limits for any such Causes of Action,

to the extent there is applicable insurance coverage.[50]  This agreement is reflected under the Plan

---

[46] *See* Perkins Decl. ¶ 11.

[47] *Id.*

[48] *Id.*

[49] In connection therewith, the Debtor and S&K cooperated with the Committee with respect to its requests for information and documents from the Debtor. On February 6, 2023, the Debtor and the Committee entered into that certain Confidentiality Agreement and Stipulated Protective Order [Docket No. 203], pursuant to which the parties agreed to certain procedures to facilitate and expedite the production and exchange of informal and formal discovery requests and protect the confidentiality and privilege of documents shared between the Debtor and the Committee in connection with the Committee's Investigation. *See also Id.* at 10.

[50] *See* Perkins Decl. ¶ 11.

30942483.2

and the Schedule of Additional Retained Causes of Action filed with the Plan Supplement.[51]

43.     Additionally, the Debtor Release meets the *Zenith* Factors and should be approved. *First*, an identity of interest exists between the Debtor and the Released Parties because (a) the Debtor has a duty to indemnify certain of the Released Parties, such as pursuant to the Debtor's governance documents, and, as a result, pursuing litigation against such Released Parties would be tantamount to litigation against the Debtor;[52] and (b) the Released Parties have an unified interest in formulating and confirming the Plan.[53]  All of the Released Parties have played an instrumental role in facilitating the Debtor's sale of its assets and subsequent wind-down.[54]  In particular, the directors and officers of the Debtor that are Released Parties were actively involved in the Debtor's process leading up to the filing of the Chapter 11 Case and continued to support and facilitate the Debtor's efforts during the Chapter 11 Case.[55]  Furthermore, such Debtor Release is being given in exchange for their efforts to develop a value-maximizing strategy and to ensure the Debtor's smooth transition into chapter 11 as well as its management of operations throughout the pendency of the Chapter 11 Case and the consummation of the sale of the Debtor's assets, which preserved and maximized the value of the Debtor's Estate.[56]

---

[51] *See* Plan Supplement, Ex. A.

[52] *See* Perkins Decl. ¶18; *see also Indianapolis Downs, LLC*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[53] *See* Perkins Decl. ¶19; *see, e.g., In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed . . ."); *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (noting an identity of interest between debtors and settling parties where such parties "share[d] the common goal of confirming the [] Plan and implementing the [] Plan Settlement"), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[54] *See* Perkins Decl. ¶18.

[55] *See* Perkins Decl. ¶20.

[56] *Id.*; *see also, e.g., In re Tribune Co.*, 464 B.R. at 187.

44.     *Second*, each of the Released Parties has made a substantial contribution to the Debtor and its Estate.  As courts in this district have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization, including active involvement in negotiating and formulating a plan.[57]  As noted above, the Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in the Chapter 11 Case.[58]

45.     The Debtor Release is narrowly tailored to Estate fiduciaries in the Chapter 11 Case and those parties whose assistance has been critical to facilitate and implement the Plan.  In particular, for the reasons set forth in the Davis Declaration, the Debtor Release against the Holders of the GUC Settlement Claims is commensurately appropriate considering, among other reasons, the agreement by the Holders of the GUC Settlement Claims to enhance recoveries for Holders of General Unsecured Claims by subordinating such GUC Settlement Claims to General Unsecured Claims.

46.     *Third*, the Debtor Release is essential to the Plan because prosecution of any claims or causes of action that may exist and are being released under the Plan through the Debtor Release would generally be complex and time-consuming and could mire the Debtor and parties in interest in wholly speculative and potentially value-destructive litigation, rather than effectuating an efficient liquidation of the Debtor that will result in a meaningful recovery for the Debtor's

---

[57] *See Zenith* 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release); *In re W.R. Grace & Co.*, 446 B.R. at 138 (finding that parties involved in settlement with the debtor made substantial contribution where, absent the release, settling parties would not have contributed a significant sum necessary to the reorganization); *In re Spansion*, 426 B.R. at 143 ("The Debtor Releasees were actively involved in negotiating and formulating the plan. It is a valid exercise of the Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan.").

[58] *See* Perkins Decl. ¶ 19.

creditors.[59]  Importantly, the Debtor Release provides finality and avoids significant delay, and therefore inures to the benefit of all the Debtor's stakeholders.

47.    Moreover, as described above, the settlements by the Holders of GUC Settlement Claims will increase recoveries available for holders of General Unsecured Claims.  Under the circumstances of the Chapter 11 Case, these distributions return meaningful value—including certainty of substantial additional recoveries to General Unsecured Claims as a result of the agreement by the Holders of the GUC Settlement Claims to the subordinated treatment of the GUC Settlement Claims—when compared to the alternative liquidation scenario.

48.    *Fourth*, the Debtor has the support of its stakeholders for the Debtor Release. Notably, the members of the Committee, as representatives and fiduciaries for unsecured creditors, each support the Plan, including the Debtor Release.  Moreover, as evidenced by the Ballot Report, Holders of Classes 3 and 4 have overwhelmingly voted to accept the Plan.  This degree of consensus evidences the support of the Debtor's stakeholders for the Debtor Release and the Plan.

49.    *Fifth*, the Plan provides for meaningful recoveries for all Classes affected by the Debtor Release.  As discussed above, the agreement by the Holders of GUC Settlement Claims to subordinate the GUC Settlement Claims to General Unsecured Claims reduced the General Unsecured Claims pool and therefore increased recoveries for holders of General Unsecured Claims.

50.    Given that the causes of action being released in the Plan through the Debtor Release belong to the Debtor, it is plainly within the Debtor's purview to release these claims.  The Debtor has exercised its business judgment to release those causes of action under the Debtor

---

[59] Perkins Decl. ¶21.

Release.[60]  In sum, the Debtor Release is not only fair, equitable, and necessary to the Debtor's

orderly wind-down, but also is appropriate under prevailing Third Circuit case law.

51.     For all of the foregoing reasons, the Debtor Release is an integral component of the

Plan, complies with the Bankruptcy Code, is fair, reasonable, and in the best interests of the Debtor,

its Estate, and its stakeholders, and should be approved as part of confirmation of the Plan.

> (ii)     *The Consensual Third-Party Releases Under the Plan Is Appropriate Under Section 1123(b)(6)*

52.     Article XI of the Plan contains appropriately tailored consensual third-party

releases by the Releasing Parties[61] (the "<u>Third-Party Releases</u>") of the Released Parties.  The

Third-Party Releases are an integral part of the Plan and should be approved given that they are

fully consensual.  Even if the Third-Party Releases were not fully consensual (which they are), the

Third-Party Releases should still be approved because they satisfy the standards governing

nonconsensual third-party releases.

> (a)     *The Third-Party Releases are Consensual Because the Releasing Parties Had a Right to Opt-out or Object to the Third-Party Releases*

53.     Third-party releases are consensual as applied to holders of claims deemed to

---

[60] Perkins Decl. at ¶¶ 19-21.

[61] Under the Plan, the term "<u>Releasing Parties</u>" means "(a) all Holders of Claims deemed hereunder to have accepted the Plan (*i.e.*, Holders of Claims in Unimpaired Classes of Claims) that have not Filed an objection to the release in Section 11.11(b) of the Plan prior to the deadline to object to Confirmation of the Plan; (b) all Holders of Claims in Class 4 that make a Class 4 Election and vote to accept the Plan; and (c) all Holders of Claims in Class 3 that (i) vote to accept or reject the Plan and do not timely submit a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Section 11.11(b) of the Plan, or (ii) do not vote to accept or reject the Plan, and either do not timely submit a Release Opt-Out, or do not File an objection to the releases in Section 11.11(b) of the Plan prior to the deadline to object to Confirmation of the Plan; provided, however, that Holders of Claims in Class 3 whose Ballots are returned to the Debtor or its agent as undeliverable, or to whom the Debtor or its agent did not mail a Ballot, shall not be deemed to participate in the releases set forth in Section 11.11(b) of the Plan, which entities, if any, shall be set forth in a notice Filed with the Bankruptcy Court by the Debtor or the Plan Administrator within five (5) Business Days of the Effective Date."

accept a plan.[62]    Moreover, where parties receive sufficient notice of a plan's release provisions

and have an opportunity to object to or opt-out of the release and fail to do so, the releases are

consensual.[63]    Specifically, in cases in which holders of claims or equity interests had an

opportunity, but chose not, to opt-out of third party releases, courts have approved third-party

releases as consensual.    For example, in *Indianapolis Downs*, this Court, approving an opt-out

release, found that:

> As for those impaired creditors who abstained from voting on the
> [p]lan, or who voted to reject the [p]lan and did not otherwise opt-
> out of the releases, the record reflects these parties were provided
> detailed instructions on how to opt-out, and had the opportunity to
> do so by marking their ballots.[64]

54.    Each of the Releasing Parties has consented to the Third-Party Releases by either:

(a) choosing not to opt-out of the Third-Party Releases despite being provided with the opportunity

to do so, or (b) holding Claims or Interests that are treated as Unimpaired under the Plan.

55.    *First,* a holder of a claim, including a claim that is impaired under a plan, may be

deemed to consent to a third-party release if the holder is provided with ample notice of the

third-party release and is provided with an opportunity to opt-out of the third party release—even

---

[62] *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013) (approving third party release that applied to unimpaired holders of claims deemed to accept the plan as consensual).

[63] *See id.* at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt-out of the releases, the record reflects these parties were provided detailed instructions on how to opt-out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *see also In re Alpha Latam Mgmt., LLC*, 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) [Docket No. 651 at 11:6–22] ("Importantly, I find the third-party releases are consensual . . . . The ballot contained an opt-out election box and holders had the right to opt-out of the releases. Unimpaired holders in non-voting classes were provided with a notice of non-voting status that included the proposed third-party releases, prominent instructions on the right to object to the releases, and conspicuous disclaimers that the releases would be binding on holders if they did not timely object to the plan. As I have previously ruled, an opt-out mechanism is a valid means of obtaining consent. The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan.").

[64] 486 B.R. at 306.

if a creditor abstains from voting.[65]   Here, the Plan provides that Claims in Classes 3 and 4 are

Impaired and entitled to vote to accept or reject the Plan and, as such, are subject to the Third-Party

Releases.   Each such Holder was provided with ample notice and had an opportunity to

affirmatively opt-out of releases by checking the opt-out box on the ballot sent to each Holder.

Moreover, the Debtor provided each known Holder of a Claim entitled to vote on the Plan an

opportunity to opt-out of, or object to, the Third-Party Releases, and made every effort to ensure

that such Holders had notice of the Third-Party Releases and the consequences of failing to opt-out

of the Third-Party Releases.[66]   The Debtor also published the Confirmation Hearing Notice in the

*New York Times*, which clearly and conspicuously advised all parties in interest to carefully review

and consider the Plan, including the Third-Party Releases.

56.     *Second*, unimpaired creditors—who are being paid in full—can be bound to

third-party releases when they have not objected to a plan, as their silence constitutes consent.

Courts in this district have routinely recognized that third-party releases are consensual and

appropriate where holders of unimpaired claims or interests are provided with detailed instructions

on how to object to releases but nevertheless do not do so.[67]   Here, the Plan provides that Holders

---

[65] *See Indianapolis Downs*, 486 B.R. at 306; *see also Spansion, Inc.*, 426 B.R. at 144 (finding that returning a ballot is not essential to demonstrating consent to a release by unimpaired class); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010) (determining that adequate notice of the proposed release was given to impaired creditors, and the ballots set forth the effect of abstaining without opting out of the release).

[66] *See* Perkins Decl. ¶22.

[67] *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. at 144 (finding that a release was not overreaching to the extent it bound unimpaired classes deemed to have accepted the plan as those creditors had not objected to the release, were being paid in full, and had received adequate consideration for the release); *see also In re Indianapolis Downs, LLC*, 486 B.R. at 306 ("In this case, the third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *see also In re In re Alpha Latam Mgmt., LLC*, 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) [Docket No. 651 at 11:22–24] ("The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan. Creditors have an obligation to read their mail and respond if appropriate. This procedure is not unique and it's routinely utilized in the law.").

of Claims in Unimpaired Classes (Class 1 Secured Claims and Class 2 Priority Non-Tax Claims) are being paid in full and are deemed to have accepted the Plan and the Third-Party Releases.  The Unimpaired Classes received (a) the Confirmation Hearing Notice, and (b) a Non-Voting Status Notice, each of which included the Third-Party Releases and prominent instructions on how to object to the Plan, including the releases therein.

57.    Lastly, the Plan provides that Holders of Claims in Class 5 and Interests in Class 6 are deemed to reject the Plan, and therefore are not Releasing Parties as defined in the Plan, and are not subject to the Third-Party Releases.  The Holders of Classes 5 and 6 received (a) the Confirmation Hearing Notice, and (b) a Non-Voting Status Notice, each of which included instructions on how to object to the Plan.

58.    Accordingly, the Third-Party Releases are fully consensual as to the Releasing Parties, which by definition does not include any Holders of Interests.

> (b)    *Even if Characterized as Non-Consensual, the Third-Party Releases Should be Approved Because They Satisfy the Fairness and Necessity Guidelines*

59.    Even if this Court deems the Third-Party Releases as non-consensual, the Third-Party Releases nonetheless satisfy the factors applied by this Court and the "fairness and necessity" guidelines for approving non-consensual releases discussed by the Third Circuit in *In re Cont'l Airlines*.[68]

60.    Third-party releases are appropriate where material consideration is provided by the releasees that results in a distribution to unsecured creditors through the plan in exchange for the release of potential claims that are unlikely to be pursued.[69]  Because the Released Parties have

---

[68]  203 F.3d 203 (3d Cir. 2000).

[69] *In re Cont'l Airlines*, 203 F.3d at 212-14.

provided significant value to the Plan, as discussed above, the Third-Party Releases are proper under either standard.[70]

> (iii) *The Exculpation Under the Plan is Appropriate Under Section 1123(b)(6)*

61.     The exculpation provision in Article XI of the Plan (the "Exculpation Provision") should also be approved under the standards established by the Third Circuit.  Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[71]

62.     Here, the Exculpation Provision is appropriate under applicable law because it is part of the Plan proposed in good faith, is appropriately limited in scope, and is being granted only to the Exculpated Parties.[72]  Each Exculpated Party receiving exculpation under the Plan is a fiduciary of the Debtor and/or its Estate and no Exculpated Party is being exculpated for acts or omissions that constitute actual fraud, willful misconduct or gross negligence.  The protection from liability that the Exculpation Provision provides to these parties is appropriate given their efforts

---

[70] *See generally Zenith*, 241 B.R. at 92 and *Master Mortg.*, 168 B.R. 930; *see also In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019) (court approved a plan that included releases for equity holders that had agreed to make a significant monetary contribution to the debtor in return for third party releases).

[71] *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that the debtors and certain other parties, such as the unsecured creditors' committee members and the professionals retained by such committee, who provided services to assist in the reorganization, are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

[72] Pursuant to the Plan, "Exculpated Parties" means, collectively, "Each of, solely in their capacities as such, and solely in connection with Section 11.12 of the Plan: (a) the Debtor and the Estate; (b) the Debtor's officers and directors that served in such capacity at any time during the Chapter 11 Case; (c) the Professionals retained by the Debtor pursuant to an Order of the Bankruptcy Court; (d) the Committee; (e) the present and former members of the Committee, but solely in their capacity as members of the Committee; and (f) the Professionals retained by the Committee pursuant to an Order of the Bankruptcy Court." *See also* Perkins Decl. ¶23.

in the Chapter 11 Case and the Plan process and their fiduciary relationship with the Debtor and/or its Estate.[73]

63.     Accordingly, the Exculpation Provision provides reasonable and appropriate protections and should be approved.

> *(iv)     The Injunction Under the Plan is Appropriate and Should be Approved*

64.     The injunction provisions set forth in Article XI of the Plan (the "Injunction") merely implements the Plan's release and exculpation provisions, in part, by permanently enjoining all applicable entities from commencing or maintaining any action on account of or with respect to any such Claims or Interests released or exculpated pursuant to the Plan.  The Injunctions are necessary to preserve and enforce the releases and Exculpation in the Plan, and are narrowly tailored to achieve that purpose.[74]

**B.     Section 1129(a)(2): Debtor has Complied with the Applicable Provisions of the Bankruptcy Code**

65.     The Debtor has satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code—here, sections 1125 and 1126 of the Bankruptcy Code.

---

[73] Perkins Decl. ¶23.

[74] *Id.* at ¶24;.*see also In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *61 (Bankr. D. Del. Feb. 21, 2018) ("The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose."); *In re Regent Commc'ns, Inc.*, No. 10-10632 (KG), 2010 Bankr. LEXIS 5793, at *18-19 (Bankr. D. Del. Apr. 12, 2010) ("The injunction provisions set forth in Article X.F of the Plan are necessary to preserve and enforce the release, exculpation, non-debtor release and injunction provisions…of the Plan and are narrowly tailored to achieve that purpose."); *In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984, at *16 (Bankr. D. Del. June 7, 2010) ("The injunction provision set forth in Section 9.2 of the Plan…is necessary to preserve and enforce the Release and the Exculpation, and the Injunction is narrowly tailored to achieve this purpose.").

### 1.    The Debtor Has Complied with Section 1125 of the Bankruptcy Code

66.    The cases and legislative history discussing section 1129(a)(2) indicate that this section principally embodies the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.  Section 1125 prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[75]  Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[76]

67.    Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Solicitation Procedures Order.  The Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to creditors and interest holders not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[77]  The Debtor, through the Voting Agent, complied with the content and delivery requirements of the Solicitation Procedures Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.

68.    The Debtor has also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  The Debtor transmitted the same Disclosure Statement to all parties entitled to vote on the Plan.

---

[75] 11 U.S.C § 1125(b).

[76] *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003).

[77] *Id.*

69.     For the reasons, the Debtor submits that it has complied in all respects with section 1125 of the Bankruptcy Code and the Solicitation Procedures Order.   No party has asserted otherwise.

### 2.       The Debtor's Solicitation Complies with Section 1126 of the Bankruptcy Code

70.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.[78]   Specifically, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.   Classes that are unimpaired under the Plan are conclusively deemed to accept.[79]   Conversely, classes that are entitled to nothing under the Plan are conclusively deemed to reject.[80]

71.     In accordance with section 1126 of the Bankruptcy Code, the Debtor solicited acceptances or rejections of the Plan from the Holders of Claims in Classes 3 and 4, which are the only Classes entitled to vote on the Plan.   As provided in the Ballot Report, Classes 3 and 4 voted to accept the Plan.[81]   Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.   No party has asserted otherwise.

---

[78] 11 U.S.C. § 1126.

[79] See 11 U.S.C. § 1126(f).

[80] See 11 U.S.C. § 1126(g).

[81] See Ballot Report.

C.      **Section 1129(a)(3): The Plan has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

72.      Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[82]   The Third Circuit has found that "[f]or purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[83]   The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan.[84]

73.      The Debtor has met its good faith obligation under the Bankruptcy Code. Throughout the Chapter 11 Case, the Debtor has focused on maximizing value for its various stakeholders.  The Plan, Plan Supplement, and all documents necessary to effectuate the Plan were developed after months of analysis and negotiations between the Debtor and other key constituents and were proposed with the legitimate and honest purpose of maximizing the value of the Debtor's Estate and effectuating a successful and speedy wind-down of the Debtor's operations after the sale of substantially all of the Debtor's assets.[85]   Moreover, the Plan is the product of arm's-length negotiations among the Debtor and various parties-in-interest, including the Committee.[86]   The

---

[82] 11 U.S.C. § 1129(a)(3).

[83] *PWS*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted).

[84] *In re Sun Country Dev., Inc*., 764 F.2d 406, 408 (5th Cir. 1985).

[85] *See* Perkins Decl. ¶25.

[86] *Id.*

Plan has been proposed in good faith as interpreted under the Bankruptcy Code and will achieve a result consistent with the overall objectives and purposes of the Bankruptcy Code.[87]

74.     Based on the foregoing, the facts and record of the Chapter 11 Case, and the record to be made at the Confirmation Hearing, the Plan and related documents have been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  Indeed, no party has asserted otherwise.[88]

### D.     Section 1129(a)(4): The Plan Provides for Court Approval of Certain Administrative Payments

75.     Section 1129(a)(4) requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, be subject to approval of the Court as reasonable.[89]

76.     Here, all payments made or to be made by the Debtor for services or for costs or expenses in connection with the Chapter 11 Case incurred during the period from the Petition Date through and including the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[90]  Article XI of the Plan provides that all final requests for payment of Professional Fee Claims for services rendered through the Effective Date shall be filed no later than sixty (60) days after the Effective Date and all such final requests

---

[87] *See In re Am. Capital Equip. LLC*, 688 F.3d 145 (3d. Cir. 2012) (internal quotations omitted) (court noting that the important point of a good faith inquiry is whether the plan itself will achieve a result consistent with objectives and purposes of the bankruptcy code.

[88] *See* Bankruptcy Rule 3020(b)(2) ("The court shall rule on confirmation of the plan after notice and hearing as provided in Rule 2002. If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.").

[89] *See In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[90] *See* Perkins Decl. ¶26.

will be subject to approval by the Court in accordance with the procedures established by the

Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the

*Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a),*

*and Local Rule 2016-2, Establishing Procedures for Interim Compensation and Reimbursement*

*of Expenses of Professionals* [Docket No. 123]. Accordingly, the Plan fully complies with the

requirements of section 1129(a)(4).

E.      **Section 1129(a)(5): The Plan Discloses Post-Effective Date Management**

77.      Section 1129(a)(5) of the Bankruptcy Code requires: (i) that the proponent of a plan

disclose the identity of any individual proposed to serve after confirmation as a director, officer,

or voting trustee of the debtor; (ii) that the appointment of such individuals be consistent with the

interests of creditors and shareholders and with public policy; and (iii) that the proponent disclose

the identity of any insider that will be employed by the reorganized debtor and the nature of the

compensation to be provided to such insider.[91]

78.      The Debtor has satisfied the foregoing requirements. As noted, the Debtor has

disclosed in the Plan Administrator Agreement (filed with the Plan Supplement) that Nancy A.

Washington, Esq., LLC is proposed to serve as Plan Administrator after the Effective Date. The

Plan Administrator was selected by the Committee, in consultation with the Debtor, and I therefore

believe that the appointment of the Plan Administrator is consistent with the interests of creditors.[92]

The Plan Administrator's and the Plan Oversight Committee's compensation, including fees and

expenses of the Plan Administrator, will be paid as set forth in the Plan and Plan Administrator

Agreement.

---

[91] 11 U.S.C. § 1129(a)(5).

[92] *See* Perkins Decl. ¶27.

30942483.2

F.    **Section 1129(a)(6): The Plan Does Not Require Governmental Approval of Rate Changes**

79.    Section 1129(a)(6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  As the Plan does not provide for any rate changes, section 1129(a)(6) is inapplicable here.[93]

G.    **Section 1129(a)(7): The Plan is in the Best Interests of Creditors**

80.    Section 1129(a)(7) is often referred to as the "best interests test" or the "liquidation test," and provides:

> With respect to each impaired class of claims or interests –
>
> (A) each holder of a claim or interest of such class –
>
> > (i) has accepted the plan; or
> >
> > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.][94]

81.    The best interests test focuses on individual dissenting creditors or equity interest holders rather than classes of claims or equity interests.[95]  Under the best interests test, each non-accepting creditor or equity holder must "receive . . . on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive. . . if the debtor were liquidated under chapter 7. . . on such date."[96]  The best

---

[93] *See id.* at ¶28.

[94] 11 U.S.C. § 1129(a)(7).

[95] *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 415, 434 (1999).

[96] *Id.* at 442 n. 13, citing section 1129(a)(7); *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).

interests test is generally satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than under a chapter 7 liquidation.[97]

82.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The Debtor, with the assistance of its financial advisors, have prepared a liquidation analysis comparing the range of recoveries generated under the Plan with a hypothetical chapter 7 liquidation (the "Liquidation Analysis").[98]

83.     As set forth in the Liquidation Analysis and the Davis Declaration, confirmation of the Plan will provide each holder of an Allowed Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code.[99]  The Debtor believes that if it were to incur the additional costs of a Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the Chapter 7 trustee, such costs would reduce potential distributions to Allowed Impaired Claims on a dollar-for-dollar basis.[100]  Conversion would also likely delay the liquidation and wind-down process and reduce the ultimate distribution, if any, to unsecured creditors.[101]

84.     In addition, if the Chapter 11 Case was converted to a chapter 7 case, Class 3 (General Unsecured Creditors) would not receive the additional recovery on account of the Holders

---

[97] *See In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006), *appeal dismissed*, No. 1:07CV30, 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") (citations omitted).

[98] *See* Disclosure Statement, Exhibit B.

[99] *Id.*; *see* Davis Decl. ¶ 11.

[100] *Id.*

[101] *Id.* at ¶ 24.

of GUC Settlement Claims' agreement to treat such GUC Settlement Claims as subordinated to General Unsecured Claims.

85.     Accordingly, because the recoveries provided under the Plan would exceed the recoveries that would be available in a chapter 7 liquidation, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.      Section 1129(a)(8): Acceptance by Impaired Classes**

86.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either vote to accept a plan or be unimpaired under that plan.[102]  As evidenced by the Ballot Report, Classes 3 and 4 voted to accept the Plan.

87.     As discussed above, Classes 1 and 2 are deemed to have accepted the Plan.  Holders of Claims in Class 5 and Interests in Class 6 are deemed to reject the Plan; however, the Plan may still be confirmed over the dissent of Class 5 and Class 6 because, as set forth below, the Debtor has satisfied the requirements for cramdown under section 1129(b) of the Bankruptcy Code.

**I.      Section 1129(a)(9): The Plan Complies with Statutorily Mandated Treatment of Administrative Claims and Priority Tax Claims**

88.     Section 1129(a)(9) of the Bankruptcy Code requires that holders of claims for administrative expenses allowed under section 503(b) of the Bankruptcy Code must receive on the effective date cash equal to the allowed amount of such claims.  The treatment of Administrative Claims and Priority Tax Claims, as set forth in sections 3.1.1 and 3.1.3 of the Plan, is in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code. Accordingly, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

---

[102] 11 U.S.C. § 1129(a)(8).

30942483.2

**J.      Section 1129(a)(10): The Plan has been Accepted by At Least One Impaired Class of Claims**

89.      Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  As detailed herein and in the Voting Report, each of the Voting Classes has voted to accept the Plan, exclusive of any acceptances by insiders.[103]   Accordingly, the Plan satisfies the requirements of section 1129(a)(10).

**K.      Section 1129(a)(11): The Plan is Feasible**

90.      Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the Bankruptcy Court determine that a plan is feasible.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[104]   As described below, the Plan is feasible within the meaning of this provision.

91.      The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether a plan is workable and has a reasonable likelihood of success.[105]   Moreover, "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."[106]

---

[103] *See* Voting Report.

[104] 11 U.S.C. § 1129(a)(11).

[105] *See Armstrong World Indus.*, 348 B.R. at 167; *In re NII Holdings, Inc.*, 288 B.R. 356, 364 (Bankr. D. Del. 2002); *In re The Leslie Fay Cos.*, 207 B.R. 764, 788–89 (Bankr. S.D.N.Y. 1997); *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995).

[106] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed, so as to protect against a visionary or speculative plan. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11], at 1129-34 (15th ed. 1984)).

92.    Applying the foregoing legal standards, the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Plan provides for the completion of the Debtor's liquidation and the distribution of its assets in accordance with the priority scheme set forth in the Bankruptcy Code and the terms of the Plan.  Therefore, confirmation of the Plan will not be followed by the need for further financial reorganization of the Debtor, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code.[107]

93.    Moreover, the Plan Administrator will have sufficient assets to accomplish its task under the Plan and the Debtor has already taken significant steps to wind down in an orderly fashion during the Chapter 11 Case, including, without limitation, selling substantially all of the Debtor's assets through the Court-approved sale.

94.    Based upon the foregoing, the Plan has more than a reasonable likelihood of success and satisfies the feasibility standard of section 1129(a)(11).[108]

**L.    Section 1129(a)(12): The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930**

95.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan."[109]  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority as administrative expenses.[110] In accordance with these provisions, Article XI of the Plan provides that the Post-Effective Date Debtor and the Plan Administrator shall be obligated to pay Statutory Fees to the U.S. Trustee until

---

[107] *See* Davis Decl. ¶13.

[108] *Id*. at ¶14.

[109] 11 U.S.C. § 1129(a)(12).

[110] 11 U.S.C. § 507(a)(1).

the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The Post-Effective Date Debtor will have adequate means to make such payments.[111]  Accordingly, the Plan complies with section 1129(a)(12).

     **M.**    **Sections 1129(a)(13)-(16) Are Inapplicable**

96.    The Debtor does not have any retiree benefit programs within the meaning of section 1114 of the Bankruptcy Code and, as such, section 1129(a)(13) does not apply to the Plan.[112]

97.    The Debtor is not required to pay domestic support obligations.[113]  Accordingly, section 1129(a)(14) does not apply.

98.    The Debtor is not an individual.[114]  Thus, section 1129(a)(15) does not apply.

99.    The Debtor is a moneyed, business, or commercial corporation.[115]  Therefore, section 1129(a)(16), which applies only to debtors that are nonprofit entities or trusts, does not apply.

     **N.**    **Section 1129(b): The Plan Satisfies the "Cramdown" Requirements**

100.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth by section 1129(b) of the Bankruptcy Code are satisfied.[116]  To confirm a plan that has not been accepted by all impaired classes (thereby

---

[111] *See* Davis Decl. ¶14; Perkins Decl. ¶36.

[112] *See* Perkins Decl. ¶37.

[113] *See* Perkins Decl. ¶38.

[114] *See* Perkins Decl. ¶39.

[115] *See* Perkins Decl. ¶40.

[116] *See* 11 U.S.C. § 1129(b).

failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[117]

### 1.    Section 1129(b)(1): The Plan Does Not Unfairly Discriminate

101.    Because Class 5 and Class 6 are deemed to have rejected the Plan, the requirements of Bankruptcy Code section 1129(a)(8) are not satisfied.    The Debtor therefore requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code, the "cramdown" provision, with respect to Class 5 (Subordinated Claims) and Class 6 (Interests).

102.    The Plan does not discriminate unfairly with respect to Class 5 and Class 6.[118]    Here, the Plan's treatment of Class 5 and Class 6 is proper because all similarly-situated Holders of Claims and Interests in Class 5 and Class 6, respectively, will receive the same treatment and the Plan's classification scheme rests on a legally acceptable rationale.[119]    Class 5 constitutes Subordinated Claims and Class 6 constitutes Interests, both of which are not similarly situated—legally or otherwise—to the Claim in any other Class.[120]    Accordingly, the Plan does not discriminate unfairly with respect to impaired Claims and Interests and satisfies the requirements of section 1129(b).

---

[117] *See* 11 U.S.C. § 1129(b)(1); *In re Mallinckrodt PLC*, 2022 Bankr. LEXIS 273 (stating that a debtor must show no unfair discrimination and that the recovery is fair and equitable to each class of claims to confirm a cramdown plan).

[118] *See* Perkins Decl. ¶31.

[119] *Id.*

[120] *Id.*

## 2.    Section 1129(b)(2): The Plan is Fair and Equitable

103.    The Plan is also "fair and equitable" with respect to Class 5 and Class 6 because the Plan complies with the "absolute priority" rule.[121]  Section 1129(b)(2)(C) of the Bankruptcy Code provides, among other things, that a plan is fair and equitable with respect to a class of interests if the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.[122]  The Plan satisfies section 1129(b)(2)(C) for Class 5 and Class 6, because no Class junior to Class 5, and any class junior to Class 6, shall not receive any distribution under the Plan on account of its junior interest.[123]  Accordingly, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

### O.    Section 1129(c): Only One Plan

104.    Only one Plan is before the Court.  Therefore, section 1129(c) of the Bankruptcy Code is satisfied or otherwise inapplicable.

### P.    Section 1129(d): The Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act

105.    Section 1129(d) provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  The Debtor commenced the Chapter 11 Case with a bona fide business need, and business objective, to maximize the value of its assets—which they have accomplished—and not to avoid taxes or the application of section 5 of the Securities Act.[124]  Specifically, the Debtor commenced the Chapter 11 Case after concluding in December 2022 that

---

[121] *Id.* at ¶32.

[122] 11 U.S.C. § 1129(b)(2)(C)(i)-(ii).

[123] *See* Plan, Art. III; *see also* Perkins Decl. ¶32.

[124] *See* Perkins Decl. ¶42.

it lacked sufficient capital to satisfy its ongoing expenses and that restructuring initiatives were necessary to preserve its liquidity and maintain operations.[125]  The Debtor then took several affirmative steps to extend its liquidity runway, engaged advisors, and conducted a prepetition marketing effort to explore the potential sale of its assets.[126]  The Debtor successfully consummated the sale to the successful bidder for the Debtor's assets, and such sale proceeds (and other assets) are now proposed to be distributed to creditors in accordance with the Plan.[127]  Accordingly, the Plan satisfies the requirements of section 1129(d).

Q.    **Section 1129(e): The Debtor's Chapter 11 Case Is Not a Small Business Case**

106.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[128]  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,490,925[] (excluding debt owed to 1 or more affiliates or insiders)."[129]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

R.    **Substantive Consolidation of the Debtor and Quanergy Perception Retroactively as of the Petition Date and Consummation of the Merger Transaction is Appropriate**

107.    As provided under the Plan, the Plan serves as a motion for approval of[130] the substantive consolidation of the Debtor and Quanergy Perception effective as of the Petition Date

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *See* 11 U.S.C. § 1129(e).

[129] 11 U.S.C. § 101(51D)(B).

[130] Courts in Delaware have generally held that an order approving substantive consolidation must include explicit language in the order that provides a retroactive application.  *In re Sunset Aviation, Inc.*, 468 B.R. 641, 646 (Bankr.

30942483.2

for all purposes, including the consolidation of assets and liabilities, the solicitation of acceptances of the Plan, and distributions to creditors, pursuant to section 105 of the Bankruptcy Code.[131]

108.    Specifically, if substantive consolidation is ordered as provided herein and in the Plan and the Confirmation Order, then effective as of the Petition Date (i) all assets and liabilities of the Debtor and Quanergy Perception will be treated as if they were merged, (ii) each Claim against the Debtor will be deemed a single Claim against and a single obligation of the consolidated Debtor, (iii) any Claims Filed or to be Filed in the Chapter 11 Case will be deemed single Claims against the consolidated Debtor, (iv) all transfers, disbursements and Distributions on account of Claims made by or on behalf of the Debtor's Estate hereunder will be deemed to be made by or on behalf of the consolidated Estate, (v) all guarantees by the Debtor shall be eliminated so that any Claim and any guarantee thereof by the Debtor, as well as any joint and/or several liability of the Debtor with respect to Quanergy Perception, shall be treated as one collective obligation of the consolidated Debtor, and (vi) any obligation of the Debtor as to Claims will be deemed to be one obligation of the consolidated Debtor.[132]

### 1.    *Substantive Consolidation of the Debtor and Quanergy Perception is Warranted Under the Third Circuit's* Owens Corning *Test*

109.    The Debtor believes the substantive consolidation of the Debtor and non-Debtor Quanergy Perception as of the Petition Date is warranted under the standard set forth by the Third Circuit in *Owens Corning*.

---

D. Del. 2011) (holding that "the language of the order—that is, whether it is expressly *nunc pro tunc*—is controlling; where there is no language suggesting that the order should be applied retroactively, the order will not be given that effect"). Accordingly, if such relief if approved by the Court, the Confirmation Order will provide express language as to the retroactive application effective as of the Petition Date of the substantive consolidation relief sought under the Plan.

[131] *See* Plan, Art. V. ¶5.2.

[132] *See id.*

110.    It is well established that bankruptcy courts may use their equitable powers under section 105(a) of the Bankruptcy Code to consolidate the assets and liabilities of different legal entities as if the assets were held, and the liabilities were owed, by a single legal entity, and erase inter-entity liabilities.[133]

111.    Moreover, the majority of courts have held that the bankruptcy court's equitable powers allow a court to substantively consolidate a debtor with a non-debtor affiliate or entity.[134] While the Third Circuit has not expressly considered the issue of substantive consolidation of a non-debtor and debtor, in *Owens Corning* the Third Circuit stated that the substantive consolidation of a debtor and non-debtor may be appropriate under certain circumstances.[135]

112.    The Third Circuit has adopted an "intentionally open-ended, equitable inquiry" to determine when substantive consolidation is appropriate.[136] Unlike the substantive consolidation tests in other circuits, the *Owens Corning* test has no set list of factors to determine if substantive consolidation is appropriate; rather, the Third Circuit in *Owens Corning* held that, absent consent, substantive consolidation is warranted where the proponent of substantive consolidation shows "that (i) prepetition they disregarded separateness so significantly their creditors relied on the

---

[133] *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005); *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (stating that "substantive consolidation usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies").

[134] *See, e.g.*, *In re Bonham*, 229 F.3d 750, 771 (9th Cir. 2000); *Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964); *In re Creditors Serv. Corp.*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996); *In re New Ctr. Hosp.*, 187 B.R. 560, 566-67 (E.D. Mich. 1995); *In re United Stairs Corp.*, 176 B.R. 359, 368 (Bankr. D.N.J. 1995); *In re Gucci*, 174 B.R. 401, 413 (Bankr. S.D.N.Y. 1994) ("[I]t is not a requirement [of substantive consolidation] that all the entities be debtors."); *Matter of Munford, Inc.*, 115 B.R. 390, 396 (Bankr. N.D. Ga. 1990).

[135] *Owens Corning*, 419 F.3d at 208, n.13 (noting that "[i]ndeed, [courts] have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors") (citing *Bonham*, 229 F.3d at 765).

[136] *See generally Owens Corning*, 419 F.3d 195.

breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[137]

113.    The *Owens Corning* test only applies absent consent to substantive consolidation.[138]  Notably, no creditor has objected to the Plan and the Committee supports the Plan and believes that the substantive consolidation of the Debtor and Quanergy Perception is appropriate.  Therefore, the substantive consolidation of the Debtor and Quanergy Perception is consensual, and the Court should approve such relief on this ground alone.

114.    Nevertheless, even if substantive consolidation of the Debtor and Quanergy Perception was not consensual, the relief requested herein is warranted under both prongs of the *Owens Corning* test.  As to the first prong, "[a] prima facie case for [substantive consolidation] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity."[139]  To satisfy this prong, the proponent "must show both (1) corporate disregard creating contractual expectations of creditors that they were dealing with [the entities to be consolidated] as one indistinguishable entity and (2) in their prepetition course of dealing, creditors actually and reasonably relied on the supposed unity of these entities."[140]

115.    For the reasons set forth in the Davis Declaration, prior to the Petition Date creditors relied on the unity of the entities in their dealings with the Debtor and Quanergy Perception as a

---

[137] *Owens Corning*, 419 F.3d at 211.

[138] *Id.*

[139] *Owens Corning*, 419 F.3d at 212.

[140] *Owens Corning*, 419 F.3d at 212.

consolidated entity.[141]  Prior to the Petition Date, the Debtor and Quanergy Perception conducted business under the same name and creditors and other parties conducted business with both entities as one consolidated entity.[142]  For example, contracts that originated prior to the Business Combination[143] with Legacy Quanergy (now Quanergy Perception) and remain in effect today, name the Debtor (*i.e.*, Quanergy Systems, Inc.), and not Quanergy Perception, as the contract counterparty, demonstrating that corporate disregard of entity separateness created contractual expectations of creditors that they were dealing with one consolidated entity.[144]

116.    Moreover, the Debtor and Quanergy Perception shared and utilize a comingled centralized consolidated account for receivables and payment of obligations, which is owned by Quanergy Perception, but in the name of Quanergy Systems, Inc.[145]  As such, the Debtor and Quanergy Perception transferred assets between, and satisfied liabilities of, each other, demonstrating that the creditors actually and reasonably relied on the supposed unity of the entities in satisfying purchase orders and other obligations under existing contracts with the Debtor and Quanergy Perception.[146]  Accordingly, the prepetition dealings of the Debtor and Quanergy Perception demonstrate that creditors relied on the breakdown of corporate entities and treated both entities as one.

---

[141] *See* Davis Decl. ¶ 23-27.

[142] *Id.* at ¶ 18.

[143] "Business Combination" shall have the meaning ascribed to it in the Disclosure Statement.

[144] Davis Decl. ¶ 23.

[145] *Id*.

[146] *Id*.

117.    The second prong under the *Owens Corning* test (*i.e.*, the hopeless comingling of assets and liabilities) is also satisfied.  As the Third Circuit explained in *Owens Corning*, this rationale is implicated in situations where "[w]ithout substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise Jarndyce and Jarndyce, the fictional suit in Dickens' Bleak House where only the professionals profited)."[147]  As described in the Davis Declaration, the assets and liabilities of the Debtor and Quanergy Perception are so scrambled postpetition that tracing and reconciling a reliable and complete allocation of assets and liabilities across the Debtor and Quanergy Perception would be exceptionally difficult, time consuming, and costly to the Debtor's estate and Quanergy Perception, such that all creditors would be in a worse position.[148]

118.    Following the Business Combination, the Debtor and Quanergy Perception disregarded accounting formalities such that both entities were treated as one under the Debtor's books and records and all financial reporting was completed on a consolidated basis under the name, Quanergy Systems, Inc.[149]  Additionally, as stated above, the Debtor and Quanergy Perception utilized a centralized comingled bank account that funded all receivables and payables of both entities.[150]

119.    In addition to lack of accounting formalities, there was also a lack of documentation regarding transactions among the Debtor and Quanergy Perception.[151]  For example, intercompany

---

[147] *Owens Corning*, 419 F.3d at 211, n.20.

[148] Davis Decl. ¶20.

[149] *Id.* at ¶24.

[150] *Id.* at ¶23.

[151] *Id.*

transactions between the Debtor and Quanergy Perception were not reported or allocated and there were no formal agreements memorializing the terms upon which the two entities did business with each other.[152]  Accordingly, funds regularly flowed on an undocumented basis between the Debtor and Quanergy Perception.[153]  As such, the Debtor's records simply do not contain documentation that could allow for the proper allocation of assets and liabilities based on formal agreements. Therefore, any effort to analyze and apportion each of the Debtor's and Quanergy Perception's share of assets and liabilities would inevitably be based on certain assumptions of historic assets and liabilities, which will not only require substantial resources but may also result in benefiting certain creditors at the expense of others.[154]  Such a process would likely be subject to challenge and ultimately result in costs that would drain Estate resources and further delay the conclusion of the Chapter 11 Case to the detriment of the Debtor's Estate, creditors, and other stakeholders.

120.    Accordingly, substantive consolidation of the Debtor and Quanergy Perception is warranted and in the best interest of the Estate and the Debtor's creditors based on the unique facts of the Chapter 11 Case, which demonstrate, as required under the *Owens Corning* test, that prior to the Petition Date, the Debtor's creditors relied on the breakdown of the entity borders and treated both entities as one and the assets and liabilities of the Debtor and Quanergy Perception are hopelessly comingled that separating them is prohibitive and harmful to creditors.

---

[152] *Id.*

[153] *Id.*

[154] *Id.* at ¶24.

### 2. Substantive Consolidation of the Debtor and Quanergy Perception Effective as of the Petition Date is Warranted

121.    In addition, the Court should exercise its discretion to order substantive consolidation effective as of the Petition Date.  In determining whether a substantive consolidation order should be given retroactive application, the majority of courts have adopted the standard articulated by the D.C. Circuit in *Auto-Train*.[155]  In *Auto-Train*, the D.C. Circuit held that "a bankruptcy court must undertake an additional and slightly different balancing process before using its equitable *nunc pro tunc* powers to give a consolidation order retroactive effect."[156]  Under the *Auto-Train* test for retroactive substantive consolidation, "a court should enter a consolidation order *nunc pro tunc* only when it is satisfied that the use of *nunc pro tunc* yields benefits greater than the harm it inflicts," which "inquiry will closely parallel that conducted with respect to consolidation."[157]

122.    While the Third Circuit has not addressed the issue of retroactive relief in the context of substantive consolidation,[158] in *Owens Corning*, the Third Circuit acknowledged that courts have approved retroactive substantive consolidation of a debtor and a non-debtor.[159]  In

---

[155] *In re Falls Event Ctr. LLC*, 600 BR 857, 869–870 (Bankr. D. Utah 2019); *In re Century Elects., Mfg., Inc.*, 310 BR 485, 493 (Bankr. D. Mass. 2004); *In re Kroh Bros. Dev. Co.*, 117 BR 499, 502 (WD Mo. 1989).

[156] *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C. Cir. 1987).

[157] *Auto-Train*, 810 F.2d at 277.

[158] In *Owens Corning*, the Third Circuit declined to follow the balancing test in *Auto-Train* to determine whether substantive consolidation is appropriate *prospectively*, but it did not opine on the standard for *retroactive* substantive consolidation.  *Owens Corning*, 419 F.3d at 210 (declining to adopt the *Auto-Train* balancing test to determine substantive consolidation because it presumably allows for substantive consolidation even where a creditor "relied on the separateness of the entities").

[159] *Owens Corning*, 419 F.3d at 208, n.13 (noting that courts have allowed "the substantive consolidation of debtors and non-debtors . . ., and in some cases consolidation retroactively (known also as *nunc pro tunc* consolidation) . . ."); *see also Bonham*, 229 F.3d at 771 (affirming a bankruptcy court's order of substantive consolidation *nunc pro tunc* based on the "discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether *nunc pro tunc* consolidation should be ordered").

addition, one case in Delaware decided prior to *Owens Corning* adopted the standard articulated

by the D.C. Circuit in *Auto-Train* to determine whether retroactive substantive consolidation is

appropriate.[160]

123.    As discussed in the Davis Declaration, the Debtor believes that substantive

consolidation effective as of the Petition Date is appropriate because the retroactive relief will

yield benefits greater than any potential harm it may inflict.   Retroactive relief will align the

Chapter 11 Case with creditor and stakeholder expectations, and importantly, move the case

towards its conclusion, with all the assets and liabilities of each entity consolidated in a single

entity as of the Petition Date.   As with the Merger Transaction described below, this relief is

consistent with the operations of the Debtor's Estate, the conduct of business between the Debtor

and Quanergy Perception, on the one hand, and its creditors, on the other hand, prior to and

throughout the Chapter 11 Case, and also with the expectations of all parties in consummating the

sale of substantially all of the Debtor's assets.   Accordingly, the benefit requirement under

*Auto-Train* is satisfied.   As to any potential harm, the Debtor believes that, as described above,

creditors have relied on the unity of the Debtor and Quanergy Perception such that any harm

resulting from retroactive relief would be outweighed by its benefit.

124.    Accordingly, the Debtor believes that retroactive substantive consolidation

pursuant to the Plan and Confirmation Order is a sound exercise of the Debtor's business judgment

and is appropriate under the circumstances of the Chapter 11 Case, and is in the best interest of the

Debtor's Estate and all creditors and parties in interests.[161]

---

[160] *In re GC Companies, Inc.*, 298 B.R. 226, 232 (D. Del. 2003) (in applying *Auto-Train*, the court held that substantive consolidation is not appropriate because "the Trustee would be deprived of substantial quarterly fees, while the estate's only benefit would be the ability to evade . . .payment of quarterly fees") (internal quotations omitted).

[161] Perkins Decl. ¶44.

### 3. *Entry Into the Merger Transaction Following the Retroactive Substantive Consolidation of the Debtor and Quanergy Perception is Warranted*

125.     As provided under the Plan, the Plan also serves as a motion seeking authorization to enter into the Merger Transaction with non-Debtor Quanergy Perception following the substantive consolidation of the Debtor and Quanergy Perception effective as of the Petition Date pursuant to the Plan, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

126.     As described in the Plan and the Davis Declaration, the proposed Merger Transaction contemplates a transaction in which Quanergy Perception will be merged with and into the Debtor, with the Debtor as the surviving entity pursuant to a parent-subsidiary short-form merger under section 253 of the Delaware General Corporate Law (the "DGCL").  Section 253 of the DGCL provides that, where a parent owns 90% or more of all classes of stock of another corporation, the board of the parent can approve a merger of the subsidiary into the parent without holding a meeting of the parent's stockholders.  Accordingly, in accordance with section 253 of the DGCL, the Debtor's Board adopted resolutions authorizing the entry into the Merger Transaction with Quanergy Perception, subject to the Court's approval.  The Merger Transaction will be effective upon the filing of the Certificate of Ownership and Merger in the office of the Secretary of State of the State of Delaware.

127.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."[162] Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[163]  Although

---

[162] 11 U.S.C. § 105(a).

[163] 11 U.S.C. § 363(b).

section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such transactions be based upon the sound business judgment of a debtor.[164]  Likewise, under Delaware law, merger transactions under section 253 of the DGCL are reviewed under the business judgment rule.[165]

128.    As detailed in the Perkins Declaration and Davis Declaration and based on the same reasons the Debtor seeks retroactive substantive consolidation, the Debtor believes that entering into the Merger Transaction following the retroactive substantive consolidation of the Debtor and Quanergy Perception pursuant to the Plan and Confirmation Order is a sound exercise of the Debtor's business judgment and is justified under the circumstances.[166]  As with substantive consolidation, the Merger Transaction will align the Chapter 11 Case and the operational structure of the Debtor's Estate with the expectations of the Debtor's creditors and other parties in interest, including the Buyer's expectations in consummating the Sale, and will allow the Debtor to avoid the potential harm in separating the Debtor's assets and liabilities from that of Quanergy Perception.[167]

129.    Accordingly, the Debtor believes that entering into the Merger Transaction after the substantive consolidation of the Debtor and Quanergy Perception effective as of the Petition

---

[164] *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit Court of Appeals adopted the "sound business judgment" test in *Abbotts Dairies*).

[165] *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (holding that the business judgment rule applies to merger transactions under section 253 of the DGCL and that "in order to serve its purpose, § 253 [of the DGCL] must be construed to obviate the requirement to establish entire fairness").

[166] Perkins Decl. ¶44.

[167] *Id.*; Davis Decl. ¶30.

Date is in the best interest of the Debtor's Estate, creditors, and parties in interest.[168]

## V.    CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER

130.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and to orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

131.    The Debtor respectfully submits that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry.[169]  The Debtor believes that an expeditious effectuation of the Plan will reduce costs and maximize the value of the Estate.  Thus, the Debtor respectfully requests a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

*[Remainder of Page Left Intentionally Blank]*

---

[168] Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the Merger Transaction and shall authorize the Debtor, following the retroactive substantive consolidation of the Debtor and Quanergy Perception, to effectuate the Merger Transaction by filing the Certificate of Ownership and Merger in the office of the Secretary of State of the State of Delaware.

[169] *See, e.g.*, *Alpha Latam Management, LLC*, Case No. 21-11109 (JKS) (Bankr. D. Del. Mar. 16, 2022) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Chaparral Energy, Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) (same); *In re Chisholm Oil and Gas Operating, LLC*, Case No. 20-11593 (BLS) (Bankr. D. Del. Sept. 23, 2020) (same); *In re Pyxus Int'l, Inc.*, Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) (same); *In re Skillsoft Corp.*, Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) (same).

## VI.    CONCLUSION

For all of the reasons set forth herein, the Debtor respectfully requests that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order, waiving the stay imposed by Bankruptcy Rule 3020(e), and granting such other and further relief as may be appropriate under the circumstances.


Dated: Wilmington, Delaware
        November 6, 2023

*/s/ Sean M. Beach*
Sean M. Beach (No. 4070)
Shane M. Reil (No. 6195)
Heather P. Smillie (No. 6923)
**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: sbeach@ycst.com
        sreil@ycst.com
        hsmillie@ycst.com

and

Cullen Drescher Speckhart (admitted *pro hac vice*)
Michael A. Klein (admitted *pro hac vice*)
Lauren A. Reichardt (admitted *pro hac vice*)
**COOLEY LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Email: cspeckhart@cooley.com
        mklein@cooley.com
        lreichardt@cooley.com

*Counsel for the Debtor and Debtor in Possession*

30942483.2